**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| In re: | § | |
| **CHRISTOPHER BRANDON JUDGE** | § | |
| **and RAQUELLE ANN JUDGE,** | § | |
| | § | **CHAPTER 7** |
| 〰〰〰 | § | |
| | § | **CASE NO. 23-41465** |
| **KRISTIN NEWMAN** | § | |
| *Plaintiff*, | § | **ADV. PRO. NO. 23-04066** |
| | § | |
| vs. | § | **JUDGE EDWARD L. MORRIS** |
| | § | |
| **CHRISTOPHER BRANDON JUDGE** | § | |
| **and RAQUELLE ANN JUDGE,** | § | |
| | § | |
| *Defendants*. | | |

---

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**
**APPENDIX**

---

Plaintiff KRISTIN NEWMAN, (hereinafter, "Plaintiff"), provides the following Appendix, which includes:

1. The Motion for Summary Judgment Exhibit List;

2. Affidavit of Jerry Brook in support of the Motion for Summary Judgment;

3. Affidavit of Kristin Newman in support of the Motion for Summary Judgment.


Dated December 16, 2024

Respectfully submitted,

By

/s/     *Michael S. Newman*
Michael S. Newman SBOT #14963900

Michael S. Newman, Attorney at Law, pllc
8813 N. Tarrant Parkway, Suite 252
North Richland Hills, Texas  76182-8461
Tel 817-656-8100
Email@NewmanLawTX.com
Attorney for Plaintiff

*/s/ Kristin Newman*
Kristin Newman
SBOT # 24102279
1409 Kaitlyn Lane
Keller, TX 76248
T:  817-480-5877
E-Mail:  kristinnewman@me.com

CERTIFICATE OF SERVICE - I hereby certify that a true and correct copy of the foregoing document was served on Christopher Brandon Judge and Raquelle Ann Judge, as Defendants, and Clayton L. Everett, as lead counsel, via according to the Federal Rules of Civil Procedure, Federal Rules of Bankruptcy Procedure

Via US Mail and Email:
 Clayton L. Everett, Texas State Bar No. 24065212
NORRED LAW, PLLC | 515 E. Border St. | Arlington, Texas 76010
Phone: (817) 704-3984 | clayton@norredlaw.com
Attorneys for Defendants

*/s/ Michael S. Newman*

MSJ Appendix 000002

# APPENDIX

# ATTACHMENT 1

MSJ Appendix 000003

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **In re:** | § | |
| **CHRISTOPHER BRANDON JUDGE** | § | |
| **and RAQUELLE ANN JUDGE,** | § | |
| | § | **CHAPTER 7** |
| **~~~~~~** | § | |
| | § | **CASE NO. 23-41465** |
| **KRISTIN NEWMAN** | § | |
| *Plaintiff*, | § | **ADV. PRO. NO.23-04066** |
| | § | |
| **vs.** | § | **JUDGE EDWARD L. MORRIS** |
| | § | |
| **CHRISTOPHER BRANDON JUDGE** | § | |
| **and RAQUELLE ANN JUDGE,** | § | |
| | § | |
| *Defendants*. | | |

---

### PLAINTIFF'S LIST OF EXHIBITS FOR MOTION FOR SUMMARY JUDGMENT

---

EXHIBITS:

A    DEFENDANTS' TWITTER ADVERTISEMENT FOR ARCHITECTURAL SERVICES

B    DRAW SCHEDULE

C    LLC DOCUMENTS FOR JUDGE FFW, LLC

D    TEXT MESSAGE THAT DOORS AND WINDOWS WERE ORDERED

E    CONTRACT FOR CONSTRUCTION OF PLAINTIFF'S HOME

F    INSPECTION REPORT OF TEXAS INSPECTOR

G    ENGINEERING REPORT OF FALKOFSKE ENGINEERING

H    BLACK BEAR CONSTRUCTION GROUP, INC. INVOICES

EXHIBIT A


DEFENDANTS' TWITTER ADVERTISEMENT FOR

ARCHITECTURAL SERVICES

MSJ Appendix 000005





← **Chris Judge**

2 Tweets




**Follow**

## Chris Judge
@judgedfw

Realtor | Architecture & Design | Land Development | Construction
Consulting #20M20

🗓 Joined December 2019

**29** Following **8** Followers

MSJ Appendix 000006



# TEXAS DEPARTMENT OF LICENSING & REGULATION

## *License Data Search Results.* [Search Again](#) | [Back](#)

No Records Found
You searched on:
Licensee Name Starts as "JUDGE, CHRIS"

| [License#](#) | [Exp Date](#) | Name | City | Zip | County | Phone |
|---|---|---|---|---|---|---|

### If license not found, please contact Customer Service at 800-803-9202

[Search Again](#) | [Back](#)

[Privacy and Security Policy](#) | [Accessibility](#) | [Open Records Policy](#) | [Link Policy](#)
[Compact with Texans](#) | [Report Suspected Fraud, Waste, or Abuse](#) | [Texas.gov](#) | [Statewide Search](#)
[Texas Homeland Security](#) | [Texas Transparency](#) | [Texas Veterans Portal](#) | [Contact TDLR](#)

TEXAS OCCUPATIONS CODE

Sec. 1051.001.  DEFINITIONS.  In this subtitle:

(1)  "Architect" means a person registered under this chapter to engage in the practice of architecture.

…

(7)  "Practice of architecture" means a service or creative work applying the art and science of developing design concepts, planning for functional relationships and intended uses, and establishing the form, appearance, aesthetics, and construction details for the construction, enlargement, or alteration of a building or environs intended for human use or occupancy, the proper application of which requires education, training, and experience in those matters.  The term includes:

(A)  establishing and documenting the form, aesthetics, materials, and construction technology for a building, group of buildings, or environs intended to be constructed or altered;

(B)  preparing, or supervising and controlling the preparation of, the architectural plans and specifications that include all integrated building systems and construction details, unless otherwise permitted under Section 1051.606(a)(4);

(C)  observing the construction, modification, or alteration of work to evaluate conformance with architectural plans and specifications described in Paragraph (B) for any building, group of buildings, or environs requiring an architect;

(D)  programming for construction projects, including identification of economic, legal, and natural constraints and determination of the scope and spatial relationship of functional elements;

(E)  recommending and overseeing appropriate construction project delivery systems;

(F)  consulting, investigating, and analyzing the design, form, aesthetics, materials, and construction technology used for the construction, enlargement, or alteration of a building or environs and providing expert opinion and testimony as necessary;

(G)  research to expand the knowledge base of the profession of architecture, including publishing or presenting findings in professional forums; and

(H)  teaching, administering, and developing pedagogical theory in academic settings offering architectural education.


Sec. 1051.0015.  PURPOSE OF REGISTRATION REQUIREMENT.  The purpose of Section 1051.701(a) is to:

(1)  safeguard life, health, property, and the public welfare;  and

(2)  protect the public against the irresponsible practice of architecture.


Sec. 1051.701.  REGISTRATION REQUIRED.  (a)  A person may not engage in the practice of architecture, or offer or attempt to engage in the practice of architecture, as defined in Section 1051.001(7)(A), (B), or (C) unless the person is registered as an architect under this chapter.

(b)  A firm, partnership, corporation, or association, including a firm, partnership, corporation, or joint stock association engaged in the practice of engineering under Section 1001.405, may engage in the practice of architecture, represent to the public that the entity is engaged in the practice of architecture or is offering architectural services, or use the word "architect" or "architecture" in any manner in its name _**only if any practice of architecture or architectural service performed on behalf of the entity is performed by or through a person registered as an architect under this chapter.**_

MSJ Appendix 000008

SUBCHAPTER  P.  OTHER  PENALTIES  AND  ENFORCEMENT  PROVISIONS:
ARCHITECTS

Sec. 1051.801.  CRIMINAL PENALTY.  (a)  A person, whether acting independently or on
behalf of the person's firm, commits an offense if, in violation of this chapter, the person:
(1)  engages in the practice of architecture, or offers or attempts to engage in the practice of
architecture;
(2)  prepares architectural plans or specifications for and observes or supervises the construction,
enlargement, or alteration of a building for another person;  or
(3)  advertises or puts out a sign, card, or drawing designating the person as an architect or
architectural designer or uses another business or professional title that uses a form of the word
"architect."
(b)  An offense under this section is a misdemeanor punishable by a fine of not less than $250
and not more than $1,000. Each day of violation is a separate offense.
(c)  In an action brought under this section, the board may be represented by a district or county
attorney or by other counsel as necessary.

EXHIBIT B


DRAW SCHEDULE

MSJ Appendix 000010



# PROJECT DRAW SCHEDULE

NEWMAN RESIDENCE
1224 DURHAM LANE
CLEBURNE, TEXAS 76033

## 1. DRAW SCHEDULE

**The Contract price is: $380,606.08, broken down into the following categories**
Base Price + Upgrades: $344,925.00
Allowances: $35,681.08

Payment shall be made to the Contractor in accordance with the following schedule:
NOTE: All expenses categorized as "Allowances" will be added to each Draw Cycle as purchased

**DEPOSIT: Design/Build Deposit: $10,000.00**

**DRAW #1: Start of Construction Draw: 5%**
- The purpose of this draw is to order window & doors immediately, permitting & engineering required to start the project

**DRAW #2: Ready to Pour: 10%**
- The release of this draw is due upon the completion & installation of Form Boards, Rough Plumbing, Plastic & Rebar, Underground Electrical & Pass of Pre-Pour Inspection by 3rd Party Inspector

**DRAW #3: Concrete Pour Complete: 10%**
- The release of this draw is due upon the completion of concrete pouring, finish & removal of form boards

**DRAW #4: Lumber Delivery: 10%**
- The release of this draw is due upon the delivery of the substantial amount of lumber to required to frame the home, which includes but not limited too wall studs, plates, ceiling joists, roof rafters, exterior sheathing & roof decking. Note: Some framing materials may lag behind as needed such as the cornice package (fascia, soffit & siding)

**DRAW #5: Framing Complete: 10%**
- The release of this draw is due upon the completion of rough framing, per plans (Rough framing is considered all walls, exterior sheathing, ceilings, roof structure, excluding exterior siding &

MSJ Appendix 000011

roofing) NOTE: Due to potential window delays, the exterior sheathing may enclose all window openings to allow for interior rough in work during the delayed period.

**DRAW #6: Rough-In Complete: 15%**
**-** The release of this draw is due upon the completion of Rough HVAC, Rough Electrical, Plumbing Top Out, Roofing (excluding any metal roofing), exterior cornice/siding & Pass of Rough In/ Pre-Drywall Inspection by 3rd Party Inspector

**DRAW #7: Sheetrock Complete: 10%**
- The release of this draw is due upon the completion of Spray Foam Insulation, Sheetrock Installation, Tape, Bed & Texture throughout the home (excluding showers or wet areas where hardibacker will be installed)

**DRAW #8: Interior Finish 1: 10%**
- The release of this draw is due upon the completion of cabinet installation, main flooring installation (all flooring excluding any carpet areas), countertop installation.

**DRAW #9: Interior Finish 2: 10%**
**-** The release of this draw is due upon the completion of trim & door installation, electrical final, HVAC final, Plumbing final

**DRAW #10: Final Payment: Remaining Balance**
- Final payment is due upon the completion of all paint, hardware and fixture installation, final touch up and completion of punch list.


## **2. CHANGE ORDERS**

Any change to the work or materials specified in this Contract may be made only by a written change order must be signed by the Owner and the Contractor. All approved change orders shall be, dated, shall reflect the new or additional work, any additional costs, and any change extending the time of completion.
**Any costs incurred by any change will be covered by the Owner(s).**


SEEN AND AGREED TO:


_____          _____
Owner                                  Date          Builder                                Date



_____
Owner                                  Date

MSJ Appendix 000012

EXHIBIT C


LLC DOCUMENTS FOR

JUDGE DFW, LLC

MSJ Appendix 000013

Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300



**Certificate of Formation
Limited Liability Company**

**Filed in the Office of the
Secretary of State of Texas
Filing #: 803714586 08/07/2020
Document #: 988177780002
Image Generated Electronically
for Web Filing**

### Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

## JUDGE DFW, LLC

### Article 2 – Registered Agent and Registered Office

☑A. The initial registered agent is an organization (cannot be company named above) by the name of:

## LEGALINC CORPORATE SERVICES INC.

### OR

☐B. The initial registered agent is an individual resident of the state whose name is set forth below:

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**10601 CLARENCE DR**
**SUITE 250  FRISCO  TX  75033**

### Consent of Registered Agent

☐A. A copy of the consent of registered agent is attached.

### OR

☑B. The consent of the registered agent is maintained by the entity.

### Article 3 - Governing Authority

☐A. The limited liability company is to be managed by managers.

### OR

☑B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Managing Member 1:  **RAQUELLE    RENFRO**       Title:  **Managing Member**

Address:  **550 RESERVE ST STE 650    SOUTHLAKE  TX, USA  76092**

Managing Member 2:  **CHRISTOPHER    JUDGE**       Title:  **Managing Member**

Address:  **550 RESERVE ST STE 650    SOUTHLAKE  TX, USA  76092**

### Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

**Supplemental Provisions / Information**

MSJ Appendix 000014

[The attached addendum, if any, is incorporated herein by reference.]

## Organizer

The name and address of the organizer are set forth below.

**LOVETTE DOBSON**          **17350 STATE HWY 249 #220 HOUSTON TX 77064**

### Effectiveness of Filing

☑ A. This document becomes effective when the document is filed by the secretary of state.

### OR

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

### Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**LOVETTE DOBSON**

Signature of Organizer

**FILING OFFICE COPY**

MSJ Appendix 000015

| **Form 424** **(Revised 05/11)** |  | This space reserved for office use. |
|---|---|---|
| Submit in duplicate to: Secretary of State P.O. Box 13697 Austin, TX 78711-3697 512 463-5555 FAX: 512/463-5709 **Filing Fee: See instructions** | **Certificate of Amendment** | |

# Entity Information

The name of the filing entity is:

JUDGE DFW, LLC
_____

State the name of the entity as currently shown in the records of the secretary of state.  If the amendment changes the name of the entity, state the old name and not the new name.

The filing entity is a: (Select the appropriate entity type below.)

☐ For-profit Corporation               ☐ Professional Corporation

☐ Nonprofit Corporation               ☐ Professional Limited Liability Company

☐ Cooperative Association             ☐ Professional Association

☑ Limited Liability Company           ☐ Limited Partnership

The file number issued to the filing entity by the secretary of state is:  0803714586

The date of formation of the entity is:    08/07/2020

# Amendments

### 1.  Amended Name

(If the purpose of the certificate of amendment is to change the name of the entity, use the following statement)

The amendment changes the certificate of formation to change the article or provision that names the filing entity. The article or provision is amended to read as follows:

The name of the filing entity is: (state the new name of the entity below)

_____

The name of the entity must contain an organizational designation or accepted abbreviation of such term, as applicable.

### 2.  Amended Registered Agent/Registered Office

The amendment changes the certificate of formation to change the article or provision stating the name of the registered agent and the registered office address of the filing entity.  The article or provision is amended to read as follows:

MSJ Appendix 000016

Registered Agent
(Complete either A or B, but not both. Also complete C.)

☐ A. The registered agent is an organization (cannot be entity named above) by the name of:

_____

**OR**

☐ B. The registered agent is an individual resident of the state whose name is:

_____
*First Name*                              *M.I.*          *Last Name*                              *Suffix*

The person executing this instrument affirms that the person designated as the new registered agent has consented to serve as registered agent.

C. The business address of the registered agent and the registered office address is:

                                                                            TX
_____
*Street Address (No P.O. Box)*                          *City*                          *State*    *Zip Code*

### 3. Other Added, Altered, or Deleted Provisions

Other changes or additions to the certificate of formation may be made in the space provided below. If the space provided is insufficient, incorporate the additional text by providing an attachment to this form. Please read the instructions to this form for further information on format.

Text Area (The attached addendum, if any, is incorporated herein by reference.)

☐ **Add** each of the following provisions to the certificate of formation. The identification or reference of the added provision and the full text are as follows:

☑ **Alter** each of the following provisions of the certificate of formation. The identification or reference of the altered provision and the full text of the provision as amended are as follows:

ARTICLE 3. CHANGE THE MEMBER'S LEGAL NAME
        from RAQUELLE RENFRO to RAQUELLE JUDGE

☐ **Delete** each of the provisions identified below from the certificate of formation.

## Statement of Approval

The amendments to the certificate of formation have been approved in the manner required by the Texas Business Organizations Code and by the governing documents of the entity.

MSJ Appendix 000017

## Effectiveness of Filing (Select either A, B, or C.)

A. ☑ This document becomes effective when the document is filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing.  The delayed effective date is: _____

C. ☐ This document takes effect upon the occurrence of a future event or fact, other than the passage of time.  The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

[blank box]

## Execution

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date:    06/30/2021

By:    _Christopher Judge_____

Signature of authorized person

Christopher Judge
Printed or typed name of authorized person (see instructions)



Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697

Jane Nelson
Secretary of State

# Office of the Secretary of State

### Certificate of Fact

The undersigned, as Secretary of State of Texas, does hereby certify that the document, Certificate of Formation for JUDGE DFW, LLC (file number 803714586), a Domestic Limited Liability Company (LLC), was filed in this office on August 07, 2020.

It is further certified that the entity status in Texas is forfeited existence. The entity became inactive on June 24, 2022.

In testimony whereof, I have hereunto signed my name officially and caused to be impressed hereon the Seal of State at my office in Austin, Texas on March 11, 2023.



Jane Nelson
Secretary of State

*Come visit us on the internet at https://www.sos.texas.gov/*

Phone: (512) 463-5555
Fax: (512) 463-5709
Dial: 7-1-1 for Relay Services
Prepared by: SOS-WEB
TID: 10264
Document: 1228770270003

EXHIBIT D


TEXT MESSAGE OF RAQUELLE JUDGE ADVISING WINDOWS

AND DOORS HAD BEEN ORDERED

MSJ Appendix 000020



**12:01**

**CJ  RJ**

2 People >

Dec 11, 2021 at 9:34 AM

Good morning! Two questions for the master closet: (1) is it possible to make the window operable? (2) is it possible to add a fan in there?

I want to make sure the washer/dryer doesn't make the room hot.

Raquelle Judge

Hey! We can do a fan instead of a chandelier if you want! (Keep in mind though, your normal laundry room doesn't get hot so idk why your closet would)

we Just placed the window package 

I guess that's true too. Ok nvm! Haha thanks for letting me run things by you!!

Dec 28, 2021 at 1:01PM

Raquelle Judge

It's official! We're booked for 2022! We're excited that you're one of our clients for the year 

We strongly believe in quality over quantity and take a lot of pride in our builds. In order to do that for our clients we put a cap on how many

iMessage

EXHIBIT E

CONTRACT FOR CONSTRUCTION OF PLAINTIFF'S HOME

MSJ Appendix 000022

# DESIGN & BUILD CONTRACT



This Contract dated 08/02/2021 is made by and between these parties: **Judge DFW, LLC**, referred to as the "**Contractor**", and **Kristin Newman**, who are referred to as the "**Owner(s)**".

The Contractor's business address :
PO Box 607, Ponder, Texas 76259
The Contractor's Telephone number: (817) 975-3530

The Owner(s) current addresses: 1409 Kaitlyn Lane, Keller, TX 76248
The Owner(s) Telephone number(s): 817-480-5877

The Owner(s) is possessed (Or will posses) of a parcel of real estate, located at the following address: 1224 Durham, Cleburne, TX
This parcel will be referred to as the "Premises" in this Contract.

## 1. SCOPE OF THE WORK

The Contractor agrees to construct a Single Family Residence ("Home") upon the Premises. The Contractor shall furnish all the labor and materials, as specified in "Budget A" (to be attached via amendment upon final budgeting & design) for such work, and shall obtain all required building permits.

Contractor shall obtain all deed restrictions, subdivision covenants, easements, liens or other encumbrances affecting the Premises, and also a lot survey depicting applicable setback lines. The Contractor shall also obtain all necessary approvals from any architectural review board or Home Owners' Association as may be applicable, and shall bear all costs associated with obtaining these approvals.

## 2. COMPENSATION and FINANCING

**The Contract price is: $370,000.00**
(Price is contingent upon final plans & budgeting)

Payment shall be made to the Contractor in accordance with the following provisions:

**Design/Build Deposit: $10,000.00** - This deposit will start & release the construction documents to the :"Owners" with full rights to use as they desire. In the event that the Owners decided to move forward with another builder or terminate the project, the Design/Build Deposit will become non-refundable and retained by Judge DFW, LLC.



**Start of Construction Deposit**: **5%** of the final contract price will be due at the beginning of construction as operational funds. This deposit will be applied to the final payment when all work is completed. If a construction loan is being utilized, the 5% will be drawn from the loan.

**Draw Process** – Owner(s) shall pay to the Contractor progress payments based on weekly expenses of materials or payments made to subcontractors on completed work. A billing statement shall be provided by the Contractor to the Owner(s) on the last day of the schedule period, or as soon thereafter as reasonably possible. Payment shall be made by the Owner(s) not more than three (3) days from the date of billing. If financing is run through a bank, funds must be released to Judge DFW, LLC immediately following bank funding.

## 3. COMMENCEMENT AND TIME OF COMPLETION

Commencement of the work is defined as no earlier than the beginning of substantial excavation for the foundations, footings or base of the new construction, and unless postponed by excusable delay, the Contractor will commence work **on or before 7 days** after the deposits are paid and approval by the required governing bodies and final authorization by the Owner(s) to proceed. All work shall be completed by **April 1, 2021**. The construction shall be deemed completed upon the issuance of the certificate of occupancy, or if there is none, upon a determination of the Contractor that the Home is substantially complete and ready for occupancy, or upon the occupancy of the Home by the Buyers or any third party. Time is of the essence, and the Contractor shall use his best efforts to complete construction by the completion date. However, if reasons beyond the Contractor's control cause any delay in the progress of the work, the required date of completion shall be extended for a period equal to 1 ½ days for each day of excusable delay. Excusable delay shall include delay occasioned by unforeseen site conditions, such as by acts of God, by acts of war, terrorism or criminal activity, by inclement weather to the extent that work is not reasonably possible, by boundary disputes, or by disputes with Home Owner Associations, architectural review committees, or zoning officials, by labor strikes, by changes in governmental laws or regulations, by acts or the failure to act by governmental agencies and their employees, or by utility companies, or by such additional occurrences that impede the progress of the work that are outside the Contractor's direction or ability to control.

## 4. INSURANCE – RISK OF LOSS

During the course of this Contract:
(a) The Contractor shall furnish and be responsible for the cost of General Liability Insurance and extended coverage insurance upon the work in progress. In the event of a covered casualty loss, all proceeds of this insurance shall be utilized for payment of repair or replacement costs for covered Premises damage. The Contractor shall be responsible for payment of repair and replacement costs in the amount of the deductible, and for any insufficiency in the cost of replacement and repair over and above the amount of the insurance proceeds.
(b) The Contractor shall maintain and be responsible for the cost of the Contractor's general liability insurance, workers' compensation insurance, and unemployment insurance, with coverage in accordance with the requirements of state law.
(c) The Contractor shall be responsible for obtaining and verifying certificates of insurance from all Subcontractors.




## 5. CHANGE ORDERS

Any change to the work or materials specified in this Contract may be made only by a written change order must be signed by the Owner and the Contractor. All approved change orders shall be, dated, shall reflect the new or additional work, any additional costs, and any change extending the time of completion.
**Any costs incurred by any change will be covered by the Owner(s).**

## 6. ACCESS – SITE VISITS – INTERFERENCE WITH SUBCONTRACTORS

The Owner(s) shall at all times have access to the Premises and the right to inspect the work. However, construction sites can be hazardous. If the Owner(s) or an invitee enters the Premises during the course of construction, they do so at their own risk. The Owner(s) shall make no liability claim on their own behalf against the Contractor for any damage or injury occurring on the Premises, and will indemnify, defend and hold the Contractor harmless from all third party liability claims made by any agent, employee, or invitee of the Owner(s), to include payment of the Contractor's reasonable legal expenses.

The Owner(s) agrees not to interfere with any work being performed on the Premises, or with any trade contractor, or laborer on site. The Owner(s) will not communicate directly with any trade contractor or laborer regarding the method or manner of their work, and all statements or inquiries intended for trade contractors or laborers will be directed to the Contractor. Further, the Owner(s) will not hire or attempt to hire any trade contractor or laborer for any work on the Premises, whether specified or additional, during the course of the construction without the express written permission of the Contractor.

## 7. MECHANICS LIENS

The Contractor shall promptly pay all workers, subcontractors, and material suppliers that furnish any labor, materials or equipment for the work performed on the Premises. The Contractor shall obtain lien waivers or releases from all subcontractors and material suppliers, and deliver the lien waivers or releases to the requesting party or mandated recipient.

## 8. FINAL INSPECTION and CERTIFICATE OF ACCEPTANCE

Within three (3) days from receipt of the certificate of occupancy, or if there is none, within three (3) days after receiving the Contractor's certificate of substantial completion, the Owner(s) or a designated representative, will inspect the Premises in the Contractor's presence. At the time of the inspection, the Owner(s) or their designated representative will deliver to the Contractor a signed punchlist identifying any workmanship or materials not conforming to the Contract plans and specifications, and/or any claimed deficiencies in workmanship or materials. The standard for determining if any condition constitutes a deficiency shall be governed by the performance guideline description as set out in the current edition of "Residential Construction Performance Guidelines", a publication of the National Association of Home Builders. The Contractor at his own expense shall correct all workmanship and materials that do not substantially conform to



DocuSign Envelope ID: 88E2DE96-A262-4BE6-A178-31D0AEEC0A4B

Contract specifications, and shall rectify all deficiencies in accordance with the prescribed "corrective measure" as set out in the "Residential Construction Performance Guidelines". Upon completion of the punchlist work, the Owner(s) shall deliver to the Contractor a signed Certificate of Acceptance on the attached form that is marked Exhibit D. Nothing in this section shall serve to delay or amend the due date of final payment as set forth in Section 2.

## 9. CONTRACTOR'S WARRANTY

The Contractor has provided to the Owner(s) an Express Limited Warranty Agreement for all the materials installed and workmanship performed by the Contractor under this Contract

The contractor will also provide the Owner(s) a Third Party warranty, referred to as a 1-2-10 Warranty. 1 Year Workmanship, 2 Year Manufacturing Warranty, 10 Year Structural Warranty.

IT IS AGREED THAT THE TERMS OF THIS EXPRESS LIMITED WARRANTY AGREEMENT CONSTITUTE THE OWNER(S)' SOLE AND EXCLUSIVE REMEDY FOR ANY AND ALL CLAIMS ARISING OUT OF DEFECTS IN MATERIALS OR CONSTRUCTION. ANY STATUTORY WARRANTIES AND ANY IMPLIED WARRANTIES, INCLUDING AN IMPLIED WARRANTY OF WORKMANLIKE CONSTRUCTION, AN IMPLIED WARRANTY OF HABITABILITY, OR AN IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR USE, ARE HEREBY WAIVED AND DISCLAIMED.

## 10. CANCELLATION

Cancellation by Mutual Consent - This Contract may be cancelled by mutual consent at any time upon execution of a termination agreement signed by both parties.

Cancellation by Contractor - If the Owner(s) fails to make any payment due, or fails to comply with any other material obligation under this Contract, unless cured, the Contractor at his sole option may cancel the Contract in accordance with the procedures stated below.

Cancellation by Owner(s) - If the Contractor fails to supply proper materials or skilled workers, fails to pay for materials, labor or equipment, fails to perform this Contract in a timely manner, or otherwise materially breaches the Contract provisions, unless cured, the Owner(s) at his or her sole option may cancel this Contract in accordance with the procedures stated below.

Cancellation Procedures - The party intending to cancel will deliver to the other party a written notice of intention to cancel. Said notice will be dated and signed, and will list the specific cause or causes that would justify cancellation. The receiving party will have seven (7) days from the date of the notice (or such additional time as the parties may agree to in writing) to remedy or cure all listed causes that justify cancellation. Upon the expiration of seven (7) days without remedy or cure, the Contract may be cancelled upon delivery to the non-canceling party of a written cancellation document. Any cancellation sought by the Owner(s) will be contingent on payment in full to the Contractor of all costs and. Upon cancellation, the Contractor shall remove all his tools, equipment, and materials from the Premises, and shall not thereafter go upon the Premises, except by invitation, pursuant the terms of the Warranty, the provisions of any notice and opportunity to repair laws or agreement, or as otherwise may be permitted by state law.




## 11 . NOTICES

Any notice or other document required or permitted to be delivered under this Contract may be given by first class mail, or may be hand delivered to any of the authorized individuals listed below.

The Owner(s) - authorized address, e-mail addresses, telephone numbers:
The Owner(s) Information: Kristin Newman
Phone Number: 817-480-5877
Email Address: knewman@andersonriddle.com

The Contractor- authorized address, e-mail addresses, telephone numbers:
PO Box 607, Ponder, Texas 76259
chris@judgedfw.com, raquelle@judgedfw.com
(817) 975-3530, (682) 365-3003

## 12. MEDIATION and ARBITRATION – SMALL CLAIMS

Any and all disputes between the parties, including but not limited to a dispute relating to or arising out of any alleged breach of Contract, any alleged breach of a statutory obligation, any claim for damages against the Contractor, any claim of negligence, fraud, breach of the Express Limited Warranty Agreement, breach of implied warranty, or any consumer protection act violation, shall be resolved as follows:

Either party may request mediation by giving written notice to the other. The notice shall include a brief description of the disagreement. Mediation of disputes is encouraged, but neither party shall be required to accept mediation. If an offer to mediate is accepted, the parties shall select a mutually agreed mediator, and shall schedule a mediation session as soon as reasonably possible. Mediated results are nonbinding, but the parties may reduce any mediated resolution to writing and execute it as a binding Contract. The costs of mediation shall be equally divided by the parties

## 13. ATTORNEYS FEES

Unless otherwise provided for in the terms of this Contract, all reasonable attorneys' fees and legal expenses incurred by one party, that arise out of the breach of this Contract by the other party, or that arise by a failure in the other party's obligations, shall be paid by the party who has breached or who has otherwise failed to perform.

## 14. JURISDICTION

The provisions of this Contract shall be interpreted in accordance with the laws of the state of Texas.

## 15. SEVERABILITY




Should any clause or provision of this Contract be ruled invalid or unenforceable in any court of competent jurisdiction, the remainder of the Contract shall nevertheless survive in full force and effect.

## 16. SIGNATURES

Should two or more signatories be classified as Owners under this Contract, the signature of one Owner signatory on any supplemental document required or permitted under the terms of this Contract shall be sufficient to bind all, except where it is specifically provided that the signatures of all Owners or parties are required.

## 17. ENTIRE CONTRACT

This Contract, together with exhibits and any supplementary document specifically referenced in this Contract, constitutes the entire agreement between Contractor and the Owner(s) with respect to all matters contained in this Contract, superseding all prior oral or written representations and agreements. No waiver, modification or change of any of the Contract terms shall be valid unless in writing and signed by all parties hereto, except for change orders which shall be valid when signed by one Owner.

SEEN AND AGREED TO:

_DocuSigned by:_
_Kristin Newman_                      8/9/2021 | 11:13 AM
——————————————————
F6A88EA6677143F...

_DocuSigned by:_
_Chris Judge_                         8/9/2021 | 11:45 AM CDT
——————————————————
D907020650CA49C...

Owner                         Date          Builder                        Date

——————————————————
Owner                         Date

MSJ Appendix 000028

EXHIBIT F


INSPECTION REPORT OF

TEXAS INSPECTOR

MSJ Appendix 000029



Texas Inspector
7401 Vineyard Trail
Garland, TX  75044
214-616-0112

http://www.texasinspector.com



# PROPERTY INSPECTION REPORT

---

**Prepared For:**     Kristin (or Michael) Newman
(Name of Client)

**Concerning:**     1224 Durham Lane, Celburne, TX  76033
(Address or Other Identification of Inspected Property)

**By:**     Aaron D. Miller, ACI, CEI, CMI, CPI, CRI,          (Date): 8/30/22
MTI, RCI

International Code Council (ICC) Residential
Combination Inspector 5082671-R5
International Code Council (ICC) Residential
Building Inspector 5082671-B1
International Code Council (ICC) Residential
Electrical Inspector 5082671-E1
International Code Council (ICC) Residential
Mechanical Inspector 5082671-M1
International Code Council (ICC) Residential
Plumbing Inspector 5082671-P1
American Society of Home Inspectors (ASHI)
Certified Inspector No. 203652
National Association of Home Inspectors
(NAHI) Certified Real Estate Inspector, CRI
200353
International Association of Certified Home
Inspectors (INACHI), Certified Professional

---

MSJ Appendix 000030

Inspector No. NACHI05060294
Master Inspector Certification Board, Board-Certified Master Inspector
Texas Professional Real Estate Inspectors Association (TPREIA) Master TPREIA Inspector (MTI)
Texas Real Estate Commission (TREC) Professional Inspector 4336
Texas Department of Agriculture, Structural Pest Control Service Registered Business No. 11379
Texas Department of Agriculture, Structural Pest Control Service Certified Applicator No. 40247
Exterior Design Institute (EDI/EIMA) EIFS Third Party Inspector and Moisture Analyst (CEI) MA TX-29
Post-Tensioning Institute Level One Certificate for Unbonded Prestressed Post-Tensioned Concrete Installer No. 320054833
AAMA InstallationMasters Certified Window and Door Installer
CertainTeed® Master Shingle Applicator
Building Officials Association of Texas (BOAT)
Texas Residential Construction Commission, Legacy
City of Garland, Texas Unified Building Standards Commission Member
North American Deck and Railing Association (NADRA), Member
Master Deck Professional Certification, NADRA
AAMA Door and Window Installation Master Certification
Age Safe America, Senior Home Safety Specialist

| | |
|---|---|
| (Name and License Number of Inspector) | (Date) 8/30/22 |

## PURPOSE, LIMITATIONS AND INSPECTOR / CLIENT RESPONSIBILITIES

**PURPOSE OF INSPECTION**
**A real estate inspection is a visual survey of a structure and a basic performance evaluation of the systems and components of a building. It provides information regarding the general condition of a residence at the time the inspection was conducted. It is important that you carefully read ALL of this information. Ask the inspector to clarify any items or comments that are unclear.**

**RESPONSIBILITY OF THE INSPECTOR**
**This inspection is governed by the Texas Real Estate Commission (TREC) Standards of Practice (SOPs), which dictates the minimum requirements for a real estate inspection.**

**The inspector IS required to:**
**• use this Property Inspection Report form for the inspection;**
**• inspect only those components and conditions that are present, visible, and accessible at the time of the inspection;**

• indicate whether each item was inspected, not inspected, or not present;
• indicate an item as Deficient (D) if a condition exists that adversely and materially affects the performance of a system or component OR constitutes a hazard to life, limb or property as specified by the SOPs; and
• explain the inspector's findings in the corresponding section in the body of the report form.

The inspector IS NOT required to:
• identify all potential hazards;
• turn on decommissioned equipment, systems, utilities, or apply an open flame or light a pilot to operate any appliance;
• climb over obstacles, move furnishings or stored items;
• prioritize or emphasize the importance of one deficiency over another;
• provide follow-up services to verify that proper repairs have been made; or
• inspect system or component listed under the optional section of the SOPs (22 TAC 535.233).

RESPONSIBILITY OF THE CLIENT
While items identified as Deficient (D) in an inspection report DO NOT obligate any party to make repairs or take other actions, in the event that any further evaluations are needed, it is the responsibility of the client to obtain further evaluations and/or cost estimates from qualified service professionals regarding any items reported as Deficient (D). It is recommended that any further evaluations and/or cost estimates take place prior to the expiration of any contractual time limitations, such as option periods.

Please Note: Evaluations performed by service professionals in response to items reported as Deficient (D) on the report may lead to the discovery of additional deficiencies that were not present, visible, or accessible at the time of the inspection. Any repairs made after the date of the inspection may render information contained in this report obsolete or invalid.

REPORT LIMITATIONS
This report is provided for the benefit of the named client and is based on observations made by the named inspector on the date the inspection was performed (indicated above).
ONLY those items specifically noted as being inspected on the report were inspected. This inspection IS NOT:
• a technically exhaustive inspection of the structure, its systems, or its components and may not reveal all deficiencies;
• an inspection to verify compliance with any building codes;
• an inspection to verify compliance with manufacturer's installation instructions for any system or component and DOES NOT imply insurability or warrantability of the structure or its components.

NOTICE CONCERNING HAZARDOUS CONDITIONS, DEFICIENCIES, AND CONTRACTUAL AGREEMENTS

Conditions may be present in your home that did not violate building codes or common practices in effect when the home was constructed but are considered hazardous by today's standards. Such conditions that were part of the home prior to the adoption of any current codes prohibiting them may not be required to be updated to meet current code requirements. However, if it can be reasonably determined that they are present at the time of the inspection, the potential for injury or property loss from these conditions is significant enough to require inspectors to report them as Deficient (D). Examples of such hazardous conditions include:
• malfunctioning, improperly installed, or missing ground fault circuit protection (GFCI) devices and arc-fault devices;
• ordinary glass in locations where modern construction techniques call for safety glass;
• malfunctioning or lack of fire safety features such as smoke alarms, fire-rated doors in certain locations, and functional emergency escape and rescue openings in bedrooms;
• malfunctioning carbon monoxide alarms;
• excessive spacing between balusters on stairways and porches;

MSJ Appendix 000032

• improperly installed appliances;
• improperly installed or defective safety devices;
• lack of electrical bonding and grounding; and
• lack of bonding on gas piping, including corrugated stainless steel tubing (CSST).

**Please Note: items identified as Deficient (D) in an inspection report DO NOT obligate any party to make  repairs or take other actions.**

**The decision to correct a hazard or any deficiency identified in an inspection report is left up to the parties to the contract for the sale or purchase of the home.**

**This property inspection report may include an inspection agreement (contract), addenda, and  other  information related to property conditions.**

**INFORMATION INCLUDED UNDER "ADDITIONAL INFORMATION PROVIDED BY INSPECTOR", OR PROVIDED AS AN ATTACHMENT WITH THE STANDARD FORM, IS NOT REQUIRED BY THE COMMISSION AND MAY CONTAIN CONTRACTUAL TERMS BETWEEN THE INSPECTOR AND YOU, AS THE CLIENT. THE COMMISSION DOES NOT REGULATE CONTRACTUAL TERMS BETWEEN PARTIES. IF YOU  DO NOT UNDERSTAND THE EFFECT OF ANY CONTRACTUAL TERM CONTAINED IN THIS SECTION OR ANY ATTACHMENTS, CONSULT AN ATTORNEY.**

## ADDITIONAL INFORMATION PROVIDED BY INSPECTOR

"Under current law, TREC's (the Texas Real Estate Commission's) jurisdiction extends to any inspection of real property performed in anticipation of a purchase or sale of real estate. This includes any inspection in connection with the anticipated purchase of real estate from a builder, including phase inspections (but not the inspection of a structure being constructed on land already owned by the homeowner-to-be). Likewise, any inspection performed for an owner in anticipation of selling falls under TREC's jurisdiction, regardless of whether there is a specific buyer in mind at the time of the inspection." – Devon Bijansky, Deputy General Counsel, Texas Real Estate Commission.

Additional attachments provided by Texas Inspector that make this inspection report complete are listed but not limited to the following: Property Inspection Agreement, Embedded Links to Additional Information of Systems, Addenda, Information Attached or Provided under Separate Cover, but not Paginated, et al. These contain crucial, pertinent information and the client is strongly urged to treat them as such. Failure to do so will result in a curtailed understanding of the property condition.

The digital pictures in this report are a random sampling of the conditions or damages in a representative number of areas chosen and should not be considered to show all of the conditions, damages or deficiencies observed. There will be some conditions, damages or deficiencies not represented with digital imaging. All such images remain the property of the Inspector.

The use of "special tools" is at the discretion of the inspector in order to form opinions as he sees fit in certain instances.

Any suggestions, and recommendations we may provide within our report regarding hazardous and/or unsatisfactory conditions should immediately be brought to the attention of a qualified licensed contractor or specialist to provide you with a full in-depth evaluation to determine if additional areas of concern exist within the building's components, or systems, and furnish a written cost estimate for corrective work or replacement that may be suggested within our report.  It is strongly recommended that a competent, bonded, and insured State- or City-Licensed Contractor perform all corrective work.

You are strongly urged to obtain a C.L.U.E. report on this home in an attempt to discover what, if any, insurance damage claims have been filed on this property, prior to closing escrow on this property. See:
https://personalreports.lexisnexis.com/

You are strongly urged to ascertain if any hail damages may have been incurred by this property in the past by referring to:  http://weathersource.com/zip-code-historical-weather

MSJ Appendix 000033

You are strongly urged to locate, acquire, read and thoroughly understand all documentation pertinent to the construction, remodeling, maintenance and repair of this property including, but not limited to: design drawings, engineering documents, geo-technical testing documents, building inspection permits, surveys, appraisals, seller's disclosure statements, maintenance schedules, mechanical appliance and systems owner's manuals, history of wood-destroying insect activity and treatment reports, et al., prior to the end of any time periods associated with the sale or purchase of this property.

You are strongly urged to verify that all of the items indicated as in need of repair in this report have been properly repaired prior to the end of any time periods associated with the sale or purchase of this property. Additionally, you are strongly urged to have the current owner of the property complete a new and updated Seller's Disclosure of Property Condition form: http://www.trec.state.tx.us/pdf/contracts/OP-H.pdf , immediately once the property has been vacated.

The Texas residential real estate resale contract states that the home is being purchased in as-is condition. While it is true that many, if not all, home buyers may negotiate sales prices based upon the condition of the home, ascertaining repair and remodeling costs of the properties inspected lies outside the scope of a general home inspection. In order to obtain the most accurate and realistic repair costs you are strongly urged to consult with a licensed tradesperson or general contractor in the area in which the home is located. Other possible sources for repair costs can be found using publications such as the current version of RSMeans Contractor's Pricing Guide: Residential Repair & Remodeling. Alternately, you can find a wealth of information regarding repair and remodeling costs at websites like http://www.homewyse.com/ .

> **This report does not constitute a repair list nor is it in any way intended to be used as such. This inspector provides neither repair lists nor summary reports.** It is up to the buyer and his agent to make all decisions regarding the negotiation of repairs on this property. Substantially visual inspections are considered the start of a due diligence process by the buyer and not the final or end of due diligence. Prior to closing escrow, you are strongly urged to require the seller of this property to update the seller's disclosure form once the property has been completely vacated to reflect any issues that may have occurred since the date of this inspection or that were obscured by furnishings, stored items, etc.

**IMPORTANT INFORMATION REGARDING THE FOLLOWING SYSTEMS AND MATERIALS CONDITION DESIGNATIONS REQUIRED BY THE TEXAS REAL ESTATE COMMISSION**

The definition of Deficient provided by the TREC is as follows: "Deficient - Reported as having one or more deficiencies."  Additionally, "Deficiency" is:  A condition that, in the inspectors reasonable opinion, adversely and materially affects the performance of a system or component or constitutes a hazard to life, limb, or property as specified by these standards of practice. General deficiencies include but are not limited to inoperability, material distress, water penetration, damage, deterioration, missing parts, and unsuitable installation."

Therefore, the definition of "deficiency" by the TREC is a statutory definition (as published in the Texas Register) and any other definition of "deficient" or "deficiency" would be moot to the inspector in regard to semantics. The previous "In Need of Repair" designation of parts, components and systems historically used up to Feb. 1, 2009, has been replaced by "Deficient"  (or "Deficiencies") through statutory change BUT DO NOT EXCLUDE OR DIRECT ANY INTERPRETATION, INTENT OR ACTION OF ANY BUYER EXPECTATIONS OR BUYER DUE DILIGENCE. According to the TREC, the term "deficiency" better describes the broad category of issues in which repair, replacement, or an upgrade is recommended. The "D" ("Deficiency") box on the inspection report should be used just like the ("R") ("Not Functioning or In Need of Repair") box that has been used in the past. It is not the intent of this inspector to interpret or define the terms "deficient" or "deficiency" outside the statutory definition and requirement. If you have a question you are strongly urged to consult with a real estate attorney regarding the definition(s) of "deficient" and "deficiency" as soon as possible during your option period. The responsibility to make a decision as to further analysis, repair, replace or update any item, material or system based upon the Inspector's reasonable opinion or designation of "Deficient" is solely yours. According to the TREC, "the ultimate decision what to do with the reported

MSJ Appendix 000034

information, such as making recommended repairs or to simply "live with" a reported deficiency, is a decision to be made by the person for whom the report is prepared". The principle of "caveat emptor" (let the buyer beware) should not be circumvented. (The idea that buyers take responsibility for the condition of the items they purchase and should examine them before purchase. This is especially true for items that are not covered under a strict warranty. See, e.g., SEC v. Zandford, 535 U.S. 813 (2002)). Therefore, substantially visual inspections following the state inspection standards are considered the beginning of a due diligence process by the client and not considered the final or end of due diligence. Sole reliance on this limited substantially visual inspection to purchase property is neither recommended nor prudent. A comprehensive inspection with qualified specialists is available and explained in the first contact.

---

**NOTICE TO BUILDERS AND MUNICIPAL INSPECTORS IN THE EVENT OF INTERIM INSPECTIONS**

This report format is being used as a convenience to the buyer client and any agents involved in the sale/purchase of this house. If the inspection is a pre-pour or pre-drywall inspection the TREC Inspector SOP does not apply and was not followed. All interim inspections are performed referencing the building, energy, and electrical codes adopted by the municipality and/or the state of Texas, to include local amendments. Do not attempt to inform the client that this inspector was referencing some other, unrelated set of standards.

In the event of a final inspection where the new home is substantially completed the state of Texas requires that the inspector adhere to the minimal TREC Inspector SOP. This inspector does so and exceeds that standard by referencing the building, energy, and electrical codes adopted by the municipality and/or the state of Texas, to include local amendments. Do not attempt to inform the client that this inspector was referencing some other, unrelated set of standards.

TDLR has adopted the National Electric Code 2020 Edition, as it existed on August 26, 2019, and as adopted by the National Fire Protection Association, Inc. It became effective November 1, 2020. Any non-exempt electrical work started on or after November 1, 2020, must be installed in accordance with the 2020 NEC. The 'start' of electrical work is the day the electrician begins installing electrical materials or equipment within the residential or commercial building structure. Inside the corporate limits of a municipality, electricians must abide by city permitting requirements and adhere to any local amendments.

If your municipality has adopted an older version of the code it is because they do not have inspectors trained to inspect to the currently-adopted code. Regardless if the house is in a municipality or in an unincorporated area, nothing obviates the electricians' responsibility to install to the latest adopted code.

Codes Referenced:

2015 IRC with Cleburne Amendments
2015 IECC with Cleburne Amendments
2020 NEC as per TDLR as of 11/1/20 with Cleburne Amendments

ORIENTATION: For the purpose of this report the house is assumed to face due south.

---

MSJ Appendix 000035

Report Identification: 1224 Durham Lane, Celburne, TX  76033

---

**I=Inspected**          **NI=Not Inspected**          **NP=Not Present**          **D=Deficiency**

| I | NI | NP | D | Inspection Item |
|---|----|----|----|---|

**I.  STRUCTURAL SYSTEMS**

☑ ☐ ☐ ☑    **A.  Foundations**

*Type of Foundation(s):* Conventionally-Reinforced Monolithic Slab On-Grade

*Note: Specific Limitations. There is no single formal universally accepted standard for residential building foundation performance. Even if there were, an opinion of the performance of any foundation would necessarily require several pieces of information that are typically not available to the inspector, e.g. a new construction elevation baseline survey on the date that the foundation construction was originally substantially completed, et al. Simply put: an opinion on the performance of a foundation cannot feasibly be based upon a one-time substantially visual inspection of the structure. One cannot extrapolate long-term trends from a short-term sample of facts. This is a report of first impression of what was visible and recognized by the inspector on the date and time of this inspection. The foundation performance opinion stated below neither in any way addresses future foundation movement or settlement, nor does it certify floors to be level. Should you have present or future concerns regarding the foundation's condition, you are strongly advised to consult with a licensed Professional Structural Engineer for further evaluation.*

*Though the TREC requires inspectors to identify the exact type of foundation of the building being inspected, this is often not practically feasible, e.g. in the case of parged post-tensioned slabs-on-ground, post-tensioned structurally supported slabs, and proprietary engineered systems such as suspended foundations, et al. The type of foundation reported will be reported based solely on the visual cues available and the inspector's experience in the field. No warranty is expressed or implied regarding the accuracy of this assessment.*

**For additional information on foundations go to:**

http://www.texasinspector.com/files/Foundation-Book-for-Buyers.pdf

*Method of Inspection:* The Inspector performed a substantially visual inspection of interior and exterior walls and visible grade beams. There are many limits inherent in this substantially visual inspection as the Inspector does not move private property, furniture or lift carpeting and padding to look for cracks, and does not use any specialized measuring devices (e.g. elevation surveying equipment) to establish relative elevations. These practices are beyond the bounds of the standards of practice. The condition of concealed or covered floors is specifically excluded from the inspection standards and report.

In the presence or absence of any visible defects, the Inspector may not recommend that you consult with a structural engineer or a foundation contractor, but this should not deter you from seeking the opinion of any such expert prior to continuance under your personal responsibility of due diligence. This is a report of first impression of what was visible and accessible by the inspector on the date and time of this inspection. The foundation performance opinion stated below neither in any way addresses future foundation movement or settlement, nor does it certify floors to be level. Should you have present or future concerns regarding the foundation's condition, you are strongly advised to consult with a licensed Professional Structural Engineer for further evaluation.

*Type of Inspection: Visual Inspection of the Accessible Exterior*
*Grounds for Departure: N/A*

*Comments:*

FOUNDATION

---

MSJ Appendix 000036

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | | NI=Not Inspected | | NP=Not Present | | D=Deficiency |
|---|---|---|---|---|---|---|
| **I** | **NI** | **NP** | **D** | | **Inspection Item** | |

The foundation does not appear to be in need of immediate remedial underpinning based upon a visual inspection.

The dimensions of the foundation curbs and brick ledges do not match those as depicted in the design drawings. Additionally, the north-south dimensions of the interior of the laundry room are not consistent with the dimensions as shown in the design drawings.

CONCRETE CONDITION
BRICK LEDGE FLASHING
The brick ledge flashing is missing entirely. Brick ledge flashing is required by IRC 703.7.5 Flashing. Flashing shall be located beneath the first course of masonry above finished ground level above the foundation wall or slab and at other points of support, including structural floors, shelf angles and lintels when masonry veneers are designed in accordance with Section R703.7. See Section R703.8 for additional requirements.



Brick ledge flashing required.

Flashing is necessary to direct moisture in the air space behind the masonry veneer toward the exterior. Flashing is required to be located at the first course of masonry above the finished ground level, as well as at other points of support such as at shelf angles and lintels. Flashing beneath the first course of masonry above the finished ground level is also necessary to prevent water entry into the wall below. Flashing must be made from an approved corrosion-resistant material and comply with Section R703.8.

There is another important reason for proper installation of sill flashing and that is to prevent truncated cone fractures which are commonly know as corner pops or wedge cracks. These cracks develop as a result of a shear stress at the interface between the brick and the concrete. Because brick walls expand and concrete foundations shrink, differential movement will cause shearing stresses when these materials are bonded together. A bond break or flashing between the brickwork and the concrete will permit movement to occur without damaged to the structure. It is recommended that you cosmetically patch these with bonding agent and a non-shrink epoxy grout to aid in dissuading termite activity in the crack. Additionally, should the cracks spread over a significant distance, support for the brick veneer may be compromised. These require repair as per industry standards.

Builders will usually place a piece of plastic between the bottom of the first course of brick and the slab; this reduces the friction force when the brick expands and slides against the slab.

REI 7-6 (Revised 05/20/2021)                    Promulgated by the Texas Real Estate Commission (512) 936-3000 (www.trec.texas.gov)
**Page 8 of 67**

MSJ Appendix 000037

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |
|---|---|---|---|

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|

This has the practical effect of reducing the cracking on the slab at the corners but it by no means eliminates the corner cracking.

But, don't take my word for it. Read this from R. Michael Gray, PE: "These cracks develop as a result of the expansion of the brick veneer as it is warmed by the sun. When the temperature of the brick veneer rises, the brick veneer wall expands in length and pushes or slides against the slab surface. At the end of a brick veneer wall at an outside corner of the slab, there is nothing to push back and the concrete cracks at each side of the corner forming a wedge."

Also Refer to ACI 201.1R Guide for Conducting a Visual Inspection of Concrete in Service for additional information regarding concrete cracking.

EXPOSED REBAR
The rebar is exposed on the east wall below the southeast master bedroom window. The rebar has insufficient concrete cover. Concrete cover, or the distance between the outer surface of the concrete and the surface of the embedded reinforcement (rebar) as designated by ACI 318, which is a referenced standard in the IRC and required to be followed as clearly stated in IRC 102.4. Briefly, the reasons for minimum cover requirements are as follows:
(1) to protect the rebar from environmental effects to prevent corrosion;
(2) to provide thermal insulation, which protects the rebar from fire, and;
(3) to give rebar sufficient embedding to enable them to be stressed without slipping.

The minimum cover allowed by ACI 318 is 40 to 50 mm or 1.575" to 1.9685".



Rebar exposed in east edge.

REBAR PROTRUDING FROM SLAB SURFACE
Remove the rebar that is protruding from the floor in the northeast corner of the laundry room.

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |
|---|---|---|---|

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|



Remove rebar from laundry room.

NOTE: Be aware that home inspectors in Texas are presently required by the Texas Real Estate Commission to render an opinion on the performance of foundations. This requirement is both incredibly unreasonable and impossible to meet. The performance of any foundation requires a beginning point of reference with which to compare the current state of the foundation. In the absence of a complete foundation elevation survey at the time of the foundation's construction, an opinion on the performance of a foundation is specious at best. **WE DO NOT RECOMMEND THAT YOU RELY SOLELY UPON THE OPINION STATED HEREIN REGARDING FOUNDATION PERFORMANCE.**

FOUNDATION DESIGN INFORMATION
The Texas Engineering Practice Act requires all Texas homes built on expansive soil to have engineered slabs. The ability of the foundation to withstand the forces of expansive soils where expansive soils are present can neither be determined nor opined by a limited visual inspection. That determination is an act and process of engineering which is beyond the scope of this inspection and the state inspection standards of practice. If you have a question, concern or suspected failure contact the certifying designer/engineer of record.

SOIL TYPE AND SUITABILITY
See the USGS soil type and use information provided to you in a separate report along with this inspection report for more information regarding the type of soil on your lot and the suitability of the soil type for construction of reinforced slab-on-ground foundations.

CONSTRUCTION DOCUMENTS (PLANS)
"R106 A complete set of construction documents (building plans) was not on site as required by: IRC R 106.3.1 Approval of construction documents. When the building official issues a permit, the construction documents shall be approved in writing or by a stamp which states "REVIEWED FOR CODE COMPLIANCE." One set of construction documents so reviewed shall be retained by the building official. The other set shall be returned to the applicant, shall be kept at the site of work and shall be open to inspection. . .",  and,
"R323.3.6 Construction documents. The construction documents shall include documentation that is prepared and sealed by a registered design professional that the design and methods of construction to be used meet the applicable criteria of this section."

MSJ Appendix 000039

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |
|---|---|---|---|

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|

"This section provides the minimum requirements for construction documents that an applicant must provide along with the permit application form for the application package to be considered complete. Construction documents are not just a set of drawings. Construction documents are the entire set of all submitted forms and information necessary to accurately communicate the scope of the construction. The submittals may include written special inspection and structural observation programs, construction drawings and details, reports, calculations, specifications, shop drawings, manufacturer's installation instructions, site plans and other graphic and written forms that will describe the proposed work in detail."

While it may be true that the IRC allows the building official a certain amount of latitude, in R104.1, to interpret the code for the purpose of clarification, it does not obviate his responsibility to insure that the intent and letter of the code is enforced.

"R104.1 General. The building official is hereby authorized and directed to enforce the provisions of this code. The building official shall have the authority to render interpretations of this code and to adopt policies and procedures in order to clarify the application of its provisions. Such interpretations, policies and procedures shall be in conformance with the intent and purpose of this code. **Such policies and procedures shall not have the effect of waiving requirements specifically provided for in this code."**

IRC Commentary: The building official is appointed by the legislative body of the jurisdiction to serve as the employee with the authority and responsibility for the proper administration of the code enforcement agency. The building official establishes policies and procedures that will clarify, and not nullify, the applications of the code. The development of those policies and procedures should not be simply for the convenience of the jurisdiction's employees but should be viewed as a way to effectively communicate to all interested parties involved in the construction process how the department will process applications, review construction documents, make inspections, approve projects, and determine and clarify the application of the code provisions. Properly developed, these policies and procedures can make the code enforcement department more predictable for those who are regulated and will also establish improved code compliance and public relations.

When interpretation of the code is needed, the building official is the one individual of the jurisdiction with the legal authority to interpret the code and determine how the provisions should be applied, in both general and specific cases. Some departments formalize the interpretation process and require the person with a question to submit their question in writing. Departments are encouraged to develop policies for both formal (written) and informal (verbal) requests for code interpretations. **Any such interpretations must be in conformance with the intent and letter of the code and may not waive any requirements.** It may be necessary in some cases for the building official to write these code interpretations into the permit.

IMPORTANT: If your builder refuses to supply you with a set of plans for your house you are strongly advised to obtain them from the municipal building inspections department.

Below is from https://www.texasattorneygeneral.gov/sites/default/files/2018-06/PIA_handbook_2018_0.pdf

"If a copy of public information is requested, a governmental body must provide "a suitable copy . . . within a reasonable time after the date on which the copy is requested." However,

Report Identification: 1224 Durham Lane, Celburne, TX  76033

I=Inspected          NI=Not Inspected          NP=Not Present          D=Deficiency

| I | NI | NP | D | Inspection Item |
|---|----|----|---|-----------------|

the Act does not authorize the removal of an original copy of a public record from the office of a governmental body. If the requested records are copyrighted, the governmental body must comply with federal
copyright law.

Open Records Decision No. 660(1999) (Federal Copyright Act "may not be used to deny access to or copies of the information sought by the requestor under the Public Information Act," but a governmental body may place reasonable restrictions on use of copyrighted information consistent with rights of copyright owner)."

Also see: http://foift.org/resources/texas-public-information-act/

Get the plans as soon as you can. The city is only required to retain them for 180 days after the certificate of occupancy is issued or the final inspection is approved.

See also: http://www.texasinspector.com/files/BOAT-Plans-on-Site.pdf

MANUFACTURERS' INSTALLATION INSTRUCTIONS
A complete set of materials and systems manufacturers' installation instructions was not maintained on site during this inspection as required by IRC 106.1.2.

NEW HOME DOCUMENTATION
You are strongly urged to obtain the following documents from you builder or from the municipal building inspection department.
   1) Geotechnical engineering reports and associated laboratory testing results to include, but not limited to, soil testing (e.g. standard penetration test reports, boring logs, et al.) and fill soil designations.
   2) Site soil compaction certification letter.
   3) Design firm engineering documents to include engineering drawings, engineer's notes, inspection reports, et al.
   4) Post-tensioning materials documents, e.g. shipping invoices, tendon mill reports and certifications, et al.
   5) Post-tensioning jack calibration and maintenance records for the equipment used on this site.
   6) Post-tensioning tendon stressing logs.
   7) Concrete plant, shipment and placement records.
   8) Concrete slump test records.
   9) Concrete core sample testing records.
  10) Final grading certificate by a licensed civil engineer or surveyor.
  11) Geotechnical engineer's soil compaction letter.
  12) Engineer design and approval for all departures from building code-prescribed construction methods, as well as any alterations or repairs of any items of engineered design.
  13) Engineering drawings and approval letters for all retaining walls.
  14) Framing and MEP drawings.
  15) Manuals for all mechanical equipment.
  16) Manuals for all appliances.
  17) Installation instructions for all proprietary building materials used.
  18) Initial Foundation Elevation Survey
  19) Proof of termite treatment on Texas Department of Agriculture-promulgated form.
  20) HERS rater documentation.
  21) All permits and inspection tags/reports from the municipality.
  22) All reports from special inspectors.

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |
|---|---|---|---|

| I | NI | NP | D | Inspection Item |
|---|----|----|---|-----------------|

23) Surveyor's documentation to include flood plain information.
24) Plumbing static pressure test results for the supply and DWV piping as well as gas piping.
25) Builder's warranty.

TERMITES
No signs of pre-treatment for subterranean termites were observed. IRC 320 requires that all residential building sites in the Dallas/Fort Worth area be pretreated for subterranean termites. The Texas Department of Agriculture's Structural Pest Control Service requires that this pretreatment be made by a licensed professional certified pesticide applicator and that the applicator must complete a Subterranean Termite Preconstruction Disclosure Form for each site in question.

If the builder has opted for soil treatment, insure that you receive a copy of this form with a diagram of the site treated and a complete disclosure of the type and amount of termiticide used. Your builder may opt for spraying the framing with a borate solution. Other options may be approved by the municipality such as physical barriers. Similar documentation will be required for these treatments which should be obtained from the builder at the pre-drywall phase of construction.

Regardless which method is approved you are strongly urged to combine other methods with treatment of the framing with a borate solution, namely Bora-Care by Nisus, as per the manufacturer's application instructions.

☑ ☐ ☐ ☑          **B.  Grading and Drainage**

> All residential lot drainage in the DFW area must be designed in accordance with the guidelines contained in the "Storm Water Management Design Manual" incorporating the City of Fort Worth Local Criteria Section and the North Central Texas Council of Governments (NCTCOG) integrated Storm Water Management (iSWM) Design Manual for Site Development. These standards were first promulgated in 2006, and are commonly referred to as I-SWIM Standards.

*Comments:*

GRADING
The grading around the perimter of the foundation must be improved to promote the flow of storm water away from the house. Grading specifications are spelled out clearly in International Residential Code (IRC) R401.3, "*Surface drainage shall be diverted to a storm sewer or other approved point of collection so as to not create a hazard. Lots shall be graded so as to drain surface water away from foundation walls. The grade away from foundation walls shall fall a minimum of 6 inches (152 mm) within the first 10 feet (3048)*". This is equivalent to the 5% grade required by the foundation design firm's engineer. **<u>FAILURE TO MAKE THESE IMPROVEMENTS MAY EFFECTIVELY VOID YOUR FOUNDATION WARRANTY!</u>**

MSJ Appendix 000042

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |
|---|---|---|---|

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|



R 401.3 is not the only place in the code requiring this drainage provision. R506.1, and R 403.1.8 instruct builders slab-on-grade residential buildings on expansive clay soils to adhere to an even stricter commercial building code, that of the International Building Code 1805.8.2, "*Slab-on-ground foundations. Slab-on-ground, mat or raft foundations on expansive soils shall be designed and constructed in accordance with WRI/CRSI Design of Slab-on-Ground Foundations or PTI Design and Construction of Post-Tensioned Slabs-On-Ground.*" PTI Design is the Post-Tensioning Institute of which this inspector is both a member and a Level 1 Certificate holder. The home you are buying is built on an unbonded post-tensioned slab-on-grade foundation and must adhere to these specifications. The Post-Tensioning Institute's *Construction and Maintenance Procedures Manual for Post-Tensioned Slab-On-Grade Construction,* echoes this requirement.

Additionally, the engineer responsible for the foundation design specifies in the shop drawings and general notes therein what the grading should be in relation to this particular foundation. Industry standards again underscore the need for theses improvements. Yards shall have grades and swales that provide for proper drainage away from the home in accordance with the Code or other governmental regulations. If the grades or swales fail to meet the industry standards, the builder shall take such action as is necessary to bring the variance within the standard.

**NOTE: The municipality's plat drainage requirements can exceed those set forth by the IRC, i.e. require more than a 6" drop in elevation in the first 10' out from the perimeter of the foundation, but cannot be less stringent. The surveyor responsible for the final lot survey has no authority to approve lot drainage that is not code-compliant, as per IRC 105.8 "Responsibility. It shall be the duty of every person who performs work for the installation or repair of building, structure, electrical, gas, mechanical or plumbing systems, for which this code is applicable, to comply with this code.."**
See: http://www.texasinspector.com/files/Drainage-Improvement-Primer.pdf

**It is crucial that you understand that water ponding around the foundation perimeter will cause potential heaving of the soil far in excess of that predicted in the geotechnical report upon which the design of this foundation is predicated. This will lead to differential movement and foundation distress.**

DRAINAGE

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I | NI | NP | D | Inspection Item |
|---|----|----|----|---|

I=Inspected            NI=Not Inspected            NP=Not Present            D=Deficiency

The swales on the east and west sides of the lot are improperly sloped and will not perform as intended and required. Swales must slope a minimum of ¼" per foot as per accepted engineering practice.

See: http://www.foundationperformance.org/projects/FPA-SC-01-0.pdf

*6.1.1.1 Site Grading*

*Site grading causes excess water to flow away from the foundation via surface sloping and drainage swales. Adequate surface drainage slopes are essential to minimize foundation movement and damage. Current International Residential Code requires 6" minimum fall the first 10' out from and perpendicular to building walls, and 2% minimum elsewhere to drain off lot. Because current building practices sometimes have homes built closer than 10' to the adjacent structure or lot line, it is necessary to have greater slopes so that the 6" minimum is maintained.*

See: http://www.texasinspector.com/files/Drainage-Improvement-Primer.pdf
https://www.youtube.com/watch?v=anRdSVc-2X8



**Swales**

when the overall lot drainage is toward the house, swales can be used to direct surface water away from the foundation

MOSQUITO HARBORAGE

Mosquitoes are quite capable of nesting and breeding anywhere that provides some moisture and shade. Grass in swales happens to be one of their favorite locations as is pine straw, rocks, mulch, ground cover, vines, etc. Basically anywhere and on anything that can hold moisture. For some reason people seem to think mosquitoes need water – as in large puddles or pools – to breed but in fact there are many species that require just a tad bit of moisture to reproduce. These are the species that wreak havoc on most homeowners. Especially if you lot is well shaded and moist. Ref: Handbook of Pest Control – The Behavior, Life History, and Control of Household Pests, 10th Edition, Arnold Mallis, Chapter 15, Page 1051, Heading Aquatic Habitats.

TEXAS HEALTH AND SAFETY CODE
Sec. 343.011.  PUBLIC NUISANCE.  (a)  This section applies only to the unincorporated area of a county.

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | | NI=Not Inspected | | NP=Not Present | | D=Deficiency |
|---|---|---|---|---|---|---|
| **I** | **NI** | **NP** | **D** | | **Inspection Item** | |

(3)  maintaining premises in a manner that creates an unsanitary condition likely to attract or harbor mosquitoes, rodents, vermin, or other disease-carrying pests;

IRC 102.2 Other laws. The provisions of this code shall not be deemed to nullify any provisions of local, state or federal law.

 - Compliance with the requirements of the code does not entail authorization, approval or permission to violate the regulations of other local, state or federal laws. Other laws, ordinances and regulations not administered or enforced by the building official could be in existence and enforced by another authority having

jurisdiction over those provisions. Although the requirements may have similar provisions to those of the code, the work must be in conformance to the other regulations.

**Water is destructive.** It can flow through fissures in the soil, rise under hydrostatic pressure or capillary action, and even find a path through solid surfaces, and few structures may be immune to its power. Grading and drainage are probably the most significant aspects of a property, simply because of the direct and indirect damage that moisture can have on structures. More damage has probably resulted from moisture and expansive soils than from most natural disasters, and for this reason we are particularly diligent when we evaluate site conditions. In fact, we compare all sites to an ideal.

In short, the ideal foundation placed on expansive and contractive earth will have soils that slope away from the house [ref: R401.3 and the typical on grade foundation design], and the interior floors will be at least 4-6 inches higher than the exterior grade [ref: R404.1.6]. Also, the residence will have gutters and downspouts that discharge into area drains with catch basins that carry water away to hard surfaces. If a property does not meet this ideal, we will not endorse it, even though there may be no readily visible evidence of moisture intrusion, and recommend that you consult with a qualified grading and drainage contractor or geotechnical engineer.

Additionally, grading and drainage cannot be adequately inspected under a visual inspection unless done so in a hard rain. We have discovered evidence of moisture intrusion inside homes when it was raining that would not have been apparent otherwise. Grading and drainage that does not measure up to this ideal condition is more likely to affect foundation performance, exacerbate water ponding and allow moisture intrusion into any hairline cracks that may be present in the foundation. Also, in conjunction with the cellulose materials found in most modern homes, moisture can facilitate the growth of biological organisms that can compromise building materials and produce microorganism like substances that can have an adverse affect on health; and encourage wood-destroying insects.

The sellers or occupants will obviously have a more intimate knowledge and experience of the site than we could possible hope to have during our one time visit so it is recommended that you review the seller disclosure or ask for disclosure under your personal responsibility of due diligence.

WARNING:
Proper lot and adjacent municipal drainage provisions are absolutely necessary to insure proper foundation performance. This includes all areas that will be paved; cut and fill slopes; channel, swales, detention basins including completed outlet structures, terraces, berms, and other drainage facilities as indicated on the plans and as specified in the adopted building codes. This also includes all drainage facilities and final stabilization measures as required by the approved plans and as specified in the adopted building codes. It is important to note that

MSJ Appendix 000045

Report Identification: 1224 Durham Lane, Celburne, TX 76033

| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |
|---|---|---|---|

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|

your builder's 10-year structural warranty will be voided if the grading and drainage of the lot are not properly installed and maintained.

NOTE: All grading and drainage elevation measurements were observed using a Technidea Zip Level Pro precision altimeter leveling instrument which was calibrated onsite per the manufacturer's instructions. This level is easily as accurate as any surveyor's transit over distances encountered on residential lots.

☑ ☐ ☐ ☑    **C. Roof Covering Materials**
*Types of Roof Covering:* Asphalt Composition Roofing Material – Tab Shingles Over Roof Sheathing
*Viewed From:* Viewed From Ladder At Eave
*Grounds for Departure: Inspector's Knee was Injured*

*Note: Specific Limitations. The Inspector is not required to and does not physically walk on roof surfaces. All roof surfaces will be inspected from a ladder at the edge of the roof (if the inspector deems this safe using a 16-ft. ladder), and through the use of binoculars while standing on the ground. The Inspector is not required to determine or report the age or life expectancy of any roof coverings. Roofs that cannot be accessed directly by the inspector may have defects that are not visible from the ground or roof's edge. There are different roof types and materials and different methods of installing them, but all have limited warranties and most, if not all, eventually leak. Every roof is only as good as its waterproof membrane, which is concealed and cannot be examined without removing the material, and this is true of almost every type of roof. The roof covering opinion stated below in no way addresses the property's insurability. This report neither addresses future roof leaks nor does it certify that the roof is leak-free. The report does not constitute a warranty either expressed or implied regarding roof leakage. The Texas Inspection Standards of Practice for property inspections is not designed for the purpose of underwriting or insurability. The Inspector is not allowed by state law to issue warranties. It is unreasonable to expect that it can be ascertained if a roof leaks under any weather conditions based upon a limited substantially visual inspection during a one-time site visit. You are strongly advised to consult with a shingle or roof covering manufacturer-certified roofing contractor for further in-depth evaluations during every conceivable weather condition prior to the end of any time periods associated with the sale or purchase of this property.*

**You are strongly urged to have an adjustor from your homeowner's insurance carrier inspect and verify that this roof meets their current underwriting criteria prior to the end of any time periods associated with the sale or purchase of this property.**

*Comments:*

SLOPED ROOFING

The installation of the roof covering is incomplete.

FLAT VALLEY

There is a flat valley near the intersection of the roofs above the west end of the patio. The term "flat valley" is used to indicate a valley on a pitched roof that terminates into a flat or low slope area. This low slope allows water to pool and can lead to leaks even if it is underlayed

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |
|---|---|---|---|

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|

properly. Building a flat roof valley is no different than a plumber installing a drainpipe that is flat for a few feet just to accommodate some aesthetic feature.



Flat valley
or
depression.

All valleys must be designed to have a clear drainage channel off of the roof –i.e. no flat valleys. This is a violation of IRC R903.1 General. Roof decks shall be covered with approved roof coverings secured to the building or structure in accordance with the provisions of this chapter. Roof assemblies shall be designed and installed in accordance with this code and the approved manufacturer's installation instructions such that the roof assembly shall serve to protect the building or structure. (Commentary) In all cases, a roof must be designed to provide protection from the elements. For the roof to adequately perform this function, it must be designed in accordance with this chapter. This section requires flashing where the roof intersects vertical elements such as walls, chimneys, dormers, plumbing stacks, plumbing vents and other penetrations of the weather-protective barrier.

Roof drainage to remove water from the roof to an approved location is also regulated. This also violates IRC 903.2 Flashing. Flashings shall be installed in a manner that prevents moisture from entering the wall and roof through joints in copings, through moisture permeable materials and at intersections with parapet walls and other penetrations through the roof plane.

Some roofers claim that there products to make a flat valley watertight. Are they right? The answer here is a little more complex than it may seem.  Flat valleys can be made watertight using one of several products including metal flashing and modified bitumen membranes. Most products designed for this purpose are good products and can be made watertight even in a flat valley.  However, the problem arises when an extreme weather event, say an ice storm, occurs that causes water to backup in the valley.  The valley then holds water until the water level reaches the top of the flashing or the membrane.  On a relatively low slope roof (4-6/12) this may just be a couple of inches.  The water then flows over the top of the flashing or membrane and right into the house. Ice storms occur almost every year in North Central Texas.

Flat valleys must be avoided. When they are not, redesign of the areas concerned is strongly urged.

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |
|---|---|---|---|

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|

FLASHINGS
The plumbing vent jack flashings have not been installed as required by IRC 903.2 and 903.2.1. You are strongly urged to insist that the builder not offload drywall into the house before these flashings - and the windows - are installed.

☑ ☐ ☐ ☑      **D. Roof Structures and Attics**
*Viewed From:* Entered Attic and Performed a Visual Inspection of the Accessible Portions of the Attic
*Grounds for Departure: N/A*
*Approximate Average Depth of Insulation:* No insulation present
*Approximate Average Thickness of Vertical Insulation:* No insulation present
*Attic Ventilation Type: None Visible (Not Required for Encapsulated Attic)*
*Insulation Types: No Insulation Present*
*Comments:*

ROOF STRUCTURE
ACCESS REQUIRED

The access opening is undersized both for the minimum required and for the equipment installed in the attic. An attic access opening a minimum of 22" X 30" is required as per IRC R807.1: R807.1 Attic access. In buildings with combustible ceiling or roof construction, an attic access opening shall be provided to attic areas that exceed 30 square feet (2.8m2) and have a vertical height of 30 inches (762 mm) or greater. The rough-framed opening shall not be less than 22 inches by 30 inches (559 mm by 762 mm) and shall be located in a hallway or other readily accessible location. A 30-inch (762 mm) minimum unobstructed headroom in the attic space shall be provided at some point above the access opening. See Section M1305.1.3 for access requirements where mechanical equipment is located in attics.

NOTE: The requirement for an attic access is predicated on the likelihood that during the life of the structure, access to an attic space for repair of piping, electrical, and mechanical systems will be required.

ATTIC SERVICE FLOOR

The attic service flooring is improperly configured. IRC R1305.1.3 states, "The passageway shall have a continuous solid flooring in accordance with Chapter 5 not less than 24 inches (610 mm) wide. A level service space at least 30 inches (762 mm) deep and 30 inches (762 mm) wide shall be present along all sides of the appliance where access is required." This requires improvement.

Report Identification: 1224 Durham Lane, Celburne, TX  76033

I=Inspected          NI=Not Inspected          NP=Not Present          D=Deficiency

| I | NI | NP | D | Inspection Item |
|---|----|----|----|----|



Step required.

Service floor required.

The OSB sheathing being used as service flooring leading to and/or surrounding the furnaces is not designed for this purpose by the manufacturer, nor is it permissible by any current building code. This is not a floor-rated material and will not support the live loads that are necessarily imposed upon it by persons accessing and servicing the mechanical equipment it is intended to reach. IRC 1401.2 and IRC 1305.1.1 state clearly the requirement for flooring as an access for furnace equipment.

There is not always sufficient room for mechanical equipment and appliances to be installed in spaces such as basements, alcoves, utility rooms and furnace rooms. In an effort to save floor space or simplify an installation, designers often locate appliances and mechanical equipment on roofs, in attics or in similar remote locations. Access to appliances and equipment could be difficult because of roof slope, stone roof ballast or the lack of a walking surface, such as might occur in an attic or similar space with exposed ceiling joists. The intent of Chapters 5 and 13 of the IRC is to require a suitable access opening, passageway and workspace that will allow reasonably easy access without endangering the homeowner or service persons entering these areas to service or maintain mechanical equipment.

Chapter 5 of the IRC is primarily concerned with the structural integrity and safety afforded by any flooring system or walking surface including, but not limited to, interior floors (both wood and concrete), attic service floors, exterior decks and other surfaces intended to be walked upon. From 501.1,

"R501.1 Application. The provisions of this chapter shall control the design and construction of the floors for buildings, including the floors of attic spaces used to house mechanical or plumbing fixtures and equipment. Floors (including attic floors) that house mechanical equipment or plumbing fixtures (see the definition in Chapter 2) must comply with this chapter.

R501.2 Requirements. Floor construction shall be capable of accommodating all loads in accordance with Section R301 and of transmitting the resulting loads to the supporting structural elements."

Further, the Structural Board Association (SBA) publication, "OSB in Wood Frame Construction, U.S. Edition 2001", states plainly: 5.2 Floor Sheathing: Sheathing grade

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I | NI | NP | D | Inspection Item |
|---|----|----|---|-----------------|

I=Inspected          NI=Not Inspected          NP=Not Present          D=Deficiency

subfloors are intended to have an additional layer of structural material such as an underlayment panel, wood strip flooring applied at right angles to the joists, or concrete topping.

This material must be replaced with or amended to be a floor-rated material. This is a pedestrian safety hazard. This will also likely cause some home warranty companies to refuse to service the equipment located in the areas of these floors.

PANEL EDGE SUPPORT
The flooring is also not properly installed in that the panel edges are not fully supported by framing as is required in IRC Table 503.2.1.1(j). "Unsupported edges shall have tongue-and-groove joints or shall be supported with blocking"

SERVICE FLOOR STEP REQUIRED
Properly configured attic service floor steps must be installed at the attic floor elevation offset as per IRC R311.5.3.1:
R311.5.3.1 Riser height. The maximum riser height shall be 7-3/4 inches (196 mm). The riser shall be measured vertically between leading edges of the adjacent treads. The greatest riser height within any flight of stairs shall not exceed the smallest by more than 3/8 inch (9.5 mm).

NOTE: The code establishes that the maximum riser height is 7-3/4 inches (197 mm). The International Residential Code does not provide a minimum riser height as does the International Building Code, where a 4-inch (102mm) limit is specified. The provisions specify how the riser height is to be measured. See Commentary Figure 311.5.3.1(1). A significant safety factor relative to stairways is the uniformity of risers and treads in any flight of stairs. The section of a stairway leading from one landing to the next is defined as a flight of stairs. It is very important that any variation that would interfere with the rhythm of the stair user be avoided. While it is true that adequate attention to the use of the stair can compensate for substantial variations in risers and treads, too frequently the stair user does not give the necessary attention.

To obtain the best uniformity possible in a flight of stairs, the maximum variation between the highest and lowest risers is limited to 3/8 inch (9.5 mm). This tolerance is not to be used as a design variation, but its inclusion is in recognition that construction practices make it difficult to get exactly identical riser heights and tread dimensions in constructing a stairway in the field.

This constitutes a pedestrian trip hazard and must be repaired for your safety and the safety of servicepersons entering your attic.

RAFTERS

TOE-BEARING RAFTERS
Toe-bearing rafters were observed in multiple locations. Cutting a rafter this way reduces the depth of the rafter, allowing the rafter to split along the grain and greatly reducing the span of the rafter. This issue could be solved by using longer rafters and raising the roof a few inches to bear on the heel of the cut, or by changing the pitch of the roof slightly to bear on the heel of the cut, but the builder does not like either option for complicated reasons; primarily profit-motivated reasons. This is a building code violation as per IRC 301.1 and is not allowed in IRC 301.2 (1) as per the American Wood Council's Wood Frame Construction Manual.

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I | NI | NP | D | Inspection Item |
|---|----|----|----|-----------------|

I=Inspected          NI=Not Inspected          NP=Not Present          D=Deficiency

One of many toe bearing rafters at front porch.

Toe bearing rafter.



Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |
|---|---|---|---|

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|



Toe bearing rafter.

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |
|---|---|---|---|

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|



Toe bearing rafter.



Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |
|---|---|---|---|

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|



Toe bearing rafter.



Extreme toe bearing rafter.

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |
| --- | --- | --- | --- |

| I | NI | NP | D | Inspection Item |
| --- | --- | --- | --- | --- |



Extreme toe bearing rafter.

When a new house is improperly designed, as with most houses from production builders, rafters often bear on the toe rather than the heel of the seat cut or are notched too deeply over the top plate. These situations weaken the rafter at the bearing point and can split the rafter. Always  bear the rafter on the heel of the seat cut. This does two things. It means the full depth of the rafter is bearing on the top plate, so you don't have to worry about the rafter's splitting. It also means you can get more insulation over the top of the outside wall, providing much better energy efficiency.

In some cases, providing full bearing at the heel cut might require lowering the exterior wall a few inches. The height of the wall can be determined from the plans and double-checked in the field. However, instead of lowering the wall, the rafters frequently are notched. If rafters are notched too deeply over the top plate (kind of a reverse bird's-mouth), they could split at the inside edge of the top plate because of shear stresses caused by the flexing of the rafters under load. Joist hangers can be used in this case to support the heel of the rafters, eliminating the problem. Simply attach the hanger to the double top plate and set the heel of the rafter in the hanger. Remember, top flange hangers are made that also work well in these cases.

If your builder or municipal inspector disagrees, as they often do, ask him to contact the design firm's engineer for a calculation showing that the shear capacity of the hip is adequate at the bearing point. You are strongly urged to obtain the engineer's opinion on his stamped and signed letterhead.

REI 7-6 (Revised 05/20/2021)            Promulgated by the Texas Real Estate Commission (512) 936-3000 (www.trec.texas.gov)
Page 26 of 67

MSJ Appendix 000055

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |
|---|---|---|---|

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|

Roof uplift connectors are required as per IRC 301.1:

R301.1 Design.

Buildings and structures, and all parts thereof, shall be constructed to safely support all loads, including dead loads, live loads, roof loads, flood loads, snow loads, wind loads and seismic loads as prescribed by this code. The construction of buildings and structures shall result in a system that provides a complete load path capable of transferring all loads from their point of origin through the load-resisting elements to the foundation.

Rafter to top plate connector brackets are required as per IRC R802.11:

R802.11.1 Uplift resistance.

Roof assemblies which are subject to wind uplift pressures of 20 pounds per square foot (0.958 kN/m2) or greater shall have roof rafters or trusses attached to their supporting wall assemblies by connections capable of providing the resistance required in Table R802.11. Wind uplift pressures shall be determined using an effective wind area of 100 square feet (9.3 m2) and Zone 1 in Table R301.2(2), as adjusted for height and exposure per Table R301.2(3).

See: http://www.aaronsinspections.com/Roof%20Uplift%20Connectors.pdf

RIDGE BOARD(S)

The ridge board splice in the garage is improperly supported. The configuration of the ceiling and attic in the garage do not match those in the design drawings. In the attempt to vault the garage ceiling the builder has attempted to support a spliced ridgeboard from adjacent rafters. This is not an approved framing method and, in this inspector's professional opinion, it will not function as intended over time. The builder should have followed the plans or, at a minimum, installed a ridge beam to properly support the structure above the garage. If this is to remain as is, a signed and stamped letter of approval from a licensed structural engineer is required.



This will not adequately support a spliced ridge.

GUARDS AT ATTIC STAIRS

The attic stair opening is required by OSHA 29 CFR 1926.501(b)(13) to be outfitted with a guard to prevent personnel from falling to the floor below. While builders and municipal inspectors tend to ignore OSHA regulations on a regular basis, these are still requirements that must be met. OSHA standards are federal laws. IRC 102.2  "Other laws. The provisions of this code shall not be deemed to nullify any provisions of local, state or federal law."

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |
|---|---|---|---|

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|



Further, Texas case law states that: "The relevance of an OSHA standard is that it, and the ANSI standards which form the basis for most OSHA standards, are the cumulative wisdom of the industry on what is safe and what is unsafe. While OSHA was written to protect employees, an unsafe practice for an employee applies equally well to a customer who legitimately finds himself in the same geographic space as the employee. Safety principles don't change depending on whether the victim is an employee, a customer, or a passerby. Therefore it has relevance to the standard of care." WalMart Stores v. Bettye Jean Seale, Case No. 04-94-00295-CV, Court of Appeals of Texas, San Antonio, May 10, 1995.

This is a pedestrian slip and fall hazard for which the owner will be liable in the event of a fall.

☑ ☐ ☐ ☑    **E.   Walls (Interior and Exterior)**

> *Note: Specific Limitations. The Inspector is not required to determine the condition of interior wall coverings except as they pertain to structural performance or moisture penetration; identify obvious damaged wall coverings or determine the conditions of paints, stains or other surface coatings whether interior or exterior; determine the condition of built-in cabinets or shelves; inspect for the presence of safety glass where the glazing is not clearly labeled as such; or determine the presence, extent or type of vapor barriers or insulation in any walls.*
>
> *Furnishings, personal items and stored items are not moved by the Inspector during the inspection. If areas are inaccessible or obstructed you are strongly urged to have the house professionally re-inspected once the furnishings and/or stored items have been removed and prior to closing escrow.*

*Exterior Wall Claddings: Sheathing*

*Composite Trim*

*Interior Wall Claddings: Rough Framing*

*Comments:*

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |
|---|---|---|---|

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|

WALLS

STUDS

OVER-BORED STUDS

Studs in the master bedroom are bored closer than 5/8" from the stud faces. This is not allowed as per IRC 302.6 #2. Repair or replacement is required. Stud shoes are required for these repairs. Metal plates will not suffice.



Stud shoes required.

DAMAGED STUD

A stud in the east wall of the master closet is over-bored and damaged. A stud shoe is required.

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| | | | | |
|---|---|---|---|---|
| **I=Inspected** | | **NI=Not Inspected** | **NP=Not Present** | **D=Deficiency** |
| I | NI | NP | D | **Inspection Item** |

Stud shoe required.

Nails i metal plate find no hold.

**ADD STUDS UNDER ROOF BRACES**
Additional studs are required to transmit the load imposed by roof braces support atop the walls as per IRC R301.1  Application. Buildings and structures, and all parts thereof, shall be constructed to safely support all loads, including dead loads, live loads, roof loads, flood loads, snow loads, wind loads and seismic loads as prescribed by this code. The construction of buildings and structures in accordance with the provisions of this code shall result in a system that provides a complete load path that meets all requirements for the transfer of all loads from their point of origin through the load-resisting elements to the foundation. Buildings and structures constructed as prescribed by this code are deemed to comply with the requirements of this section.



Add stud under roof brace.

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |
|---|---|---|---|

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|



Add stud under roof brace.

This section specifies the minimum design loads required for structures built in accordance with the provisions of the IRC. In structural design, loads are generally divided into two categories: gravity loads, which act vertically, and lateral loads, which act horizontally. Lateral loads typically result from either wind (see Section R301.2.1), earthquakes (see Section R301.2.2) or flood loads (see Section R301.2.4. Although wind, flood and earthquake design may concern themselves with lateral loads, there are also vertical force components that should be considered. All structures must be designed to support these loads and provide a complete load path capable of transferring these loads from their point of origin through the appropriate load-resisting elements and foundation and ultimately to the supporting soil. The charging statement specifically states that any building or structure that has been built in strict compliance with this code provides a complete load path that meets all requirements for load transfer from the point of origin to the foundation. A load path that is either incomplete or inadequate will expose the structure to damage just as surely as an undersized structural member will. The concept of a complete load path is a fundamental principle in structural engineering, and the code makes it clear that a complete load path must be provided.

and R801.2 Requirements. Roof and ceiling construction shall be capable of accommodating all loads imposed according to Section R301 and of transmitting the resulting loads to the supporting structural elements.

ADD STUDS FOR BEAM SUPPORT
Additional studs are required in the west wall of the master bathroom to support the west end of the east-west-oriented upset beam. See above for code citations.

MSJ Appendix 000060

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I | NI | NP | D | Inspection Item |
|---|----|----|----|---|

I=Inspected          NI=Not Inspected          NP=Not Present          D=Deficiency



Add two studs under beam support.

**CRIPPLE STUDS**
The cripple stud has been removed in the southeast corner of the master bedroom. The window sill must be supported by a steel angle.



Add steel angle.

**STUDS OUT OF PLUMB**
Studs near the south lavatory in the master bathroom and in the northwest corner of the master bedroom are out of plumb.

**TOP PLATES**
The top plate is excessively notched in the north wall of the Jack and Jill bathroom. This requires repair as per IRC 602.6.1.

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | | NI=Not Inspected | | NP=Not Present | | D=Deficiency |
|---|---|---|---|---|---|---|

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|

Renail plate here.



### SILL PLATES

As per IRC R 403.1.6, the exterior wall sole (sill) plates must be anchored to the foundation with anchor bolts spaced a maximum of 6 feet on center. Anchor bolts shall also be located within 12 inches from the ends of each plate section. The sill plate anchors (bolts) are not located in the field of the sill plates in many locations, e.g. in the laundry room, master closet, and along the west wall of the master bedroom, et al..



Bolts do not engage plates at all.

REI 7-6 (Revised 05/20/2021)                Promulgated by the Texas Real Estate Commission (512) 936-3000 (www.trec.texas.gov)
**Page 33 of 67**

MSJ Appendix 000062

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | | NI=Not Inspected | | NP=Not Present | | D=Deficiency | |
|---|---|---|---|---|---|---|---|
| **I** | **NI** | **NP** | **D** | | | | **Inspection Item** |



Bolts not in sill plate.



Bolt not in sill plate.

Sill bolts must be located in the center third of the sill (sole) plate as per IRC 403.1.6.

MSJ Appendix 000063

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |

| I | NI | NP | D | Inspection Item |
|---|----|----|----|----------------|



Bolt not in center third of plate.

Sill bolts are missing nuts and washers in many locations, e.g. in the study, the laundry room, master closet, et al.



Nut and washer missing.

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I | NI | NP | D | Inspection Item |
|---|----|----|---|-----------------|

**I=Inspected**          **NI=Not Inspected**          **NP=Not Present**          **D=Deficiency**



Nut and washer missing.

All new framing in contact with the foundation, e.g. at the fireplace, the west wall of the master shower stall, and in the west wall of the west hallway must be pressure-treated as per IRC 317.1(2). This also applies to all pocket door units.



Must be pressure-treated.

MSJ Appendix 000065

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I | NI | NP | D | Inspection Item |
|---|----|----|---|-----------------|

I=Inspected          NI=Not Inspected          NP=Not Present          D=Deficiency



Must be pressure-treated.



Must be pressure-treated.

BRACED WALLS

The wall bracing requirements set forth in IRC 602.10 have not been met.

The installation of the sheathing is incomplete and requires installation as per the sheathing and window manufacturers, IRC 102.4 and 602.3 and 703.

AIR SEALING

All walls must be air-sealed as per 2015 IECC C402.5.1.1 Air barrier construction. The continuous air barrier shall be constructed to comply with the following:
1. The air barrier shall be continuous for all assemblies
that are the thermal envelope of the building

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I | NI | NP | D | |
|---|----|----|---|---|
| **I=Inspected** | | **NI=Not Inspected** | **NP=Not Present** | **D=Deficiency** |

| I | NI | NP | D | Inspection Item |
|---|----|----|---|-----------------|

and across the joints and assemblies.
2. Air barrier joints and seams shall be sealed,
including sealing transitions in places and
changes in materials. The joints and seals shall be
securely installed in or on the joint for its entire
length so as not to dislodge, loosen or otherwise
impair its ability to resist positive and negative
pressure from wind, stack effect and mechanical
ventilation.
3. Penetrations of the air barrier shall be caulked,
gasketed or otherwise sealed in a manner compatible
with the construction materials and location.
Joints and seals associated with penetrations shall
be sealed in the same manner or taped or covered
with moisture vapor-permeable wrapping material.
Sealing materials shall be appropriate to the
construction materials being sealed and shall be
securely installed around the penetration so as not
to dislodge, loosen or otherwise impair the penetrations'
ability to resist positive and negative
pressure from wind, stack effect and mechanical
ventilation. Sealing of concealed fire sprinklers,
where required, shall be in a manner that is recommended
by the manufacturer. Caulking or
other adhesive sealants shall not be used to fill
voids between fire sprinkler cover plates and
walls or ceilings.
4. Recessed lighting fixtures shall comply with Section
C402.5.7. Where similar objects are installed.


NOTE: Overlapping sheathing joints are mechanical joints and do not constitute a code-
compliant air barrier.



FIREBLOCKING

All utility penetrations of the wall plates must be fireblocked as per IRC 602.8: R602.8
Fireblocking required. Fireblocking shall be provided to cut off all concealed draft openings
(both vertical and horizontal) and to form an effective fire barrier between stories, and between
a top story and the  roof space. Fireblocking shall be provided in wood-frame construction in
the following locations.
1. In concealed spaces of stud walls and partitions, including furred spaces and parallel rows
of studs or staggered studs; as follows:
1.1. Vertically at the ceiling and floor levels.
1.2. Horizontally at intervals not exceeding 10 feet
(3048 mm).
2. At all interconnections between concealed vertical and
horizontal spaces such as occur at soffits, drop ceilings
and cove ceilings.
3. In concealed spaces between stair stringers at the top and
bottom of the run. Enclosed spaces under stairs shall
comply with Section R311.2.2.
4. At openings around vents, pipes, ducts, cables and wires
at ceiling and floor level, with an approved material to

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I | NI | NP | D | Inspection Item |
|---|----|----|---|-----------------|

I=Inspected          NI=Not Inspected          NP=Not Present          D=Deficiency

resist the free passage of flame and products of combustion.
5. For the fireblocking of chimneys and fireplaces, see Section R1003.19.
6. Fireblocking of cornices of a two-family dwelling is required at the line of dwelling unit separation.

SHEATHING

AIR SEALING

The sheathing is not properly lapped in several locations as required by the manufacturer.

All exterior sheathing joints must be taped.

DAMAGE REPAIR

All damaged sheathing requires repair.



Repair holes in sheathing.

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I | NI | NP | D | Inspection Item |
|---|----|----|---|-----------------|

I=Inspected            NI=Not Inspected            NP=Not Present            D=Deficiency



Repair hole in sheathing.

### Damage Repair Guidelines

| Damage to Panel Description | Repair Guideline |
|---|---|
| Facer Delaminations | Small Areas: Sheathing Tape (3M 8087 or equal) Large Areas: Liquid House Wrap (StoGuard or equal) |
| Tears or holes in Thermo-Ply less than 1" in length or diameter (non-structural) | 4" Self-Adhering Flashing Tape meeting AMMA 711-07 (FortiFlash Butyl or equal) |
| Tears or holes up to 3" in length or diameter. | Back with 2x6 blocking (min), fasten to blocking, and apply Self-Adhering Flashing Tape meeting AMAA 711-07 (FortiFlash Butyl or equal) |
| Tears or holes greater than 3" in length or diameter | Replace Panel |

*These guidelines should be used with good judgement to ensure sheathing maintains intended structural, moisture, and air barrier requirements.

SHEATHING UNDER-ENGINEERED?
Research by the APA (Engineered Wood Association) published in Product Advisory SP-1186 in July of 2018 states in part:

"Tests were performed at three independent laboratories to measure the lateral load (shear wall) performance of five different flexible structural sheathing materials. The results were compared directly with the values published in the manufacturers' product evaluation reports based on the same referenced ASTM test standards. Test results from all labs consistently show that the tested flexible structural sheathing materials overstate their lateral load

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | | NI=Not Inspected | | NP=Not Present | | D=Deficiency | |
|---|---|---|---|---|---|---|---|
| I | NI | NP | D | | | | |
| | | | | **Inspection Item** | | | |

resistances by as much as 42 percent when compared to their published design values. Some of those products are as thin as 0.078 inch, but claim shear wall values that are higher than those for 15/32-inch-thick wood structural panels. These overstated lateral load design properties published by the manufacturers raise a question related to the safety and reliability of a structure designed with these products."

What this means to you is the likelihood exists that the flexible sheathing on your home will not perform its intended function. You are strongly urged to have an independent engineer advise you regarding this.

SIDING/TRIM
VERMIN ENTRY POINTS
Vermin entry points were observed. Mice and rats often find easy access to homes through poorly fitting soffits, fascia, siding and trim. If rodents are able to reach the attic, they may travel from room to room or unit to unit through openings for pipes, ducts, and wiring. Attics provide excellent harborage in winter, spring, and fall, but are often too hot during summer. Common attics, basements, or raised foundations in condominiums and apartments are a frequent source of rodent infestation.



Vermin entry point east.

Rodents destroy insulation, electrical wiring, plumbing, and other structural components of buildings (Fig. 1). Insulation damage alone may amount to a loss of several thousand dollars in only a few years. Energy loss from damaged buildings results in added annual costs. Rodent-induced fires from damaged electrical wiring or nest building in electrical panels cause loss of property and threaten human safety.

Rodents also serve as vectors or reservoirs of a variety of diseases, such as salmonellosis, leptospirosis, and murine typhus, that are transmittable to humans. Additionally, they may be sources of swine dysentery, brucellosis, sarcoptic mange, and tuberculosis, all of which affect livestock or pets.

The most effective means of limiting rodent damage is rodent-proof construction. New buildings are required to be designed and built to prevent rodent entry as per IRC 2404.9. Rodentproofing. Buildings or structures and the walls enclosing habitable or occupiable rooms and spaces in which persons live, sleep or work, or in which feed, food or foodstuffs are

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| | | | | |
|---|---|---|---|---|
| **I=Inspected** | | **NI=Not Inspected** | **NP=Not Present** | **D=Deficiency** |

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|

stored, prepared, processed, served or sold, shall be constructed to protect against the entry of rodents.

Openings in the eave returns (areas where the soffit meets an adjoining roof surface) shall not be large enough to allow entry by pests as per industry standards. Eave returns, truss blocks, attic vents and roof vent openings shall not allow rodents, birds, and other similar pests into home or attic space. If an eave return, truss block, attic vent or roof vent opening that allows rodents, birds, and other similar pests into home or attic space, the builder shall take such action as is necessary to bring the variance within the standard state in this section. The industry standard is 5-6-1 of the NAHB Residential Construction Performance Guidelines, upon which most builder warranties are based.

The common sense version is this: we build houses primarily for two reasons; to protect us from the elements and to choose which animals we wish to live with. Failing either or both of these, we have not built a house, but merely a structure which does not perform its basic intended functions. Rodents in structures are more than just a nuisance. They are a health hazard and are destructive to PEX plumbing and any exposed wiring.

See: https://icwdm.org/species/rodents/rodent-proof-construction/

☑ ☐ ☐ ☑    **F.  Ceilings and Floors**

> *Note: Specific Limitations. The Inspector is not required to determine the condition of interior ceiling or floor coverings except as they pertain to structural performance or moisture penetration; identify obvious damaged ceiling or floor coverings or determine the conditions of paints, stains, vinyls, ceramics, woods, carpets, marbles, stones or other surface coatings whether interior or exterior; or determine the presence of or damage from animal urine or other substances to ceilings or floors.*

*Ceiling Claddings: Rough Framing*

*Floor Coverings: Concrete*

*OSB*

*Comments:*

CEILINGS

JOIST HANGERS

Joist hangers are missing in multiple locations. The floor or ceiling joist must be supported on each end by a top plate, ledger strip or joist hanger as per IRC 502.6.2. This is also a requirement in the National Design Standard, which is a referenced standard in the International Residential Code. NDS 2.3.1.2 Bearing Joists shall bear directly on beams, girders, ledgers, or load-bearing walls or be supported by hangers or framing anchors. Joist bearing shall be in accordance with the requirements of Table 2.7C.

MSJ Appendix 000071

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |
|---|---|---|---|

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|



Joist hangers required.



Joist hanger required.

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |
|---|---|---|---|

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|



Joist
hangers
required.



Joist
hangers
required.

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I | NI | NP | D | |
|---|----|----|---|---|
| I=Inspected | | NI=Not Inspected | NP=Not Present | D=Deficiency |

| I | NI | NP | D | Inspection Item |
|---|----|----|---|-----------------|



Joist hanger required.



Joist hangers required.

NOTCHED CEILING JOISTS

The builder has notched ceiling joists at the southeast and southwest corners of the front porch. This is not allowed by IRC 502.8.1.

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | | NI=Not Inspected | | NP=Not Present | | D=Deficiency |
|---|---|---|---|---|---|---|

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|



Notched joists not allowed.



☐ ☑ ☑ ☐    **G.  Doors (Interior and Exterior)**

*Comments:*

There were no doors installed.

☐ ☑ ☑ ☐    **H.  Windows**

*Note: Specific Limitations. The Inspector is not required to inspect or comment on the presence or condition of storm windows, awnings, shutters, or other security devices or*

REI 7-6 (Revised 05/20/2021)                    Promulgated by the Texas Real Estate Commission (512) 936-3000 (www.trec.texas.gov)
**Page 46 of 67**

MSJ Appendix 000075

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |
|---|---|---|---|

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|

*systems. Only readily accessible windows are checked for operation during this inspection. "Failed thermal pane seals" (in actuality, failed desiccant inserts) in insulated glass windows are not always readily visually detectable. The visible moisture between panes in a "failed seal" situation may be apparent or not due to variations in atmospheric conditions. Windows are reported as they are observed at the time of the inspection only. No attempt to quantify the number of defective windows is made. No warranty is implied. If you have present or future concerns regarding the integrity of "thermal pane seals", it is strongly suggested that you consult with a Professional Fenestration Specialist for further evaluation. See the addendum at the end of this report regarding this issue.*

*The AAMA- certified windows cannot be determined at this stage of construction to be flashed and installed in accordance with the manufacturer's installation instructions and AAMA 2400 or ASTM E211-012 to prevent water penetration.* **You are strongly urged to have these windows professionally leak tested in strict accordance with either AAMA 502-08, Voluntary Specification for Field Testing of Newly Installed Fenestration Products, or ASTM E1105.-15, Standard Test Method for Field Determination of Water Penetration of Installed Exterior Windows, Skylights, Doors, and Curtain Walls, by Uniform or Cyclic Static Air Pressure Difference, and/or AAMA 502-08, Voluntary Specification for Field Testing of Newly Installed Fenestration Products, prior to the end of any time periods associated with the purchase of this home.**

*Note: Windows that are closer than 18 inches to the floor pose a safety hazard, especially upstairs windows that are low to the floor. We strongly recommend that all windows in these areas be upgraded to double paned windows that are constructed with tempered safety glass.*

Window Types: Unknown
Glazing Types: Unknown
*Comments:*

There were no windows installed.

☐ ☑ ☑ ☐   **I. Stairways (Interior and Exterior)**

*Comments:*

There was no stairway present.

☐ ☑ ☑ ☐   **J. Fireplaces and Chimneys**

*Note: Specific Limitations. The Inspector is not required to inspect or comment on the adequacy of the draft or performance of a chimney, or chimney structures located more than eight (8) feet above any accessible roofline. The Inspector does not remove chimney caps or cap flashings. The interiors of flues are not inspected except visually from the vantage point of the firebox, when accessible. Freestanding wood burning stoves are beyond the scope of this inspection. Should you have present or future concerns regarding fireplaces, draft performance, inaccessible chimney structures or freestanding wood burning stoves, consult with a Professional Chimney Sweep for further evaluation.*

Fireplace Types: No Fireplace Present
Chimney Types: N/A

*Comments:*

Report Identification: 1224 Durham Lane, Celburne, TX  76033

---

**I=Inspected**　　　　　**NI=Not Inspected**　　　　　**NP=Not Present**　　　　**D=Deficiency**

| I | NI | NP | D | Inspection Item |
|---|----|----|---|-----------------|

There was no fireplace present.

☑ ☐ ☐ ☑　　**K.  Porches, Balconies, Decks, and Carports**

> Note: Specific Limitations. The Inspector is not required to inspect or report on detached structures or waterfront structures and equipment (e.g. detached garages, buildings, barns, storage areas, boathouses, boat docks, bulkheads, seawalls, et al.).

*Comments:*

PORCH AND PATIO ROOF SUPPORTS
The front porch and patio support posts are inadequately connected to the foundation and the roof beams to resist uplift and lateral displacement. This requires the addition of metal brackets as per IRC 502.9.

STEEL I-BEAM-TO-WOOD FRAMING CONNECTIONS
The steel I-Beam at the patio is not connected to the "attached" wood framing. See:
https://www.finehomebuilding.com/membership/pdf/18009/021180084.pdf

☐ ☑ ☑ ☐　　**L.  Other**
*Comments:*

N/A

## II.  ELECTRICAL SYSTEMS

☑ ☐ ☐ ☑　　**A.  Service Entrance and Panels**

> *Note: Specific Limitations. The Inspector is not required to determine the service capacity amperage or voltage or the capacity of the electrical system relative to present or future use or requirements; conduct voltage drop calculations; determine the accuracy of breaker labeling; or determine the insurability of the property. The Inspector does not test any electrical or lighting systems not directly mounted on or attached to the house.*
>
> *SPECIFIC LIMITATION: TREC regulation 535.229(b)(3)(E)(iii) requires the inspector to identify bonding deficiencies. This is not practically feasible to accomplish within the scope of a substantially visual inspection and/or without the use of special tools. You are strongly urged to hire a licensed electrician to verify the bonding of all metal structures within the house that are likely to become energized, prior to the end of any time periods associated with the purchase of this home.*

*Type of Service: Underground*
*Size of Service: 120/240 Volt Main Service*
*Type of Grounding: Ground Connection Not Visible*
*Main Distribution Panelboard Location: Garage Interior Wall*
*Panel Rating: Main Service Rating 200 Amps*
*Grounds for Departure: N/A*
*Disconnect Type: Breakers*

---

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I | NI | NP | D | | |
|---|----|----|---|---|---|

I=Inspected          NI=Not Inspected          NP=Not Present          D=Deficiency

| I | NI | NP | D | Inspection Item |
|---|----|----|---|----------------|

Comments:

SERVICE/ENTRANCE
GROUNDING PROVISIONS
The grounding of the electrical service appears to be ineffective.  The service should be grounded in strict accordance with NEC 250. When two driven rods are used the rods must be space 6' apart as per NEC 250.53(A)(2)X.

☑ ☐ ☐ ☑     **B.  Branch Circuits, Connected Devices, and Fixtures**
*Type of Wiring:*  Copper (Where Observed)
*Comments:*

SPECIFIC LIMITATIONS: Electrical receptacles or switches that have been child-proofed, are inaccessible using a 17 ft. ladder, were in use during the inspection, were observed to be significantly damaged, or were obstructed by furnishings or stored items were not inspected. You are strongly urged to have these devices inspected by a licensed master electrician prior to purchasing the home.

DISTRIBUTION WIRING
PROTECTION FROM DAMAGE
Steel nail plates are required in many locations to protect electrical wiring where a distance of 1-1/4" from the edge of a bored hole to the edge of the stud cannot be maintained as per NEC 300.4(A)(1).

Nail plate required.



Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | | NI=Not Inspected | NP=Not Present | | D=Deficiency | |
|---|---|---|---|---|---|---|

| I | NI | NP | D | Inspection Item | | |
|---|---|---|---|---|---|---|

Nail plate required.



Protection or relocation is required in multiple locations to protect electrical wiring that is run parallel to the edge of the stud where a distance of 1-1/4" to the edge of the stud cannot be maintained as per NEC 300.4(D).

Some electrical cables are located within 6'-0" of the attic stair or scuttle openings. All electrical cables located within 6'-0" vertically and horizontally of the attic stair opening are required by NEC 334.23:

334.23 In Accessible Attics.

The installation of cable in accessible attics or roof spaces shall also comply with 320.23:

320.23 In Accessible Attics.

Type AC cables in accessible attics or roof spaces shall be installed as specified in 320.23(A) and (B).

(A) Where Run Across the Top of Floor Joists. Where run across the top of floor joists, or within 2.1 m (7 ft) of floor or floor joists across the face of rafters or studding, in attics and roof spaces that are accessible, the cable shall be protected by substantial guard strips that are at least as high as the cable. Where this space is not accessible by permanent stairs or ladders, protection shall only be required within 1.8 m (6 ft) of the nearest edge of the scuttle hole or attic entrance.

In accessible attics, Type AC cable installed across the top of floor joists or within 7 ft of the floor or floor joists across the face of rafters or studs must be protected by guard strips. Where the attic is not accessible by a permanent ladder or stairs, guard strips are required only within 6 ft of the scuttle hole or opening.

(B) Cable Installed Parallel to Framing Members. Where the cable is installed parallel to the sides of rafters, studs, or floor joists, neither guard strips nor running boards shall be required, and the installation shall also comply with 300.4(D).

SUPPORT
More than two cables are supported under staples in multiple locations. The staple manufacturer's listing limits the installation to two cables. This violates NEC 110.3(B) and 334.30. This requires improvement.

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |
|---|---|---|---|

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|



Maximum 2 cables under staple.

**DE-RATING CIRCUITS**
Two or more cables were observed to be installed through the same opening in the wood framing that is or is to be sealed with insulation, caulk, or sealing foam, without maintaining spacing between the cables. This is only allowed by NEC 334.80 if the circuits are de-rated or adjusted according to Table 310.15(B)(3)(a) and the provisions of 310.15(A)(2). Exceptions are not allowed.



De-rate cables with more than 2 in any hole.

**NM-B IN DAMP OR WET LOCATIONS**
The installation of NM-B cable in conduit under the slab foundation for powering the kitchen island, is not suited to this application.  It must be replaced with wiring, such as UF cable, that is listed and labeled for exterior use as per NEC 334.12(b)(4), AND NEC 334.10(3).

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |
|---|---|---|---|

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|



Replace NM-B with UF cable.

SMOKE DETECTORS

Interconnected smoke detectors must be installed in the bedrooms, common areas outside the sleeping areas, and on each story of the house, as per IRC R 313.1, NFPA 72, and the Texas Health and Safety Code 766.002 and 766.0021.

Additionally, as per Texas HB 2118, Sept. 1, 2007:
(b) If a one-family or two-family dwelling does not comply with the smoke detector requirements of the building code in effect in the political subdivision in which the dwelling is located, any home improvement to the dwelling that requires the issuance of a building permit must include the installation of smoke detectors in accordance with the building code in effect in the political subdivision in which the dwelling is located, including performance, location, and power source requirements.

**IRC 314.4 does allow for IR-connected as opposed to hard-wired interconnected alarms. It is this inspector's opinion that hard-wiring detectors is the optimum choice.**

## III. HEATING, VENTILATION AND AIR CONDITIONING SYSTEMS

☑ ☐ ☐ ☐     **A. Heating Equipment**
*Type of Systems:* Heat Pump with Central Force Air Furnace
*Energy Sources:* Electricity

*Note: Specific Limitations. The system fan, burner and heat exchanger were not readily accessible for inspection without disassembly of the unit. Because we do not disassemble equipment the condition of the system interior is unknown. If the system does not have a documented history of regular (annual) cleaning and maintenance since its installation, servicing by a licensed professional HVAC technician is required. Heat pumps are not operated at an ambient temperature of 60 degrees F. or more and are never operated in emergency mode.* **WARNING: This inspection will likely not meet the underwriting requirements of a home warranty (residential service contract) company. Many of these**

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |
|---|---|---|---|

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|

> **companies have been known to decline coverage due to subjective and often specious code compliance and maintenance arguments. You are strongly advised to ask your "home warranty" (residential service contract) provider to assure that the system meets their underwriting requirements prior to contracting for their services or closing escrow on the property. Failure to do so may result in future claim denial.**

*Comments:*

FURNACE

The furnace appears to be in satisfactory condition.

☑ ☐ ☐ ☑   **B. Cooling Equipment**

*Type of Systems:* Central Forced Air Compressed Gas Split System

> *Note: Specific Limitations. The system fan and evaporator coil was not readily accessible for inspection without disassembly of the unit. Because we do not disassemble equipment the condition of the system interior is unknown. If the system does not have a documented history of regular cleaning and maintenance since its installation, servicing by a licensed professional HVAC technician is required. Previous repairs to the system may have resulted in mismatching of the condenser and evaporator units. You are strongly advised to have an HVAC technician inspect this system and verify that it has been installed in strict accordance with the manufacturer's installation instructions and the Air Conditioning Contractors of America (ACCA) Manuals D, J, and S, prior to closing escrow on this home.* **WARNING: This inspection will likely not meet the underwriting requirements of a home warranty (residential service contract) company. Many of these companies have been known to decline coverage due to subjective and often specious code compliance and maintenance arguments. You are strongly advised to ask your "home warranty" (residential service contract) provider to assure that the system meets their underwriting requirements prior to contracting for their services or closing escrow on the property. Failure to do so may result in future claim denial.**

*Comments:*

AIR CONDITIONER UNIT

The condensate drain lines must be configured to permit the clearing of blockages and performance of maintenance without requiring the drain lines to be cut as per IRC 1411.3.3.

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |
|---|---|---|---|

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|



Trap too shallow and not serviceable.

☑ ☐ ☐ ☑     **C.  Duct System, Chases, and Vents**
*Comments:*

RETURN AIR DUCTWORK
No energy recovery ventilation system (ERV) was observed to be installed. It is unknown if the system supply airflow rate exceeds the values in 2015 IECC Tables C403.2.7 (1) and (2). If so, an ERV system is required.

REGISTER PROTECTION
You are strongly urged to have the builder mask all HVAC register openings during the construction process to keep construction debris, insects, and animals out of the ducts.

## IV. PLUMBING SYSTEM

☑ ☐ ☐ ☑     **A.  Plumbing Supply, Distribution Systems and Fixtures**
*Location of water meter:* Not Located
*Location of main water supply valve:* Garage Interior Wall
*Static water pressure reading:* N/A
*Type of Supply Piping Where Visible:* PEX (Where Observed)

Note: Specific limitations. A substantially visual inspection by a home inspector does not address slab leaks as per the Texas Administrative Code, Title 22, Part 33, Chapter 535, Subchapter R, Rule *535.227(b)(3)(A)(iv) General Limitations. This inspector is not required to inspect anything buried, hidden, latent, or concealed. These are plumbing leaks which occur either in or under the concrete foundation. Slab leaks can only be discovered and ascertained by a licensed plumber using specialized tools and skills. Because they are a common problem in the North Central Texas* **area you are strongly urged to have the supply and drain piping of this house leak tested by a licensed master plumber prior to the end of any time periods associated with the sale or purchase of this home.**

Report Identification: 1224 Durham Lane, Celburne, TX 76033

| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |
|---|---|---|---|

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|

*Slab leaks can occur in your home's potable water line or in your outgoing sanitary sewer line; both of which may be embedded in or under the foundation of the building. Leaks in either set of lines can cause large amounts of damage to the foundation and each has its own list of causes, some are shared. Slab leaks in the potable water line can potentially be more destructive because the supply water is under pressure. It runs through or under the concrete slab, then to the water heater where copper pipes split off and carry water to all the hot and cold water fixtures in your house.*

*There are four main causes of slab leaks in a houses incoming water lines. Chemistry is the first, either the chemical interaction between copper water pipes or the water running though them (copper pipe is very susceptible to pinhole leaks caused by the chemical composition of your water), or electrolysis from the copper pipe coming into contact with soil. The second is that due to the foundation shifting (because of poor design or installation, or a change in the moisture of the expansive clay soil) and pull your pipes apart. The third is water pressure that is too high (the diameter of the pipes installed may be too small) will corrode copper pipe. Leaks will also form at points where the pipes bend or change direction. The fourth cause may just be poor craftsmanship or workmanship: inferior plumbing supplies or materials (e.g. pipes, soldering) or a plumber that rushes or isn't experienced. It could also be a kinked line (a piece of pipe with an imperfection) or nicked by another (non-plumbing) workman, such as those that pour the concrete.*

*Unlike those in incoming water lines which will continuously leak because of the continuous flow and pressure, slab leaks in sanitary sewer lines only leak when a toilet is flushed, someone takes a shower or bath, or faucet is turned on. There are four main causes of slab leaks in sanitary sewer lines. The first is a crack or break in the cast iron, galvanized steel, or PVC sewer pipes, caused by shifting of the foundation. The second is, in the case of cast iron or galvanized steel pipes, parts of the pipe may be exposed to soil, sand, or gravel which are porous to water -this can lead to rusting. The third cause is the chemicals, solvents, and cleaning solutions that are poured down the drain which interact and corrode the metal pipes. The fourth cause is poor craftsmanship or workmanship, inferior plumbing supplies or materials, or a plumber that rushes or isn't experienced.*

*Your homeowners insurance is not likely to cover slab leaks. This sort of coverage varies from company to company. Even if they do, they will not usually cover all of the expenses to make the necessary repairs.*

There are essentially two methods for making these kinds of repairs. The traditional method involves finding the leaks and then cutting or breaking out the concrete slab in order to make the repairs and afterwards repairing the concrete. This is a tremendously invasive and expensive procedure that, depending on the number of leaks involved and the size of the house, can cost anywhere from $20K - $50K.

The latest method on the scene involves lining the piping with food grade epoxy. This is a nearly non-invasive procedure. The cost is also less than the traditional methods, but will still be in the $10K - $15K range.

In addition to the expense and inconvenience of the actual leak repairs, slab leaks are a leading cause of foundation damage.

*Comments:*

SUPPLY PLUMBING

PROTECTION FROM DAMAGE

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |
| --- | --- | --- | --- |

| I | NI | NP | D | Inspection Item |
| --- | --- | --- | --- | --- |

The PEX supply piping has not been installed completely within the wall cavities in the master bedroom and requires either relocation or protection from damage as per 2603.2.1 Protection against physical damage. In concealed locations, where piping, other than cast-iron or galvanized steel, is installed through holes or notches in studs, joists, rafters or similar members less than 1.25 inches (31.8mm) from the nearest edge of the member, the pipe shall be protected by shield plates. Protective shield plates shall be a minimum of 0.0575-inch-thick (1.463 mm) steel, shall cover the area of the pipe where the member is notched or bored and shall extend a minimum of 2 inches (51 mm) above sole plates and below top plates.

PEX plate needed in master bedroom.



PROTECTION FROM FREEZING

The supply piping requires insulation in order to protect it from freeze damage as per IRC P2603.6 and/or the PEX manufacturer. P2603.6 Freezing. In localities having a winter design temperature of 32°F (0°C) or lower as shown in Table R301.2(1) of this code, a water, soil or waste pipe shall not be installed outside of a building, in exterior walls, in attics or crawl spaces, or in any other place subjected to freezing temperature unless adequate provision is made to protect it from freezing by insulation or heat or both. Water service pipe shall be installed not less than 12 inches (305 mm) deep and not less than 6 inches (152 mm) below the frost line.

COMMENTARY: Water, soil or waste pipes must be protected from freezing, whether installed inside or outside the building. Where pipe installation occurs in an exterior wall or unheated space, such as a crawl space or attic, adequate protection must be provided in the form of insulation or heat or both. Where the temperature of the air surrounding the insulation remains low for a significant period, insulation alone will not provide adequate protection from freezing without the addition of heat. In such conditions, the water in the pipe will freeze regardless of the amount of insulation used. Conditions differ significantly between occupied and unoccupied buildings because of heat added in occupied buildings for the comfort of the occupants. When a building remains vacant for an extended period, heat from another source must be supplied to offset heat loss.

Where piping is not directly adjacent to heated spaces in a building, electric resistance heat tapes or cables can be used to supply heat to the piping. Some types of heat tapes should not be used on piping in concealed spaces as the tapes can burn out and require replacement. Plastic piping requires self-limiting type heat tape to prevent overheating of the pipe.

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| | | | |
|---|---|---|---|
| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|

Hose bibbs and wall hydrants located on the exterior wall must be protected from freezing when installed in areas subject to freezing temperatures. This protection can be accomplished by installing devices such as freezeproof hose bibbs that locate the valve seat within the heated space and allow residual water within the hydrant to drain after the valve is closed. Freezeproof hose bibbs cannot be installed where the valve seat is located in an unheated garage or storage room. The valve seat must extend through to the heated side of the exterior wall. The valve assembly on these devices is available in different lengths to accommodate various wall thicknesses (see commentary, Section P2903.10). Table R301.2(1) supplies a method for determining areas that have a winter-design temperature of 32°F (0°C) or less. Water service pipe installed outdoors underground must be at least 12 inches (305 mm) below grade or 6 inches (152 mm) below the frost depth, whichever is greater, to protect against freezing. The 12-inch (305 mm) minimum cover above the pipe protects it from external damage (see Commentary Figure P2603.6).

WATER FIXTURES
Blocking was missing or incomplete at the shower stall. PVC shower pan liner is installed after the carpenters have finished the rough shower stall and dam. To provide support for the shower pan material, blocking of 2" x 10"s must be placed between the lower ends of the studs, forming the shower stall. The outer face of the blocking must be flush with the studs, forming the shower stall. This is required by the pan liner manufacturer and thus by IRC 2709.2 and 102.4.

The shower pan liner is smaller than is required to cover the area allocated for the shower pan.

PROTECTION OF BATHTUBS AND SHOWER PANS
You are strongly urged to have the builder mask the bathtubs and shower pans with sections of flexible sheathing, Ramboard®, or the like to prevent damage to these during the construction process.

| ☑ | ☐ | ☐ | ☑ | **B. Drains, Wastes, and Vents** |
|---|---|---|---|---|

*Type of Sewer System: Private Sewer System*
*Type of Sewer (DWV) Piping: PVC (Where Observed)*

> Note: Specific Limitations: Plumbing fixture overflow devices, integral or site-plumbed, are not tested. These are typically not accessible. Even when accessible, if improperly installed or configured, damage may occur to the property during testing. The TREC SOP for inspectors does not provide for inspection techniques that will cause damage to the property as reasonably determined by the inspector. You are strongly urged to have these tested by a licensed master plumber prior to the end of any time periods associated with the purchase of this home.

*Comments:*

DRAIN/WASTE / VENT (DWV)

PROTECT FROM DAMAGE
The PVC DWV piping has not been installed completely within the wall cavities in the north wall of the Jack and Jill bathroom, the west wall of the laundry room, and the northwest corner

Report Identification: 1224 Durham Lane, Celburne, TX 76033

| I | NI | NP | D | |
|---|----|----|---|---|
| I=Inspected | | NI=Not Inspected | NP=Not Present | D=Deficiency |

| I | NI | NP | D | Inspection Item |
|---|----|----|---|---|

of the master bedroom and requires either relocation or protection from damage as per 2603.2.1 Protection against physical damage. In concealed locations, where piping, other than cast-iron or galvanized steel, is installed through holes or notches in studs, joists, rafters or similar members less than 1.25 inches (31.8mm) from the nearest edge of the member, the pipe shall be protected by shield plates. Protective shield plates shall be a minimum of 0.0575-inch-thick (1.463 mm) steel, shall cover the area of the pipe where the member is notched or bored and shall extend a minimum of 2 inches (51 mm) above sole plates and below top plates.



Add metal plates at DWV.

TOILET DRAIN CLEARANCE FROM WALL

The center of the toilet drain is located less than 12-1/2" from the rough framing at the back (north side) of the toilet. Most, if not all, toilets require 12" from the finished wall.

REI 7-6 (Revised 05/20/2021)        Promulgated by the Texas Real Estate Commission (512) 936-3000 (www.trec.texas.gov)
Page 58 of 67

MSJ Appendix 000087

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I | NI | NP | D | Inspection Item |
|---|----|----|---|-----------------|

I=Inspected          NI=Not Inspected          NP=Not Present          D=Deficiency



Center of drain too close to back wall.

The center of the powder room toilet drain is located less than 15-1/2" from the rough framing at the east side of the toilet. This is required by IRC 307.1, Figure 307.1, and 2705.1(5).



Center of drain too close to side wall.

KITCHEN ISLAND LOOP
The DWV piping is improperly configured at the kitchen island. This requires improvement as per IRC 3112, unless the builder intends to install an air admittance valve as allowed by IRC 3114.

☐ ☑ ☑ ☐    **C.  Water Heating Equipment**
*Energy Sources:*  N/A
*Capacity:*  Unknown
*Comments:*

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |
|---|---|---|---|

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|

There is no water heater installed.

☐ ☑ ☑ ☐   **D. Hydro-Massage Therapy Equipment**
*Comments:*

There is no hydro-massage therapy equipment present.

☐ ☑ ☑ ☐   **E. Gas Distribution Systems and Gas Appliances**
*Gas Meter Location: Not Installed*
*Type of Gas Piping: N/A*
*Type of Gas: N/A*

*Comments:*

There is no gas system installed.

## V. APPLIANCES

*Note: Specific Limitations. It is both generally infeasible and not required by the TREC for the inspector to be qualified to inspect appliances to manufacturers' installation or performance standards.*

**Important Information: Any type of appliance past its manufacturer's limited warranty is likely to fail soon. The length of a warranty may indicate the appliance's quality or lack thereof. Appliances are not immune to failure without notice. Most major kitchen appliances come with a one-year warranty.**

☑ ☑ ☑ ☐   **A. Range Hood and Exhaust Systems**
Type of Unit: Updraft Vented (Not Present)

*Comments:*

RANGE HOOD
The airflow of the proposed unit is unknown. IRC M1503.4 Makeup air required. Exhaust hood systems capable of exhausting in excess of 600 cubic feet per minute (0.19 m3/s) shall be provided with makeup air at a rate approximately equal to the exhaust air rate. Such makeup air systems shall be equipped with a means of closure and shall be automatically controlled to start and operate simultaneously with the exhaust system.

CLEBURNE AMENDMENT
M1503.4 Makeup air required. Exhaust hood systems capable of exhausting in excess of 400 cubic feet per minute (0.19 m3/s) shall be provided with makeup air at a rate approximately equal to the difference between the exhaust air rate and 400 cubic feet per minute. Such makeup air systems shall be equipped with a means of closure and shall be automatically controlled to start and operate simultaneously with the exhaust system.  **Exception:  Where**

REI 7-6 (Revised 05/20/2021)                    Promulgated by the Texas Real Estate Commission (512) 936-3000 (www.trec.texas.gov)
**Page 60 of 67**

MSJ Appendix 000089

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |
|---|---|---|---|

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|

**all appliances in the house are of sealed combustion, power-vent, unvented,  or electric, the exhaust hood system shall be permitted to exhaust up to 600 cubic feet per minute (0.28 m3/s) without providing makeup air. Exhaust hood systems capable of exhausting in excess of 600 cubic feet per minute (0.28 m3/s) shall be provided with a makeup air at a rate approximately equal to the difference between the exhaust air rate and 600 cubic feet per minute.**

For an explanation of the concept see: https://www.youtube.com/watch?v=4PEs09a2AmU

https://www.youtube.com/watch?v=rSIqKGsF2ZA

☑ ☐ ☐ ☑    **B. Mechanical Exhaust Vents and Bathroom Heaters**
*Comments:*

BATHROOM EXHAUST FANS
The fan ducts have not been installed in strict accordance with the manufacturer's installation instructions or ASHRAE 62.2. Unnecessary 180° bends and excessively long runs in the ducts will significantly decrease the fan performance standards to below what is required by IRC 303.3 X, M1507, and ASHRAE 62.2. This requires repair.



Excessive duct bend.

REI 7-6 (Revised 05/20/2021)                    Promulgated by the Texas Real Estate Commission (512) 936-3000 (www.trec.texas.gov)
**Page 61 of 67**

MSJ Appendix 000090

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |
|---|---|---|---|

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|



Excessive duct bends.



☑ ☐ ☐ ☐     **C. Dryer Exhaust Systems**

*Comments:*

SPECIFIC LIMITATIONS: We cannot and do not remove clothes dryers that block access to the dryer duct and we are unable to view inside the duct as to its condition. If the terminus of the duct is at the roofline we are usually unable to ascertain if the terminus roof cap has a gravity damper or ascertain the condition of said damper.

The dryer duct run vertical up a concealed wall was not observed with a placard (sign or label) stating the length of the dryer duct as required by IRC 1502.4.5: "Length identification. Where

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | NI=Not Inspected | NP=Not Present | D=Deficiency |
|---|---|---|---|

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|

the exhaust duct is concealed within the building construction, the equivalent length of the exhaust duct shall be identified on a permanent label or tag. The label or tag shall be located within 6 feet (1829mm) of the exhaust duct connection."

You are strongly urged to have this dryer duct professionally serviced by an HVAC contractor who installs, services, and cleans dryer ducts prior to the end of any time periods associated with the purchase of this home. Failure to do so may result in lint-induced fire.

DRYER VENT (DUCT)
The dryer vent appeared to be in satisfactory condition.

☐ ☑ ☑ ☐   **I.   Other**
*Comments:*

N/A

# ADDENDUM: REPORT OVERVIEW

If you've come away from the reading of this report regarding your new home with a feeling of surprise or disappointment due to the number of items marked as "deficient", please consider the following:

The International Residential Code allows for what is commonly referred to as "grandfathering". That is, the house can legally be occupied without the owner being responsible for making on-going changes to comply with newer versions of the building code as they are adopted. Another phrase to describe this situation is "pre-existing and non-compliant conditions".

*"IRC R102.7 Existing structures.*
*The legal occupancy of any structure existing on the date of adoption of this code shall be permitted to continue without change, except as is specifically covered in this code, the International Property Maintenance Code or the International Fire Code, or as is deemed necessary by the building official for the general safety and welfare of the occupants and the public."*

The Texas Real Estate Commission, which licenses home inspectors, makes the following statement in its publication OP-I, TEXAS REAL ESTATE CONSUMER NOTICE CONCERNING RECOGNIZED HAZARDS:

*Each year, Texans sustain property damage and are injured by accidents in the home. While some accidents may not be avoidable, many other accidents, injuries, and deaths may be avoided through the identification and repair of certain hazardous conditions. Examples of such hazards include:*

*• improperly installed or missing ground fault circuit protection (GFCI) devices for electrical receptacles in garages, bathrooms, kitchens, and exterior areas;*

*• improperly installed or missing arc fault protection (AFCI) devices for electrical receptacles in family rooms, dining rooms, living rooms, parlors, libraries, dens, bedrooms, sunrooms, recreations rooms, closets, hallways, or similar rooms or areas;*

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| | | | | |
|---|---|---|---|---|
| **I=Inspected** | | **NI=Not Inspected** | **NP=Not Present** | **D=Deficiency** |

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|

*• ordinary glass in locations where modern construction techniques call for safety glass; • the lack of fire safety features such as smoke alarms, fire-rated doors in certain locations, and functional emergency escape and rescue openings in bedrooms; • excessive spacing between balusters on stairways and porches;*

*• improperly installed appliances;*

*• improperly installed or defective safety devices; and*

*• lack of electrical bonding and grounding.*

*To ensure that consumers are informed of hazards such as these, the Texas Real Estate Commission (TREC) has adopted Standards of Practice requiring licensed inspectors to report these conditions as "Deficient" when performing an inspection for a buyer or seller, if they can be reasonably determined.*

*These conditions may not have violated building codes or common practices at the time of the construction of the home, or they may have been "grandfathered" because they were present prior to the adoption of codes prohibiting such conditions. While the TREC Standards of Practice do not require inspectors to perform a code compliance inspection, TREC considers the potential for injury or property loss from the hazards addressed in the Standards of Practice to be significant enough to warrant this notice.*

*Contract forms developed by TREC for use by its real estate licensees also inform the buyer of the right to have the home inspected and can provide an option clause permitting the buyer to terminate the contract within a specified time. Neither the Standards of Practice nor the TREC contract forms requires a seller to remedy conditions revealed by an inspection. The decision to correct a hazard or any deficiency identified in an inspection report is left to the parties to the contract for the sale or purchase of the home.*

Though not specifically required by the Texas Real Estate Commission, Texas Inspector attempts to compare the construction of the houses we inspect with the "ideal house" that is constructed in strict accordance with the current building codes, presently the version of the International Residential Code adopted by the municipality in which the house is located and the 2020 National Electrical Code.

The reasons for this are as follows: (1) Section 214.212 of the Local Government Code adopts the International Code Council's International Residential Code as it existed on May 1, 2012, as the municipal residential code for the state.

This law also allows a municipality to adopt local amendments to the code and to review and adopt any amendments made after May 1, 2012, by the International Code Council. In the course of a TREC-regulated inspection, our reports do not presume to address all code-related issues in any given house, but rather aim to provide building code information concerning the items on which we report. We have found this information to be useful to homeowners, homebuyers, and the workers who may be summoned to repair the issues noted. (3) The Texas Real Estate Commission (TREC) requires its property inspector licensees to report all "recognized hazards" as in need of repair. Any situation that is covered in a building code, which only addresses areas of construction in which "life, limb, health and public welfare" are at risk, constitutes a "recognized hazard". Therefore home inspections are, at least in part, for all practical purposes code inspections.

Because homebuilders in the State of Texas are not licensed there is little or no governmental oversight of their building practices. The local city building inspectors are more often than not overworked and underpaid municipal employees. They haven't the available time to perform thorough inspections of houses as they are being constructed. This results in a situation where the minimal building code standards are never fully met. Another way of stating this would be: In our many years of inspection experience and after inspecting several thousand houses, we have never – N-E-V-E-R – seen a house in the 16-county area comprising the D/FW Metroplex that is, in our opinion, fully in compliance with existing codes. This statement includes houses in all price ranges, of all ages, of all different designs, and by all builders.

REI 7-6 (Revised 05/20/2021)          Promulgated by the Texas Real Estate Commission (512) 936-3000 (www.trec.texas.gov)
**Page 64 of 67**

MSJ Appendix 000093

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| | | | | |
|---|---|---|---|---|
| **I=Inspected** | **NI=Not Inspected** | **NP=Not Present** | | **D=Deficiency** |

| I | NI | NP | D | Inspection Item |
|---|----|----|---|-----------------|

This house is no exception. It is not the ideal house. The ideal house would be located on the ideal site that has non-expansive, non-compressive, non-subsiding soil, and a solid substrate that is relatively close to the surface and fully capable of supporting the structure indefinitely. It would have a complete set of roof gutters, area drains, soil that is properly graded away from the foundation, and a significant difference between the elevation of the finish grade and interior floors. The site would be fully irrigated, with no shrubs, trees or swimming pools within 25 feet of the foundation. This house would, of course, be constructed of quality, time-proven materials in both strict compliance with the minimal building standards set forth in the latest versions of the International Residential Code and the National Electrical Code and all materials manufacturer's installation instructions. Additionally, the house would be built in accordance with a multitude of other references and standards in existence that specify best practice scenarios for all facets of residential constructions. (A comprehensive list of these publications is available on request.) The lot and structure would have been both mechanically outfitted and chemically treated with all available options to prevent wood destroying insect activity. For an existing home, the residence would have been meticulously maintained by the homeowners through the services of licensed and qualified professionals in every field.

Even if the "ideal builder" were to build the "ideal house", both the normal atrophy of construction materials and subsequent deferred maintenance on the part of nearly every homeowner would likely spoil the picture of the "perfect home". Due in great part to the builders' lack of ability to educate homebuyers, today's homeowners tend to treat their houses a bit like their automobiles: as disposable commodities. The tendency nowadays is for people to move every five years. With no expectation of any appreciable degree of occupancy comes a decreased, if not nonexistent, feeling of obligation to maintain.

Having said these things, it might at first blush, seem unreasonable to attempt to hold houses to such a high standard. We believe this is the only way for you to get a clear and concise overall picture of the house's condition and the improvements that could be made over time to both enhance the building's performance and possibly increase its value in the marketplace.

SEE: http://www.texasinspector.com/files/Luxury-vs-Safety-Upgrades.pdf

**THE HOUSE IN PERSPECTIVE**

**THE SCOPE OF THE INSPECTION**

All components designated for inspection in accordance with the rules of the TEXAS REAL ESTATE COMMISSION (TREC) are inspected, except as may be noted by the "Not Inspected" or "Not Present" check boxes.  Explanations for items not inspected may be in the "TREC Limitations" sections within this report.

This inspection is visual only.  A representative sample of building components are viewed in areas that are accessible at the time of the inspection.  No destructive testing or dismantling of building components is performed.

It is the goal of the inspection to put a home buyer in a better position to make a buying decision.  Not all improvements will be identified during this inspection.  Unexpected repairs should still be anticipated.  The inspection should not be considered a guarantee or warranty of any kind.

Please refer to the pre-inspection contract for a full explanation of the scope of the inspection.

## ADDENDUM: Building Code Compliance

**Anyone who tells you that the "(Fill in Your City) Building Code" for single-family residential buildings is not the International Residential Code is either ignorant of the facts or being deceptive.**

**If your builder tells you that you cannot have the house inspected he is either ignorant of the facts or being deceptive. You have a legal right under the Texas Business and Commerce Code to have the property**

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| I=Inspected | | NI=Not Inspected | | NP=Not Present | | D=Deficiency |
|---|---|---|---|---|---|---|

| I | NI | NP | D | Inspection Item |
|---|---|---|---|---|

inspected by your agent prior to purchasing it. See
http://www.statutes.legis.state.tx.us/Docs/BC/htm/BC.2.htm

**Sec. 2.513.  BUYER'S RIGHT TO INSPECTION OF GOODS.  (a)  Unless otherwise agreed and subject to Subsection (c), where goods are tendered or delivered or identified to the contract for sale, the buyer has a right before payment or acceptance to inspect them at any reasonable place and time and in any reasonable manner.  When the seller is required or authorized to send the goods to the buyer, the inspection may be after their arrival.**

**Further, the International Code Council's, Legal Aspects of Code Administration, admonishes home buyers that: ". . .it is up to the purchaser to determine the soundness of the building prior to the finalization of the purchase or to hire a professional inspector"**

**NOTE: It is important to understand that merely because the municipality has permitted an installation does not make it code compliant. R105.4 Validity of permit. The issuance or granting of a permit shall not be construed to be a permit for, or an approval of, any violation of any of the provisions of this code or of any other ordinance of the jurisdiction. Permits presuming to give authority to violate or cancel the provisions of this code or other ordinances of the jurisdiction shall not be valid. The issuance of a permit based on construction documents and other data shall not prevent the building official from requiring the correction of errors in the construction documents and other data. The building official is also authorized to prevent occupancy or use of a structure where in violation of this code or of any other ordinances of this jurisdiction.**

**Additionally, everyone working on a project is required to adhere strictly to the code, regardless of what the building official has to say. IRC 105.8 Responsibility. It shall be the duty of every person who performs work for the installation or repair of building, structure, electrical, gas, mechanical or plumbing systems, for which this code is applicable, to comply with this code.**

**The municipality and the municipal inspector are required to enforce the adopted codes and can be held liable by Texas law if they do not as per the Texas Tort Claims Act, Title 5, Governmental Liability, Section 101.0215 which reads in part:**
**"Sec. 101.0215. LIABILITY OF A MUNICIPALITY. (a) A municipality is liable under this chapter for damages arising from its governmental functions, which are those functions that are enjoined on a municipality by law and are given it by the state as part of the state's sovereignty, to be exercised by the municipality in the interest of the general public, including but not limited to:**
**(28) building codes and inspection"**

An individual who wishes to file a complaint against a registered municipal code enforcement officer or a code enforcement officer in training may write to:

https://www.tdlr.texas.gov/complaints/ComplaintForm.aspx?strRadiobutton=Code%20Enforcement%20Officers
Having said all that, we should add this: *We are not the Building Police.* Home inspectors in the state of Texas have no authority to compel full compliance with the prevailing building codes. They have no legal basis on which to enforce their opinions. Only a building official for a municipality has that enforcement authority and may direct code compliance. Additionally, we are not interpreting the building code. That is a solely a matter for the Authority Having Jurisdiction, i.e. the municipality in question. However, we always find discrepancies between what the municipal inspectors allow and stated code requirements, and feel that juxtaposing these two allows our clients to make a fully informed decision regarding the condition of the home they are buying.

When confronted with the facts many builders will fall back on any number of different logical fallacies as arguments. These are specious and of no importance. Your inspector was professional enough to provide you with the facts in this written report and to justify and support each comment with building code and industry regulation citations. If your builder disagrees with anything in this report you should insist that he responds in kind: in writing, on his company letterhead, and support each matter of contingency with the applicable building code, industry standard,

Report Identification: 1224 Durham Lane, Celburne, TX  76033

| | | | | |
|---|---|---|---|---|
| **I=Inspected** | | **NI=Not Inspected** | **NP=Not Present** | **D=Deficiency** |

| I | NI | NP | D | Inspection Item |
|---|----|----|---|-----------------|

manufacturers' installation instructions, et al. citation. If he cannot, he is merely providing you with so much hot air, distorting the facts to support his theories, and wasting your time.

Also bring the municipal inspector into the discussion by scheduling a meeting between you, the builder, and the chief building inspector of your city. Provide each of the two a copy of my report. Ask them to illustrate to you in writing on company and city letterhead where in the adopted building code the report is wrong. If they are unwilling to do so this should raise a huge red flag.

# ADDENDUM: BUILDER-EMPLOYED THIRD-PARTY INSPECTIONS

Some builders attempt to impress new home buyers with inspections performed by so-called independent third-party inspection firms. This is patently absurd. The builder's subcontractor simply cannot, by the very nature of his relationship to the builder, be impartial. This is often merely a dog and pony show intended to both manage the buyer's expectations and even (hopefully, from the builder's point of view) deflect any real independent inspections of the property.

This practice is controversial enough in areas with formal building inspection departments. In those rural and extraterritorial areas where no direct oversight is available by a governmental official and third-party oversight is required by law, it can be a real problem. It is certainly a questionably-ethical trade practice that has the potential to be deceptive.

When unqualified or under-qualified inspectors are tasked with ascertaining building code requirement compliance, structural and safety issues can be and often are overlooked. This results in substandard buildings that are unsafe. Even when inspectors are competent, subtle or overt pressure from their clients – the builders – can lead to issues not reported.

Because you are in a position to possibly be misled, whether purposely or inadvertently, you are strongly urged to consult with an attorney who specializes in residential construction law (Chapter 27 of the Texas Property Code) regarding this controversial practice and to have him or her advise you as to how to proceed in your dealings with your builder. If you need a referral to a competent attorney who is board-certified in construction defect litigation, call me.

EXHIBIT G


ENGINEERING REPORT OF

FALKOFSKE ENGINEERING

MSJ Appendix 000097



722 North Fielder Road
Arlington, Texas 76012
(817) 261-8300

February 1, 2023

Attn:   Mr. Mike Newman

Re:   Structural Observation of Existing Framing for New Construction Home
      1224 Durham Lane
      Cleburne, Tx
      Falkofske Engineering, Inc. Job No. 41.23

Dear Mr. Newman:

On January 7, 2023, I visited the above noted address to observe the framing that had been installed. It is my understanding the builder and framer abandoned the work, and there are concerns regarding the performance of the framing. The following are my observations and recommendations:

While not directly a framing issue, I noted the roof above front porch and outdoor living area to be less than a 2:12 pitch. The roof above the outdoor living area was shingled. Roofs with less than a 2:12 are not allowed to be shingled. The pitch should be altered to achieve the minimum slope or shingled removed and replaced with a metal roof.

All other noted deficiencies are noted on the attached floor plan document. At each location where a deficiency was noted, the repair or modification was noted as well..

If there are any questions regarding this report, please feel free to call.

Sincerely,

**FALKOFSKE ENGINEERING, INC.**
**Texas Registered Engineering Firm No. F-4038**

Thomas Whitecotton, M.C.E., P.E.

TJW:mlv

**Limitations:**

The review of the structures on these sites was a visual review only, and is the rendering of a professional service, the essence of which is the providing of advice, judgment, opinion, or similar professional skill.  No destructive testing of the material components of the wall was performed.  No detailed analysis was done on any portion of the structure by our office.  As such, Falkofske Engineering, Inc. and Thomas J Whitecotton P.E., shall not be held liable for the future performance of the structures on this site.

## AREA SCHEDULE

| | |
|---|---|
| FIRST FLOOR LIVING: | 2,697 SF |
| SECOND FLOOR LIVING: | 0 SF |
| TOTAL LIVING: | 2,697 SF |
| GARAGE: | 547 SF |
| PORCH & PATIO: | 851 SF |
| TOTAL UNDER ROOF: | 4,095 SF |

## WINDOW SCHEDULE

| | |
|---|---|
| A | 3'-0" X 2'-0" FIXED |
| B | (2) 3'-0" X 6'-0" SH, MULLED |
| C | 2'-0" X 2'-0" FIXED |
| D | 3'-0" X 6'-0" SH |
| E | 2'-4" X 5'-0" SH |
| F | 2'-4" X 5'-0" SH |
| G | 4'-0" X 2'-0" FIXED |
| H | 2'-8" X 6'-0" SH |
| J | 8'-0" X 5'-0" UNIT<br>2'-0" x 5'-0" SH/4'-0" x 4'-0" FIX/2'-0" x 5'-0" SH |
| K | 3'-0" X 5'-0" SH |
| L | 2'-0" X 4'-0" FIXED |

## DOOR SCHEDULE

| | |
|---|---|
| 1 | 3'-0" X 8'-0" EXT. S.C ENTRY DOOR |
| 2 | 3'-0" X 8'-0" |
| 3 | 3'-0" X 6'-8" |
| 4 | 2'-8" X 6'-8" |
| 5 | 2'-4" X 6'-8" |
| 6 | 2'-0" X 6'-8" |
| 7 | 12'-0" X 8'-0" SLIDING UNIT |
| 8 | 16'-0" X 8'-0" GARAGE DOOR |



PROJECT ADDRESS
1224 DURHAM LANE
CLEBURNE, TX 76033

PLAN NAME
NEWMAN RESIDENCE

ISSUE
November 26,

FLOOR PLAN

A.03

EXHIBIT H


INVOICES FROM

BLACK BEAR CONSTRUCTION GROUP, INC.

MSJ Appendix 000100

**Black Bear Construction Group Inc.**

8109 Autumn Run Ln
North Richland Hills, TX
76182 US
bleackbearcg@outlook.com



## Estimate

| ADDRESS | | | ESTIMATE | 1020 |
|---|---|---|---|---|
| 1409 Kaitlyn Lane, Keller, TX 76248 | | | DATE | 02/11/2023 |

| SERVICE | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| Framing | Fixing or repairing mistakes in general framing. | 4 | 2,200.00 | 8,800.00 |
| Plumbing | Removing old plumbing or broken pipes if needed. Replacing old or broken pipes in set location. | 3 | 150.00 | 450.00 |
| Window Installation | Remove old windows, install new windows | 22 | 150.00 | 3,300.00 |
| Outside Structure Framing | Building of an outdoor structure such as a pergola, patio cover etc. | 1 | 3,200.00 | 3,200.00 |
| Attic Ladder Installation | Installing Attic Ladder | 1 | 200.00 | 200.00 |
| Roof Installation | Installing or repairing roof | 1 | 425.00 | 425.00 |
| Materials | Any and all disposable materials used to complete a job. | 1 | 5,230.00 | 5,230.00 |
| Roof Foam Insulation | Installing under roof decking foam insulation | 1 | 500.00 | 500.00 |

| | | |
|---|---|---|
| SUBTOTAL | | 22,105.00 |
| TAX | | 0.00 |
| TOTAL | | **$22,105.00** |

Accepted By

Accepted Date

Page 1 of 1

MSJ Appendix 000101

**Black Bear Construction Group Inc.**

8109 Autumn Run Ln
North Richland Hills, TX
76182 US
bleackbearcg@outlook.com



# Estimate

ADDRESS
Mike Newman
1409 Kaitlyn Lane
Keller, TX  76248

ESTIMATE     1021
DATE          03/01/2023

| SERVICE | DESCRIPTION | QTY | RATE | AMOUNT |
|---------|-------------|-----|------|--------|
| Wall Framing or Repair | Replace or Repair Wall or Window Framing. Removing back sliding door header, rebuilding, reinstalling. | 1 | 800.00 | 800.00 |

|  |  |
|--|--|
| SUBTOTAL | 800.00 |
| TAX | 0.00 |
| TOTAL | **$800.00** |

Accepted By

Accepted Date

MSJ Appendix 000102

**Black Bear Construction Group Inc.**

8109 Autumn Run Ln
North Richland Hills, TX
76182 US
bleackbearcg@outlook.com



# Estimate

**ADDRESS**
Mike Newman
1409 Kaitlyn Lane
Keller, TX  76248

| | ESTIMATE | 1022 |
|---|---|---|
| | DATE | 04/09/2023 |

| SERVICE | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| Structure Removal | Removal of existing structure. Front Porch. | 1 | 1,309.00 | 1,309.00 |
| Outside Structure Framing | Building of an outdoor structure such as a pergola, patio cover etc. | 1 | 8,400.00 | 8,400.00 |
| Set New Structure Posts | Set and level new structure posts complete with floor anchors and porch swing bracing. | 7 | 900.00 | 6,300.00 |
| Framing | Fixing or repairing mistakes in general framing. Fire block, closet relocation etc. | 1 | 7,875.00 | 7,875.00 |
| Craftsman Split Front Porch Column | Decorative Front Porch Column | 7 | 250.00 | 1,750.00T |
| Wall Dryer Duct Installation | Installing Dryer Duct in wall. | 2 | 200.00 | 400.00 |
| Framing | Fixing or repairing mistakes in general framing. Address framing issues from FalkofskeEngineering report Bedroom 3 - Add (2) 2x10 SP2 Beam brace from hip at north side of room Kitchen - Add (2) 2x12 SP2 Beam below gable ridge Family Room - Add (3) 1 3/4 x 1 1/4 LVL OR (2) 1 3/4 x 14 LVL to existing beam - Add (2) 1 3/4 x 11 1/4 LVL to existing beam - Add braces from ends to ridge - Add additional 2x12 ply to beam Master Bedroom - Add brace from wall to roof Master Bedroom - Add brace from wall to roof Master Bath - Add brace from wall to roof Master Closet - Add (2) 2x12 beam below gabled roof Show less 1 x $4,000.00 | 1 | 5,600.00 | 5,600.00 |

took off this part from the brick work due to these items ar a must do for the
plumb, finish carpentry work and front porch that was not done correctly.

| | SUBTOTAL | 31,634.00 |
|---|---|---|
| | TAX | 144.38 |
| | **TOTAL** | **$31,778.38** |

Accepted By

MSJ Appendix 000103

**Black Bear Construction Group Inc.**

8109 Autumn Run Ln
North Richland Hills, TX
76182 US
bleackbearcg@outlook.com



## Estimate

ADDRESS
Mike Newman
1409 Kaitlyn Lane
Keller, TX  76248

ESTIMATE      1023
DATE          04/13/2023

| SERVICE | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| Concrete Installation | Pin & pour concrete brick ledges with A/C Pad included. | 1 | 1,309.00 | 1,309.00 |
| Exterior Brick Installation | Installing Exterior Brick on the Exterior Walls of a house or structure to customer satisfaction. Install white brick throughout entire exterior (8,568 bricks) | 1 | 14,098.00 | 14,098.00 |

Moving forward with house finish out.

| | |
|---|---|
| SUBTOTAL | 15,407.00 |
| TAX | 0.00 |
| **TOTAL** | **$15,407.00** |

Accepted By

Accepted Date

MSJ Appendix 000104

**Black Bear Construction Group Inc.**

8109 Autumn Run Ln
North Richland Hills, TX
76182 US
bleackbearcg@outlook.com



# INVOICE

BILL TO
Mike Newman
1409 Kaitlyn Lane
Keller, TX  76248

| | |
|---|---|
| INVOICE | 1064 |
| DATE | 03/01/2023 |
| TERMS | Due on receipt |
| DUE DATE | 03/01/2023 |

| SERVICE | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| Wall Framing or Repair | Replace or Repair Wall or Window Framing. Re-framing headers and openings for windows throughout house. Window opening were wrong, not in plumb and bowed lumber was used. | 1 | 2,500.00 | 2,500.00 |

| | |
|---|---|
| SUBTOTAL | 2,500.00 |
| TAX | 0.00 |
| TOTAL | 2,500.00 |
| PAYMENT | 2,500.00 |
| **BALANCE DUE** | **$0.00** |
| | **PAID** |

MSJ Appendix 000105

**Black Bear Construction Group Inc.**

8109 Autumn Run Ln
North Richland Hills, TX
76182 US
bleackbearcg@outlook.com



# INVOICE

**BILL TO**
Mike Newman
1409 Kaitlyn Lane
Keller, TX  76248

| | |
|---|---|
| INVOICE | 1063 |
| DATE | 03/13/2023 |
| DUE DATE | 03/13/2023 |

| SERVICE | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| Framing | Fixing or repairing mistakes in general framing. | 4 | 2,200.00 | 8,800.00 |
| Plumbing | Removing old plumbing or broken pipes if needed. Replacing old or broken pipes in set location. | 3 | 150.00 | 450.00 |
| Window Installation | Remove old windows, install new windows | 22 | 150.00 | 3,300.00 |
| Outside Structure Framing | Building of an outdoor structure such as a pergola, patio cover etc. | 1 | 3,200.00 | 3,200.00 |
| Attic Ladder Installation | Installing Attic Ladder | 1 | 200.00 | 200.00 |
| Roof Installation | Installing or repairing roof | 1 | 425.00 | 425.00 |
| Materials | Any and all disposable materials used to complete a job. | 1 | 5,230.00 | 5,230.00 |
| Roof Foam Insulation | Installing under roof decking foam insulation | 1 | 500.00 | 500.00 |

Deposit amount $11,000.00 for materials cost and operating expenses.

| | |
|---|---|
| SUBTOTAL | 22,105.00 |
| TAX | 0.00 |
| TOTAL | 22,105.00 |
| PAYMENT | 11,000.00 |
| **BALANCE DUE** | **$11,105.00** |

MSJ Appendix 000106

**Black Bear Construction Group Inc.**

8109 Autumn Run Ln
North Richland Hills, TX
76182 US
bleackbearcg@outlook.com



## INVOICE

| BILL TO | | INVOICE | 1066 |
|---|---|---|---|
| Mike Newman | | DATE | 05/03/2023 |
| 1409 Kaitlyn Lane | | TERMS | Due on receipt |
| Keller, TX  76248 | | DUE DATE | 05/04/2023 |

| SERVICE | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| Materials | Any and all disposable materials used to complete a job. SP2 beam material and Master Bath/Powder Room Rework | 1 | 1,498.91 | 1,498.91T |
| Materials | Any and all disposable materials used to complete a job. Special Order LVL Beams for Interior Rework per Engineer, | 1 | 990.92 | 990.92T |

Framing Materials for interior

| | | |
|---|---|---|
| SUBTOTAL | | 2,489.83 |
| TAX | | 0.00 |
| TOTAL | | 2,489.83 |
| BALANCE DUE | | **$2,489.83** |

MSJ Appendix 000107

**Black Bear Construction Group Inc.**

8109 Autumn Run Ln
North Richland Hills, TX
76182 US
bleackbearcg@outlook.com



## Estimate

ADDRESS
Mike Newman
1409 Kaitlyn Lane
Keller, TX  76248

ESTIMATE    1024
DATE        05/03/2023

| SERVICE | DESCRIPTION | QTY | RATE | AMOUNT |
|---------|-------------|-----|------|--------|
| Wall Framing or Repair | Replace or Repair Wall or Window Framing | 1 | 3,520.00 | 3,520.00 |
| Concrete Cutter | Tool Rental needed for the Job | 1 | 250.00 | 250.00T |
| Concrete Removal | Removal of concrete slab, wall etc. | 1 | 1,200.00 | 1,200.00 |
| Concrete Installation | Concrete patch drain pipe in slab | 1 | 730.00 | 730.00 |
| Plumbing | Removing old plumbing or broken pipes if needed. Replacing old or broken pipes in set location. | 1 | 352.00 | 352.00 |

This is for the Master Bath and Powder Room Rework

| | |
|---|---|
| SUBTOTAL | 6,052.00 |
| TAX | 20.63 |
| TOTAL | **$6,072.63** |

Accepted By

Accepted Date

MSJ Appendix 000108

**Black Bear Construction Group Inc.**

8109 Autumn Run Ln
North Richland Hills, TX
76182 US
bleackbearcg@outlook.com



# INVOICE

BILL TO
Mike Newman
1409 Kaitlyn Lane
Keller, TX  76248

| | |
|---|---|
| INVOICE | 1069 |
| DATE | 05/13/2023 |
| DUE DATE | 05/13/2023 |

| SERVICE | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| Structure Removal | Removal of existing structure. Front Porch. | 1 | 1,309.00 | 1,309.00 |
| Outside Structure Framing | Building of an outdoor structure such as a pergola, patio cover etc. | 1 | 8,400.00 | 8,400.00 |
| Set New Structure Posts | Set and level new structure posts complete with floor anchors and porch swing bracing. | 7 | 900.00 | 6,300.00 |
| Framing | Fixing or repairing mistakes in general framing. Fire block, closet relocation etc. | 1 | 7,875.00 | 7,875.00 |
| Craftsman Split Front Porch Column | Decorative Front Porch Column | 7 | 250.00 | 1,750.00T |
| Wall Dryer Duct Installation | Installing Dryer Duct in wall. | 2 | 200.00 | 400.00 |
| Framing | Fixing or repairing mistakes in general framing. Address framing issues from FalkofskeEngineering report Bedroom 3 - Add (2) 2x10 SP2 Beam brace from hip at north side of room Kitchen - Add (2) 2x12 SP2 Beam below gable ridge Family Room - Add (3) 1 3/4 x 1 1/4 LVL OR (2) 1 3/4 x 14 LVL to existing beam - Add (2) 1 3/4 x 11 1/4 LVL to existing beam - Add braces from ends to ridge - Add additional 2x12 ply to beam Master Bedroom - Add brace from wall to roof Master Bedroom - Add brace from wall to roof Master Bath - Add brace from wall to roof Master Closet - Add (2) 2x12 beam below gabled roof Show less 1 x $4,000.00 | 1 | 5,600.00 | 5,600.00 |
| Job Site Clean Up | Clean up all left over materials, garbage etc. from previous contractor utilizing on site dumpster. Customer may have to call to have dumpster emptied. | 1 | 0.00 | 0.00 |

| | |
|---|---|
| SUBTOTAL | 31,634.00 |
| TAX | 144.38 |
| TOTAL | 31,778.38 |
| PAYMENT | 15,889.19 |

MSJ Appendix 000109

BALANCE DUE                                      **$15,889.19**

MSJ Appendix 000110

# APPENDIX

# ATTACHMENT 2

MSJ Appendix 000111

## AFFIDAVIT of JERRY BROOK

STATE OF TEXAS        §

COUNTY OF TARRANT    §

      **BEFORE ME**, the undersigned authority, on this day personally appeared **Jerry Brook**, who swore on oath that the following facts are true:

      "My name is Jerry Brook.  I am over 18 years of age, of sound mind, and fully competent to make this affidavit.   I have personal knowledge of the facts stated herein and they are all true and correct.

I am the owner and principal of Black Bear Construction Group, Inc. which is engaged in general construction, including residential construction and remodeling.  I have over 15 years of experience in residential construction.  I was a framing contractor for 6 years, and then expanded my business to include general construction and remodeling of residential homes. I am familiar with all of the necessary work involved to complete all such projects, and am familiar with the installation of concrete foundations, concrete flatwork, framing, roofing, installation of electrical and plumbing, installation of Heating Ventilation & Air Conditioning (HVAC) systems and ductwork, installation of sheetrock and finish out, painting, flooring, installation of cabinets and trim carpentry, as well as the finish or top-out of plumbing fixtures and electrical fixtures. I have years of experience in each of these categories, as a general contractor.  I am familiar with the requirements to perform each of these items, in a good and workmanlike manner, and I am generally familiar with the minimum requirements of the applicable building codes and what is expected of each subcontractor hired to perform the associated work involved.  I am familiar with the reasonable and necessary costs associated with each phase and portion of the work in involved in the construction and remodeling of a residential home.

      I was retained by the plaintiff, Kristin E. Newman, in approximately December 2022, to evaluate the condition of the work performed by Judge DFW, LLC, Christopher Judge and Raquel Judge (hereinafter, collectively referred to as the "Builders"), in connection with the construction of plaintiff's new home at 1224 Durham Lane, Cleburne, Johnson County, Texas (hereinafter, the "project" or "plaintiff's home").

I was given a copy of the home inspection, dated August 30, 2022, prepared by Aaron D. Miller, ACI, CEI, CMI, CPI, CRI, MTI, RCI, of  Texas Inspector.   I found his report, (the "Home Inspection Report" a copy of which is attached hereto, and incorporated herein by reference) to be very thorough and concise, and that it accurately described the condition of Kristin Newman's home, in the condition as when I initially inspected it.

I conducted a walk-through of the property in approximately December 2022, and found that the construction project had been abandoned, and that there was, in place a concrete slab foundation,

AFFIDAVIT OF JERRY BROOK                            Page - 1 -

constructed on grade, with wood framing, trusses and roofing materials installed. There was some pex plumbing pipes, electrical wiring, and a portion of the HVAC system installed. There was a large pile of construction debris and trash that the Builders had allowed to be left in the front yard of the home, There was no dumpster for the use of the subcontractors, as is normal and expected in the construction industry. There was no portable toilet on the jobsite, as is required by normal construction practices. There was no temporary power pole installed to provide electricity to the job-site, nor had there been any request made to the local power company to provide electricity to the jobsite. There was no building permit displayed or issued by, the city of Cleburne or Johnson County, which was a necessary prerequisite to commencement of construction.

I requested that the owner, Kristin E. Newman (hereinafter, the "Owner") provide a copy of the building plans prepared the architect, and/or obtained by the Builders. I discovered that the Builders only provided a sketch or computer generated drawing of the exterior of the home, along with a floorplan drawing. The Builders had not produced or provided a proper set of building plans, which is not acceptable within the trade or industry of residential home construction. Building plans are necessary and required to establish the specifics of the construction, which would include foundation plans and schedules, plumbing plans and specifications, electrical plans and specifications, as well as framing plans and specifications, and engineering of the roof and trusses.

The drawings provided by the Builders were not prepared or approved by an architect. I have since learned that Christopher Judge is not, and has never been a licensed architect. Further, the drawings generated by the Builders merely depicted what the house might look like, but contained no instructions or specifications as to any of the details of the construction. The plans do not contain any specifications as to the installation of the framing of wall studs, where studs should be placed, the installation of sill plate anchors, description or specification of installation of trusses, rafters and joists, or the specifics of the installation of roofing and roofing materials, including but not limited to the roof slope, type of materials, or installation of necessary roofing design features. The roof over the back patio area was of an insufficient slope, and was not constructed according to building codes or according to standard industry practices. The patio roof, and much of the other roof needed to be removed, and the roof pitch re-designed with a proper roof pitch. Further, the newly installed roof was leaking when it rained. The wall framing contained numerous oversized holes for the pass-through of plumbing and electrical. The excessive-sized holes compromised the strength and integrity of the wall studs, and each stud would need to be replaced or repaired with proper bracing.

Christopher Judge did not install proper posts to hold up the front porch, and merely used 4x4 posts, which were improperly installed. They were too short, and did not properly support the front porch. The framer had toe-bearing rafters throughout the house which was a code violation, and was unsafe, as the roof could collapse due to the improper, and insufficient support that existed. Many of the rafters did not have the proper straps to hold them up. The inspector, and the engineer both indicated that the design of the house by Christopher Judge was improper and dangerous. There were no beams across the peak of the roof in the main living area. It only had 2x4's and 2x6's which were not sufficient to hold up the roof. In fact, after one year, the roof had sagged approximately one-inch as a result of the poor construction and design.

Additionally, Christopher Judge built the garage with a cathedral ceiling in the garage, which is not customary in the construction industry.  There was nothing holding up the roof over the garage, except 2x4's and 2x6's leaving the roof of the garage subject to collapse.  There was missing bracing in the roof area, and no fire-blocking had been installed in any of the interior framing.

The foundation was a single concrete slab, constructed on grade.  The Builders provided a foundation plan, that had been certified by a third party engineer, but it was obvious that the Builder did not follow the proposed foundation plan.  The plan contained no specifications or details, necessary or required to properly install the foundation.  Edges of the foundation were damaged and broken, with exposed rebar and pipes.  The foundation sill plate bolts were mostly either missing or installed in the wrong locations. Water pipes and waste pipes were installed in the wrong locations, and some were coming through the foundation into living spaces, and not the wall cavities.  The kitchen island piping for electrical wiring, and water lines were installed in the wrong location, and would need to be relocated.  Additionally, the foundation was missing brick ledges in several areas where brick was to be installed.

The framing was not installed in a commercially reasonable manner, nor was it installed in a good and workmanlike manner, such that it would not pass without objection in the trade or industry.  In many instances, it was not installed in accordance with code.  There were numerous instances of "toe bearing rafters" meaning the rafters that sit on the wall plates were cut, or notched, such that the ends of the rafters were cut, and the weight of the roof is sitting on the cut, or notched end.  Each of these should have been corrected, by either installing a proper rafter, or at a minimum, installing a metal brace at each such "toe-end".  It is a standard within the industry to install wall studs at specified intervals, typically, at sixteen-inch centers.  The wall studs were installed indiscriminately at different widths, throughout the house.  This allows for the proper installation of drywall, with the ends of the sheets of the drywall to meet up with the wall studs.  Further, there were a large number of wall studs placed in the wrong location. Specially, it is a code requirement to install wall studs under load bearing top plates, which many were not.    The rough openings for the windows were of differing sizes, and needed to be corrected.  The bottom plate, being the lumber under the wall studs that rests on the concrete foundation are required to be pressure treated lumber, which the Builders failed to install in many locations.

Most of the window openings and many of the door frames were incorrect and of the wrong sized dimensions and needed to be removed and reinstalled.

The waste and vent lines were installed in the wrong locations and needed to be removed and reinstalled.

The partial installation of the plumbing consisted of pex pipe, much of which was installed in the wrong places.  Pipes were coming out of the foundation, into the living spaces and not up into wall cavities.  Waste pipes were installed in the wrong locations.  Hot water lines were connected

to cold water lines, and pex pipes, in the attic, were laid  along with electric wires, which is improper, unacceptable and dangerous.

The electric wiring was partially completed, but was completely unacceptable, improper and substandard.  The person that installed the wiring had different gages of wire connected together, and had installed copper wiring in part of the house, and installed aluminum wiring in other parts of the house.  All of the main wiring, coming out of the circuit breaker box was aluminum wiring, which was improper, unacceptable, in violation of electrical building codes and was dangerous.  The circuit breaker panel was undersized, and some circuits were wired with no switches.  There were missing wiring circuits, that needed to be installed.  Similarly, the HVAC was partially installed.  I met with the HVAC subcontractor to discuss his completion  of his work.  He refused to complete the work, on the basis that he had not been paid the Builders, and he would not deliver or install the remaining equipment or provide a warranty on his work.  Further, I discovered that the HVAC system had not been designed or engineered for the home, and that no energy study had been performed.  The HVAC system installed by was undersized, as it was only a 3 ton unit, and should have been, at a minimum, a 5 ton unit.  Further, only the ductwork and air handler (inside) unit was installed, and the Judge's HVAC contractor still needed to install the outside (compressor) unit, and to charge the system with freon, which the Judge's contractor refused to do.  Therefore, it was necessary for Kristin Newman to have another HVAC contractor replace the air handler and complete the installation.

The most glaring issue that I found, on my initial walkthrough was the fact that the Builders had constructed a "cathedral ceiling" in the garage area.  Normal construction of an attached residential garage, with a peaked roof would require horizontal joists across the span of the garage space, with the peaked roof supported by trusses, with a roof beam (typically a squared length of timber) that spans an area of the building that usually is intended to be a primary load-bearing part of the roof framing.  The building sketches provided by the Christopher Judge depict garage ceiling joists, yet the Christopher Judge did not follow his own rudimentary design.  Further, Christopher Judge  had not install a single roof beam, which would be preferred, and recommended by the construction industry.   Instead, Christopher Judge installed two separate roof beams, nailed together, to hold up the roof.  The roof beams were being supported by temporary bracing, that extended from the roof beam to the floor, in an attempt to hold up the roof.  Not only was the construction and design of the "cathedral ceiling" in the garage contrary to the house sketches provided by the Builders, it was extremely dangerous, and in my opinion, likely to collapse, unless it was immediately corrected.

Upon reviewing the Home Inspection Report I realized that there were numerous defects in the home construction.  The house, as it was, in its partially completed state, could not be completed unless and until the defects were corrected.  The improvements that had been installed, that I reviewed, each contained construction defects that could not pass without objection in the trade or industry of residential construction, the work had not been performed in a good and workmanlike manner, and many of the defects would constitute code violations.

When taken as a whole, considering the significant number defects, and the severity of the defects, in my opinion, Christopher Judge and Raquelle Judge either had no knowledge of

**AFFIDAVIT OF JERRY BROOK**                                      Page - 4 -

generally acceptable building practices, or that they had no desire to follow any building codes or to construct the house in a commercially reasonable manner, or to perform their work in a good and workmanlike manner.

I felt confident that I could repair all of the defects in the general framing of the walls and window openings, as hiring qualified, licensed sub-contractors to address the defects in the plumbing, electrical and HVAC. A much more thorough inspection would be required to determined the extent of each of these defects and deficiencies.

However, I informed the owner, Kristin E. Newman, that I would only be willing to proceed with the repair work, if she retained the services of a licensed structural engineer, to evaluate the condition of the work performed and to advise of the needed repairs and corrections. The owner proceeded to retain the services of Thomas Whitecotton, M.C.E., P.E. a professional engineer (hereinafter, the "Engineer")with Falkofske Engineering (Texas Registered Engineering Firm No. F-4038). The engineer personally inspected the Property, and prepared a report detailing the existing condition and notating the necessary repairs needed to make the house meet building codes and requirements, and to make the structure same for human habitation. Attached is a true and correct copy of Engineer's report and recommendations. I have relied upon the findings and recommendations of the Engineer (as well as the Home Inspection) in formulating some of my opinions set forth herein.

The engineer has recommended the installation of ceiling joists (horizontal lumber spanning across the ceiling) in the garage area, instead of the cathedral ceiling, which had no support underneath. The engineer further recommended the installation of bracing in the garage area, and throughout the house, as well as the installation of additional LVL ("Laminated Veneer Lumber"—a sturdy composite lumber made from thin wood veneers bonded together) beams to support the existing beams installed, as they were inferior and unable to support the existing roof. In fact, the central roof beam in the house had begun to sag, and had to be raised.

The owner agreed to hire me to correct all of the existing defects, and to follow the recommendations of the Engineer.

The normal procedure to build a new home, in accordance with industry standards, involves the following steps. Based upon my inspection of the work in place and documentation provided by Christopher Judge, none of the following steps took place:

1. Licensed Surveyor- Surveys the area and provides raw data to show slope of ground, water accumulation runoff and boundaries.

2. Licensed Civil Engineer- Determines the site for what is needed for a foundation for the proposed home to be built. This includes building pad and foundation plans with thickness for foundation, footings etc.

AFFIDAVIT OF JERRY BROOK                                                                 Page - 5 -

3. Licensed Architect. Designs the initial blueprints for the home to be built working with the customer to map out what they want, all the way through the finish out of the home. Trim, cabinets etc.

4. Licensed Structural Engineer- receives the Licensed Architect plans for the home and draws his or her plans for the framing, plumbing, electrical load bearing beams and load bearing walls etc. The Structural Engineer is also responsible for the Roof Planes Roof type and support posts for porches, patios etc.

5. Licensed and Certified Building Inspector- Inspectors are required to make sure the construction of the new home meets or exceeds laws and regulations of building codes whether it be International Codes (County) or City Codes (City controlled). If in a county area outside of city limits, a reputable third party building inspection company is used. If within city limits, the city building inspector is notified and will conduct inspections for the new home. Both types of inspectors must sign off on each stage of the project.

Once all 5 of these Licensed Professionals have signed off on all that is needed for the construction of the home, then and only then can permits be pulled, temporary electric pole installed, and construction can begin.

The following list describes the normal and customary work contemplated in the construction of a residential home:

1. Building pad- 1ft. to 2ft. building pad, compacted and mixed with gravel in preparation for concrete foundation of the future home.

2. 2 inches of road base from where the driveway will start from the main road to where the garage will be located. At this time any culverts (if needed) will be installed at the main road entrance if there is a runoff ditch.

3. Footings dug in accordance with the Civil Engineers specifications. Footings, concrete forms, rebar tie ins with support, in ground plumbing and in ground electrical.

4. Inspection of footings, forms, rebar layout/ties with support, in-foundation plumbing and in ground electrical per Civil Engineer Plans of the foundation with plumbing and electrical schedule and re-bar or cable tension foundation support and concrete tie in. This will also cover brick ledges if required. If there are any discrepancies in this process, work must stop and all issues resolved within a timely manner. Customer is not responsible for the cost of repairs, discrepancies or faulty building. The General Contractor and Sub-Contractors will absorb the cost.

5. Concrete Footing and foundation installation. Surface of foundation must be level with a smooth finish. No center rises and wall anchor bolts installed 6ft. apart for single story homes, 4ft apart for 2 story homes. 5/8 anchor bolts are industry standard. Anything smaller will not withstand side pressure from high winds, heavy snow build up, ice and hurricane conditions.

6. Concrete foundation and footing Inspection. This inspection will ensure brick ledges are correct height and depth (if ledges are required), concrete density and rebar is at the correct depth utilizing Non-Destructive Testing Equipment to test the strength, durability and consistency of the concrete after curing. This equipment can also detect the rebar placement and depth to ensure no rebar was removed after initial footings, plumbing, electrical and rebar footings placement inspection was done. Many contractors try to cut corners by removing rebar after the initial concrete forms inspection.

7. Well Drilling and Septic Tank Installation. This is only required where city water and sewage is not available. Minimum acreage is required to have either or both per house. These rules change by county in Texas. The well drillers and septic installers work directly with the client and county for permits and inspections.

8. Initial Framing and General Construction of the framework, Roof Joists, wall fire blocking, interior wall framing to include load bearing walls, beams and general construction of the floor plan as provided by the Architect and Structural Engineer.

9. Framing Inspection via either third party Inspection (County) or city inspector. At this time if there are any discrepancies and/or the framing is not compliant with the pans provided or building codes, work must stop and all issues resolved within a timely manner. Customer is not responsible for the cost of repairs, discrepancies or faulty building. The General Contractor and Sub-Contractors will absorb the cost.

10. Indoor plumbing and electrical wiring. This includes placement for all sinks, showers, tubs, washer hook ups, refrigerator hook ups, etc. Electrical placement for all lights, switches, outlets, stoves, AC units and any other electrical appliance to be installed in the home. This includes the breaker box finish out with fuse blocks.

11. Plumbing and electrical inspection. All plumbing and electrical installed must be inspected and signed off by a third party inspector (county)or a city inspector. At this time if there are any discrepancies and/or the plumbing is not compliant with the plans provided or building codes, work must stop and all issues resolved within a timely manner. Customer is not responsible for the cost of repairs, discrepancies or faulty plumbing. The General Contractor and Sub-Contractors will absorb the cost.

12. Electrical inspection. All electrical installed must be inspected and signed off by a third party inspector (county)or a city inspector. At this time if there are any discrepancies and/or the electrical is not compliant with the plans provided or building codes, work must stop and all issues resolved within a timely manner.

Customer is not responsible for the cost of repairs, discrepancies or faulty plumbing. The General Contractor and Sub-Contractors will absorb the cost.

13. Roofing Installation. Depending on the area and the building codes for that area, the appropriate roof sheathing and underlayment will be installed first. Type of roofing depends on the roof pitch. For asphalt shingles (most common) minimum 2:12. Two inches rise over 12 Ft. Metal for any pitch, preferably with sound proofing.

14. Roofing inspection. All roofing installed must be inspected and signed off by a third party inspector (county)or a city inspector. At this time if there are any discrepancies and/or the roofing is not compliant with the plans provided or building codes, work must stop and all issues resolved within a timely manner. Customer is not responsible for the cost of repairs, discrepancies or faulty plumbing. The General Contractor and Sub-Contractors will absorb the cost.

15. Window installation. All windows should be installed at this time to ensure dry-in is complete after the weather board or sheathing option is installed.

16. Outer weather guard on exterior walls. Weather proofing on the exterior wall can be weather guard board or exterior sheathing with weather guard membrane. Sometimes builders will use both with the weather guard membrane on the very outside.

17. Weather board and window inspection. All weather board and windows installed must be inspected and signed off by a third-party inspector (county)or a city inspector. At this time if there are any discrepancies and/or the weather board or windows is not compliant with the plans provided or building codes, work must stop, and all issues resolved within a timely manner. The customer is not responsible for the cost of repairs, discrepancies or faulty plumbing. The General Contractor and Sub-Contractors will absorb the cost.

18. Outer brick/rock/metal and/or siding installation. Different house designs have different exterior plans to meet the requirements that the customer chooses for the motif of their home. Depending on the city, county or region the new home project is taking place, certain cities, counties and regions require different exterior siding. For example, Johnson County requires at least 4 ft. of brick or stone on new structures being built at the moment.

19. Electrical Meter Box Installation

20. Exterior wall insulation. At this time all exterior wall insulation can be installed. All insulation must meet or exceed industry standard and be correctly installed.

21. Exterior Siding and exterior wall insulation inspection. All exterior siding, brick and or metal siding with exterior wall insulation installed must be inspected and signed off by a third-party inspector (county)or a city inspector. At this time if there are any

MSJ Appendix 000119

discrepancies and/or the siding, brick and or metal siding with exterior wall insulation installed is not compliant with the plans provided or building codes, work must stop, and all issues resolved within a timely manner. The customer is not responsible for the cost of repairs, discrepancies or faulty plumbing. The General Contractor and Sub-Contractors will absorb the cost.

22. Exterior paint.

23. Electrical installation to city or county electrical company. This does not require any inspections on the builder or home owner. Each city or county electrical installations are taken care of by the company that owns the power lines in that given area.

24. Sheet rock installation to include green board installation in wet areas. 5/8 in. sheet rock for exterior walls, ½ in sheet rock for ceilings and inner walls. At this point if the customer wants to insulate the interior walls, it can be done at this time.

25. Sheet rock inspection. All sheet rock installed must be inspected and signed off by a third-party inspector (county)or a city inspector. At this time if there are any discrepancies and/or sheet rock installed is not compliant with the plans provided or building codes, work must stop, and all issues resolved within a timely manner. The customer is not responsible for the cost of repairs, discrepancies or faulty plumbing. The General Contractor and Sub-Contractors will absorb the cost.

26. Tape, Bed and Texture sheet rock to customer specifications. Interior wall, ceiling paint to customer specifications.

27. Door installation. This can also be done before the sheet rock is installed. For my company, we install the doors before the sheet rock, remove the doors from the installed door frame and store them. This ensures that the sheet rock installation goes right tup to the installed door frame. We do not like huge gaps that get covered with door trim.

28. Once the sheet rock is installed, cabinets are installed to the building plans provided. All cabinetry is installed at this time also. Once all the cabinets are the interior trim can be installed. This includes window sills, door trim, window trim and/or any custom trim the home owner wants to install.

29. Countertops per customer request.

30. Shower and tub installation with fixtures in place

31. Flooring per customer request.

32. Baseboard installation.

AFFIDAVIT OF JERRY BROOK                                      Page - 9 -

33. Sinks, shelves lighting etc. installation

34. At this point since we installed the doors and removed the doors from the installed door frames, we would re-install the doors to the installed door frames.

35. Touch up paint as needed (baseboards, trim etc.)

36. Complete property and house interior clean up. Good construction workers clean as they go.

37. House completion walk through with the client.

The property at 1224 Durham Lane, Cleburne Texas was had the foundation installed and framing with electrical, plumbing and weather board installed but no inspections on the above schedule were ever followed, nor was there any building plans to direct the subcontractors how to properly perform their work.

There is no indication that the builder, Christopher Judge followed any of the above-described processes, to ensure that the home was constructed in a good and workmanlike manner, or in compliance with any building codes, and generally accepted building practices.

During my review, inspection and completion of necessary repairs, I have discovered the following specific defects:

Foundation:
The area of the building is not within a flood zone or within the 100-year flood zone. However, when the property does have heavy rain, winter snow or any type of excess water, the house is surrounded by standing water.

This house was built on a foundation poured directly on the ground in a flat area. It is the responsibility of the General Contractor/Builder to ensure proper measures are considered for the safety of the current owners and future owners if the house is sold. A 1.5 foot to 2-foot building pad should have been put in place before the foundation was poured. This would create proper run-off away from the house and ensure there would be no flooding or damage caused by water in the future. The foundation was also broken, and rebar was exposed, pipes broken below the foundation top.

Foundation Pipes, Broken Concrete and broken pipes.



AFFIDAVIT OF JERRY BROOK

Page - 11 -



AFFIDAVIT OF JERRY BROOK



MSJ Appendix 000124



J.S. Barton, Texas State Engineer license #58124 was supposed to be the engineer who signed off on this foundation.

It is also his responsibility to ensure proper guidelines are met when he signs off on any building plan/foundation plan and can be held responsible for any discrepancies of the project he has signed off on. There was no plumbing layout or schedule on the foundation plans he signed off on. There was no surveyors report that he signed off on. And there was no building pad in place. If he had followed through with a surveyor and visited the property, like an engineer should do, he would have seen these discrepancies.

    Framing Issues

Cathedral ceilings in the garage with no support.



AFFIDAVIT OF JERRY BROOK





The outside wall had nothing to tie it to the roof. Heavy winds and/or storms with heavy winds could have blown the outer garage wall away causing extreme damage to the house structure and possibly to the occupants inside.

Missing SP2 load bearing beams (Header Beam known also as SP2)
Missing load bearing beams known as SP2 beams in key areas like bedroom #3 Primary Bedroom Closet and above fireplace.
The way these areas were constructed, the ceilings could have collapsed due to overload on roof (Heavy Ice, Wind etc.)

Missing LVL (load bearing beams)
LVL or Laminated veneer lumber (LVL), is a high strength beam that replaces traditional beams and is an industry standard for new homes for spans longer that 12 ft. LVL can support up to 4 times the amount of traditional lumber and can support up to 3 times the amount of SP2 Beams. No LVL beams were used in the living room (24 ft span) Kitchen transition to living room span (20 ft span). The structural integrity of the home was severely compromised due to the lack the required beams and proper support, which likely lead to failure and collapse of he structure, if not corrected.

Nonexistent bracing for roof in attic

The original builder designed a cathedral style roof with standard roofing materials. It is not practical or safe to design an "open concept" roof in a garage. Using standard 5/8 sheathing and asphalt shingles cannot and will not work because of the weight of all the materials combined. The roof was bowed in several locations. The garage had an open concept, cathedral roof with no bracing at all and asphalt shingles. If a hard freeze were to take place and ice formed on this roof, the structure would have collapsed. Further, there was no roof venting. To prevent the roof from being ripped off during high barometric pressure with high winds, either spin type vents, fan driven vents or vented ridge cap must be used to allow air to escape from the attic space. There were no vents in the soffit (the material located underneath the roof overhang area's) to allow steady air flow through the attic space. This is very important during the triple digit months of heat we experience in Texas. Hot air rises, ridge cap vents on top of roof allow it to escape. Soffit vents allow air flow into the attic space creating a cooler environment.

Engineer Report:



Holes for piping drilled oversized leaving 1/8 inch on load bearing walls.

Cutting holes into load bearing walls for piping, electrical etc. is permitted, but the holes must be kept to a minimum size.  Oversized holes leave no support of load bearing walls. It is the

builder/contractor's responsibility to ensure the structure is sound and does not have the propensity to fail in the future.

Bottom plate anchor bolts require a minimum ¼ inch bolts. Industry standard is 5/8 for every 4 feet. Most ¼ inch bolts used by the Builder are missing washers and nuts, are not in the correct location or missed the bottom plate completely.

All door opening sizes are different sizes and not standardized for standard door sizes.

Back porch roof at a 1.3 / 12 grade roof with asphalt shingles. Minium grade is 2.7 / 12 for asphalt shingles.

It is my opinion that the Builders failed to follow necessary International Building Code Requirements during the construction of the work that was in place, or that they were completely ignorant of them.  The structure that was in place, at the time the Builders abandoned the project, was not constructed in a good and workmanlike manner, and would not pass without objection in the residential construction industry.  It is my opinion that Builders did not prepare or obtain usual and customary, and necessary building plans, with  specifications and schedules, and it is my opinion that the drawing provided by the Builders are not Building Plans generally accepted within the residential construction industry, and that it would not be possible to properly construct a house using the drawing produced by the Builders.  It is my opinion that the building drawings produced by the Builders were not prepared by, or reviewed and approved by a licensed architect, and that there is nothing to establish or verify that the plans were proper and appropriate for use in the construction industry.

 It is also my opinion that the persons that preformed the installation of the foundation, framing, roofing, plumbing and electrical had little or no knowledge or skills necessary to complete the work that they were each performing in a good and workmanlike manner.  Additionally, it is my opinion that the Builders, themselves, had little or no knowledge or skills necessary to oversee the construction of the home, or that they failed to supervise any of its construction.

It is also my opinion that the Builders were incapable of producing a proper set of Building Plans and that they were incapable of overseeing the project to ensure that the construction was performed in a good and workmanlike manner that would pass without objection  within the trade or industry.

It is my opinion that the Builders should have inspected the work in progress and corrected each of the defects, as they occurred, or alternatively, should have withheld the payments to the foundation crew, the framer, the roofer, the plumber and the electrical installer until all defects were corrected.  It is my opinion that the Builders were motivated only by the collection of draw money from the Owner, with little or no regard to the performance of he workers in the completion of the house in a good and workmanlike manner.

## CONCLUSION

Black Bear Construction Group, Inc. has corrected all of the defects and discrepancies notated by Texas Inspections and the engineer that were present at the point in time that Christopher Judge

abandoned the project at the point of Draw #5. All of the work performed by Black Bear Construction Group, Inc. and its subcontractors was necessary to correct the defects and to complete the construction in a good and workmanlike manner, and to be in accordance with applicable building codes and to be in accordance with generally acceptable standards within the trade and industry of construction of a residential home. All amounts charged by Black Bear Construction Group, Inc., and by each of the subcontractors who performed work, or supplied materials, to correct the defects was reasonable and necessary, and were the usual and customary amounts charged in Johnson County, Texas at the time the work was performed or materials were supplied.

It is my opinion that the work performed by Christopher Judge was substandard, improper, and of little or no value to Kristin Newman, when taking into consideration the amount that Kristin Newman should have paid according to her contract, and the amount of money that it has cost her to correct the defects and the missing work that resulting from the work performed by Christopher Judge. It is my opinion that the drawings provided by Christopher Judge were not proper building plans normally used within the residential construction industry, that they were not sufficient to construct a home, they were not completed by, or certified by, a licensed architect, and that should not have been used, or relied upon in the construction of Kristin Newman's home. Further, it is my opinion that the work performed by Christopher Judge and his subcontractors was not performed in a good and workmanlike manner, and that there was no indication that the framing, roofing, electrical and plumbing was performed by persons knowledgeable, qualified or skilled to perform any of the work in place. The work in place looked like a house, but it was unsafe, unsuitable for use as a habitation, would not pass without objection in the trade or industry, and it was not constructed using standard and generally accepted residential building practices.

The total cost that was charged by Black Bear Construction Group, Inc. to fix construction defects and problems, and to bring the residence to a point of being able to continue and finishing the project was $112,807.32 which Kristin Newman has paid. Kristin Newman has additionally paid $14,707.45 to Sodd Electric to correct all of the defective electrical installation, and has paid $11,621.32 to Galan and Sons HVAC to correct the incomplete and incorrect installation of the HVAC equipment. Plaintiff has additionally paid other parties and vendors to properly complete the construction project through Draw #5, which is the point in the construction that the Christopher Judge abandoned the project.

| | | |
|---|---|---|
| Builder Risk Insurance | $983.00 | |
| Inspection Report | $700.00 | |
| Engineering Report | $1,150.00 | |
| Labor to pick up trash left in yard | $1,200.00 | |
| Labor to remove temporary trash bin | $1,200.00 | |
| Permit Fee | $900.00 | |
| Dumpster | $4,800.00 | |
| Conex Storage | $1,428.00 | |
| Pacific Columns material | $1,990.77 | |

AFFIDAVIT OF JERRY BROOK

| | | |
|---|---|---|
| Watkins Electric - install power pole | $900.00 | |
| Sodd Electric repair electrical | $14,707.45 | |
| Galan & Sons HVAC | $11,621.32 | |
| United Coop temp power connection | $1,436.14 | |
| 12 months additional interest on construction loan | $21,120.00 | |
| **Sub-Total Costs to Correct** | | **$64,136.68** |
| | | |
| Black Bear Construction to repair thru Draw 5 | $110,439.32 | |
| Black Bear Construction to repair master shower floor | $2,368.00 | |
| | | |
| **Sub-Total** | | **$112,807.32** |
| | | |
| **TOTAL COST TO CORRECT DEFECTS UP TO DRAW #5 ON THE JUDGE DFW LLC CONTRACT** | | **$176,944.00** |

All of these amounts were reasonable and were necessary to correct the construction defects present in the construction project at the time that the Judges abandoned the project, at Draw #5. These amounts  were the usual and customary costs for all such repairs in Johnson County, Texas and these amounts and were paid by Kristin Newman. The total amount incurred and paid by Kristin Newman  was **$176,944.00.**  It is my opinion that if the house was designed by a licensed architect and that proper building plans were prepared, and qualified, competent and licensed sub-contractors were hired, and proper oversight was made by a qualified and competent builder, with knowledge of applicable building codes, none of these damages would have been incurred by Kristin Newman.

Jerry Brook

SUBSCRIBED AND SWORN TO BEFORE ME by Jerry Brook on June /7, 2024, to certify which witness my hand and official seal.



MICHAEL S. NEWMAN
My Notary ID # 6069489
Expires December 28, 2024

Notary Public, State of Texas

AFFIDAVIT OF JERRY BROOK

Page - 22 -

# APPENDIX

# ATTACHMENT 3

MSJ Appendix 000134

<u>**AFFIDAVIT of KRISTIN E. NEWMAN**</u>

STATE OF TEXAS      §

COUNTY OF TARRANT    §

       **BEFORE ME**, the undersigned authority, on this day personally appeared Kristin E. Newman, who swore on oath that the following facts are true:

       "My name is Kristin E. Newman.  I am over 18 years of age, of sound mind, and fully competent to make this affidavit.   I have personal knowledge of the facts stated herein and they are all true and correct.

       "I am the owner of the real property located at 1224 Durham Lane, Cleburne, Johnson County, Texas 76033 (the "property").  I purchased the property in 2021, and then began a search to find an architect to design my home, and a builder to build it, based upon ideas and pictures that I had accumulated.  The property is not within the city limits of Cleburne, but it is within the Extra-Territorial Jurisdiction ("ETJ") of the city of Cleburne.  I first met Christopher Judge and Raquelle Ann Judge (the "Judges") in 2021, to discuss the building of my home on my property.  I learned of them through a mutual friend who told me that the Judges could design and build my home. I had also found a social media advertisement of Christopher Judge advertising architectural services, and design and builder services.   When I first met Christopher Judge and Raquelle Ann Judge, they each represented, and told me, that Christopher Judge was an architect and builder, that he had several years of experience designing and building custom homes, and that he and Raquelle were ready, willing, and able to proceed with the construction and completion of my house, based upon ideas that I already had.  Both Christopher Judge and Raquelle Ann Judge stated that Christopher Judge was a licensed architect, and that he would design my home, and, as a licensed architect, would design and produce a set of building plans, which was all part of their construction services.[1]  They also represented that they had completed a number of recent new home construction projects, and that they were in the midst of several other custom home projects. Christopher Judge stated that he was ready and capable of designing and constructing my home and that Raquelle Ann Judge was an interior designer who would assist with the interior design of my home.  The Judges represented that Christopher Judge would use his architectural skills to design my home, based upon ideas, pictures and sketches that I had accumulated.  Christopher and Raquelle Ann Judge both stated that, as an architect, Christopher Judge was capable of drafting and preparing a full set of building plans, prior to the construction of my home, and that I did not need to hire the services of another architect.  Attached hereto, as **Exhibit A** is a true and correct copy of a Twitter account advertisement of "Christopher Judge", the Defendant, in which he specifically advertised that he was engaged in the following professions: "Realtor, ***Architecture & Design***, Land Development, and Construction Consulting".  Based upon these representations, upon which I relied, I entered into a contract with the Judges for the design and construction of my home.

---

[1] Falsely holding one's self out to be an architect, or use the term "Architect" or "Architectural Designer" is unlawful, and a violation of Section 1051.001 of the Texas Occupations Code.

MSJ Appendix 000135

"After the Judges abandoned the construction of my home in May 2022, at approximately the 5th Draw Stage, I soon discovered that Christopher Judge had never produced a set of building plans.  I also found that Christopher Judge and Raquelle Ann Judge had ten to twenty other residential home construction projects that were similar to mine. In each of those projects, Christopher and Raquelle Ann Judge collected money, failed to complete the projects, and left the projects with substandard, inferior work and incomplete construction.    I also found that Christopher Judge had been sued by several other homeowners for fraudulent conduct and poor workmanship and that the money that I overpaid Christopher Judge in May 2022 was immediately used by Christopher Judge to pay his personal lawyer fees to defend him in another fraud lawsuit that was pending at that time.  The money that I had just paid to Chritopher Judge were not used to construct my house or to pay for materials and vendors.  I discovered that Christopher Judge was not, and had never been, a licensed architect in the state of Texas. Had I known of the poor quality of Christopher Judge's workmanship and lack of knowledge in the construction industry, as well as the fact that he was falsely holding himself out as a licensed architect and using unlicensed contractors, such as electricians and plumbers, I would have never hired him or Judge DFW LLC to design and construct my home and would have never paid any money to Christopher Judge or Raquelle Ann Judge.

"I would have never entered into a contract with Judge DFW LLC, or with the Defendants Christopher Judge or Raquelle Ann Judge, if I had known that Christopher Judge was not a licensed Architect or that Christopher Judge was incapable of building a custom home, or that Christpher Judge had no intention of producing building plans, following building codes or that he was not intending to build the home in a good and workmanlike manner.  Further, I would have never entered into a contract with Judge DFW LLC, or with the Defendants Christopher Judge or Raquelle Ann Judge, had they disclosed to me that they were intending to subcontract the construction work to unlicensed, unqualified and unskilled persons, including the plumber and the electrician.

"Christopher Judge represented to me that he was capable of developing, preparing and drafting a full set of building plans, as part of his services as an architect, and that he would perform such services, prior to the actual construction of my home.  Subsequent to the time that the Defendants abandoned the construction of my home, I searched the Texas Department of Licensing records, and found that Christopher Judge is not, and has never been an architect.  Further, in response to discovery, the Defendants, Christopher Judge and Raquelle Ann Judge admitted that Christopher Judge was not an architect.

"I am requesting that the Court award a judgment for all of my out of pocket damages incurred by me to correct the defective work performed by Christopher Judge, in the amount of **$237,492.98** as set forth below.

"Christopher Judge and Raquelle Ann Judge misrepresented to me that Christopher Judge was an architect, and that he  was capable of, and would develop building plans that would be properly designed and certified by him, as an architect, In the alternative, I am requesting that the Court award damages in the total amount of money that I have paid to the Judges, to date, in the

-2-

amount of **$198,518.98.**  This is the total amount that I have paid towards the construction of my home to the Judges, through the time the house was abandoned by Christopher and Raquelle Ann Judge in May 2022 (at the Draw #5 payment).  I would not have hired Christopher Judge and Raquelle Ann Judge, but for their affirmative representation that Christopher Judge was a licensed architect and a skilled and knowledgeable builder, who would produce a set of building plans prepared by a licensed architect, and that he would construct my home in a good and workmanlike manner in accordance with applicable building codes and construction standards.  Christopher Judge and Raquelle Ann Judge failed to comply with any of their promises and obligations, as further explained below.

"Prior to the construction of my home, the Defendants provided a draw schedule to reflect the amounts that the Defendants intended to collect from me as the construction progressed. Attached hereto as **Exhibit B** is a true and correct copy of the Project Draw Schedule prepared by the Defendants and given to me at the time the Contract was signed.  According to the Project Draw Schedule, the full Contract price for the construction of my home was $380,606.08.  The Defendants noted that the "*Base Price + Upgrades*" amounted to $344,925.00 and "*Allowances*" amounted to $35,681.08.    The Draw Schedule provides that "*All expenses categorized as "Allowances*" will be added to each Draw Cycle *as purchased*."  The Allowance amount was intended to be paid by me and used towards the purchase of such items as the plumbing fixtures, light fixtures, appliances, etc.  Any amount not expended would be refunded to me, and if these items were more than the allowance amount, I would owe the additional sum.  The Draw payments were percentage amounts, which should have been calculated on the Base Price of $344,925.00 only, as, no Allowance items had been purchased, through Draw Number 5.  The Defendants did calculate, and collect, the first draw amount correctly, using the Base Price of $344,925.00.  Every Draw request from the Defendants thereafter, and every payment I made in response to their request for payment, was incorrectly based on the total Contract Price of $380,606.08 (including allowance items) and not the Base Price.  The Judges had not purchased any allowance items, and therefore, they should not have billed for, or collected any amounts for allowance items.  The Judges performed work through the Fifth Draw and abandoned the project after that, in approximately May of 2022.  The Judges had not purchased, or supplied any of the Allowance items up to that point, and they should, therefore, not have calculated, or collected any portion of the Allowance items expense.  Further, when I paid Draw #5, I initially paid half of the draw amount, as a payment for partial work performed. When it came time for me to pay the remaining half of Draw Number 5, Christopher Judge invoiced me for the full amount of Draw #5 (and not just the remaining half, that was due). I inadvertently and accidentally paid the amount that Christopher Judge inovoiced, which was the full amount of Draw #5, which resulted in me over-paying draw #5, by half. That payments also included the excess amount based on the Allowance amount, as well.  Within minutes of me overpaying Draw #5, I audited my payments, and I found the discrepancies of the Judges' over-charging me on each of the Draws (#2 through #5) for the Allowance charges—as well as my accidental over-payment of Draw Number 5.  I immediately contacted Christopher Judge and requested, and demanded, that the Judges immediately refund and return the over-paid amounts.  Christopher Judge refused to return my money and he ignored my repeated requests for him to refund these overpayments—which included the Draw #5 that I had made only minutes before.  The Judges abandoned the construction project, at that time, and never returned to perform any further work.  Christopher Judge repeatedly stated that he was going to keep my overpayments, over my objection, that he was going to apply the money to the end of

the construction project, and that he was going to correct all of the defects in the construction and complete the house—but he never followed through with any of his promises.

"The Judges represented that their construction company was "Judge DFW, LLC" and that they had several years of experience building custom homes.  I have since learned that Judge DFW, LLC is not a valid Limited Liability Company, as the charter has been forfeited by the state of Texas.  Christopher and Raquelle Ann Judge were both listed as managing members of Judge DFW, LLC, and both of them were present at all meetings, and were each involved in the negotiations and planning for the construction of my home.  I have attached hereto, as **Exhibit C**, true and correct copies of the Certificate of Formation, Certificate of Amendment, Forfeiture of Judge DFW, LLC and the Certificate of Fact from the Secretary of State certifying that the status of Judge DFW, LLC has been forfeited.

"Christopher Judge only prepared sketches and drawings of the elevation (exterior) of my home, and has produced a simple floor plan which he created on an iPad.  Christopher Judge never prepared a full set of construction plans.  Instead, Christopher Judge sent pdf sketches to the framer, electric installer and plumbing installer, and expected them to build my house, based upon pdf's depicting my house, off of their mobile phones, and not from any actual printed sets of building plans.  Christopher Judge did not prepare customary building plans that included Architectural plans, framing schedules, roof and rafter schedules, energy code compliance schedules, electrical schedules, plumbing schedules, room door and window schedules, structural plans, wall section and cross section plans interior finish schedule, or mechanical plans  nor did he have any qualified person certify the structural design that he had sketched.  If I had known he was not an architect, that he was unable to produce a set of building plans, and that he intended to overcharge me and misapply my money, I would have never hired him, and I would have not continued to make draw payments to him.  Further, Chris and Raquelle Ann Judge represented that my money was being used to pay suppliers and subcontractors, and Christopher Judge provided copies of receipts and canceled checks to show that bills were being paid, which I have since learned was not true.  Christopher Judge provided receipts from other construction projects, and falsely represented that he had, in fact, paid for labor and materials on my project.  Christopher Judge did not pay the full balances owed to the HVAC contractor, or to the electrical installer, and each of those  trades refused to complete their work, or correct the defects in their work which forced me to hire other contractors to perform the work for which I had already paid to the Judges.

"The Draw Schedule provides that my first payment of $10,000.00 (deposit payment) was intended to be the Design/Build Deposit.  The Judges represented that this money was being applied for the development and production of the construction plans, which they never produced.  Christopher Judge has since told me that the $10,000.00 Deposit is "non-refundable", and even though he abandoned the project and never produced the building plans, said that he was "keeping" the money, and I was not entitled to a refund.

"The Draw Schedule provides that Draw #1, in the amount of 5% would be applied towards the immediate ordering of doors and windows, as well as permitting & engineering.  The amount due for Draw #1 was $17,246.25, and the Judges invoiced, and collected from me, the amount of $17,246.25.  On December 11, 2021, Raquelle Ann Judge sent me a text message, stating that "***we just placed the window package***".  She verbally verified that the doors and windows had been

-4-

ordered.  Attached hereto, as **Exhibit D**, is a true and correct copy of the text message from Raquelle Ann Judge.  The Judges represented, and continued to represent on multiple occasions, over the next 6 months, that the windows were ordered. Christopher Judge stated on numerous occasions that the windows were in production; that there were supply chain issues; that production was delayed due to COVID; that the windows were ready, but the glass was backordered; that the windows would be installed in a few days; and that they would be installed "by the next week". Ultimately, in  approximately June 2022, Christopher Judge admitted that he never ordered the windows, and that he took all of the money that I had paid to him, that he and Raquelle Ann Judge had been lying about the ordering of the windows, and that he and Raquelle Ann Judge had spent the $17,246.25 from Draw #1, and that he had none of my money left to pay for my windows, or to correct the construction defects at my home.  Christopher Judge told me that I needed to order and pay for the windows, and that he would take it off of the final price of my house.  If I had known, on January 9, 2022 that Christopher Judge and Raquelle Ann Judge did not order, or pay for my windows and doors, I would not have continued with the contract and I would have ceased paying any further draw money to the Judges, and would have immediately terminated the construction contract based upon the false statements and deceit of the Judges.  Because the Judges represented that they had ordered the windows, and they were going to be installed, I continued to pay the Judges the additional scheduled draw payments, up until the time that third-party inspection occurred.

"Christopher Judge repeatedly stated that he would have all of the subcontractors return to correct their substandard work, but he failed to get any of the subcontractors (the concrete finisher, plumber, electrician, framer, HVAC contractor and roofer) to come back out to my construction project.  He also promised that he was searching for a new framer, and new electrician and a new plumber, but there were "none available" for him to hire.  Christopher Judge acknowledged the shoddy, inferior work performed by his subcontractors, and promised that he would make all of the necessary repairs to correct the defects that were identified in the inspection report.  Christopher Judge never obtained a building permit, and when confronted, he stated that he "thought" that he obtained the required building permit from Johnson County, but he never did apply for one. Ultimately, I had to apply and pay for the Johnson County Building Permit.

"I signed a contract with the Judges on August 9, 2021 which obligated Judge DFW, LLC, Christopher Judge and Raquelle Ann Judge, to design, prepare architectural plans and build my home, which was supposed to have been completed by May 2022.  Attached hereto, as **Exhibit E** is a true and correct copy of the Construction Contact which I signed. The Judges began construction of my home on or about January 2, 2022, and proceeded with the foundation installation, framing and roofing, electrical rough-in (installation of electric wires, electric boxes and circuit breaker box), plumbing rough-in (running of PEX water lines), heating/ventilation/air conditioning (HVAC) rough-in (installation of air ducts and air handler unit in the attic space). This work was performed up until approximately May, 2022.  Christopher Judge stated that the work had been  completed through Draw #5, and that he would pay for a home inspector, since there was no public building inspection process for homes constructed in Johnson County, Texas outside of the city limits of Cleburne, Texas.   Christopher Judge stated that he would pay for the inspection cost, but then he asked me to pay for it, and that he would reimburse me, which he has never done.  I hired a third-party inspector, Texas Inspections, (as stipulated in the contract), to inspect the work in place.  A true and correct copy of the inspection report that was completed in

accordance with the Construction Contract (**Exhibit E**) is attached hereto as **Exhibit F**. The existing work performed by Christopher Judge was incomplete, according to the third-party inspector, it failed to meet minimum building code standards, in many respects, was unsafe, and dangerous, not suitable for use as a habitation, in danger of collapse and defective in many respects, and was not built in a good and workmanlike manner, nor was it constructed using standard building practices. The inspector advised that an engineer should be hired, to prepare a report, to provide a more detailed report as to the engineering defects, and to further advise as to what might be necessary to bring the construction up to code requirements and to conform with industry standards. A true and correct copy of the inspection report prepared by the Engineer, Thomas Whitecotton, M.C.E., P.E. a professional engineer (hereinafter, the "Engineer") with Falkofske Engineering (Texas Registered Engineering Firm No. F-4038) is attached hereto as **Exhibit G**, and is incorporated herein by reference. Since August 2022, Christopher Judge has repeatedly stated that he was going to fix the defects, and proceed with the construction. From August to November, 2022, Christopher Judge stated, on multiple occasions, that he was trying to "find a framer" to correct all of the framing defects, and that he was not abandoning the project. He also stated that he was trying to find a new plumber, because the first plumber was unlicensed, and did not install the plumbing correctly, and much of it needed to be replaced. Christopher Judge scheduled several meetings to meet us at the jobsite, to review and discuss the framing, plumbing and electrical issues, but he failed to show for each such meeting. Christopher Judge made these promises and statements on many occasions, yet the Judges have not performed any work on my house since approximately May 2022. Christpher Judge promised to remove and replace most of the window and door openings, because they were of incorrect sizes and dimensions; he was going to remove, repair, and/or replace wall studs, bracing, bottom plates and rafters, the electrical work and plumbing work, and re-build the garage with proper rafters and beams—but he never returned to perform any such work.

"The Judges convinced me to pay a percentage of the Allowance amounts, along with each draw payment, assuring me that each amount was correct, and that I should pay the amount requested, and that I was supposed to pay the percentage of the Allowance amount, along with each draw. I now realize that the amounts they requested for the percentage of the Allowance amount was not due, and I should not have paid anything towards the Allowance amount, unless and until those items were purchased-which is stated in the Contract, **Exhibit E**. The contract draw payments were supposed to be calculated on the Base Price, but, instead, Christopher Judge requested draw payments based on the full contract price (which included the Allowance amount). This resulted in overpayments made to the Judges, which I did not realize, or understand, at the time that I paid each of the Draw amounts that were requested.

"The following is a list of the overpayments that I made to Christopher and Raquelle Ann Judge:

| Deposit | $10,000.00 | |
|---|---|---|
| Draw 1 overpayment (for windows) | $17,246.25 | |
| Draw 2 overpayment | $3,568.11 | |
| Draw 3 overpayment | $3,568.11 | |
| Draw 4 overpayment | $3,568.11 | |
| Draw 5 overpayment on first 1/2 | $1,784.05 | |

MSJ Appendix 000140

| | | |
|---|---|---|
| Draw 5 overpayment on second 1/2 | $1,784.05 | |
| Draw 5 overpayment | $19,030.20 | |
| **Subtotal Overpayments to Judge** | | **$60,548.88** |

"Each payment that I made to the Judges was made to an account at Chase Bank, under the name "Judge DFW, LLC" which was controlled by Christopher Judge and Raquelle Ann Judge. The initial deposit was made by personal check, and all of the Draw payments were made by wire transfer to that account. I was not aware that the Judges had not established a separate trust fund account for this construction project, until August 2022, when Christopher Judge admitted that he had not established a separate trust fund account for my construction project, and that he had commingled my money with his personal funds and that he had taken my money.

"I have now learned that when I made the payments, and overpayments, for Draw #5, Christopher Judge immediately withdrew those funds to pay a lawyer to defend him in a civil lawsuit in which he was being sued personally, for fraud by another homeowner, for similar claims as mine.. None of that money was used in the construction of my home, and my money was not used in the normal course of business of Judge DFW LLC in the construction of homes. Further, After I issued the Draw Number 5 payments, I notified Christopher Judge that the payment of $19,030.20 was made in error (as was the extra payments for Allowance Items, and demanded that he immediately refund those overpayments. Christopher Judge refused my request and told me he was going to keep the money and apply it to the continued construction, but Christopher Judge never returned to the project.

"I have attached hereto, a true and correct copy of the construction contract for the construction of my house, as **Exhibit E** which is incorporated herein by reference.

"I have attached hereto, a true and correct copy of the draw scheduled provided by Christopher Judge and Raquelle Ann Judge for the payments due for the construction of my house, as **Exhibit** B, which is incorporated herein by reference.

"From January 2022 until October 2022, I repeatedly requested Christopher Judge provide me with the list of names, addresses and telephone numbers of all subcontractors and vendors that he was using, or intended to use, in the construction of my home. In response to my numerous requests, Christopher Judge provided me only with the following information by email on November 14, 2022:

HVAC:
Miguel Trejo (817) 554-4466
Electrical:
Zain Galvan (682) 774-9858
Framer:
Evelio Lara (469) 922-8414
Roofer:
Aender Osorio (469) 661-7114

MSJ Appendix 000141

"Christopher Judge stated that he did not have any addresses for these contractors, nor did he know if any of them were licensed.  Christopher Judge did not provide any information as to the source of any materials, including the lumber, and concrete.  Christopher Judge did not provide information regarding the identity of any other persons or trades used in the partial construction of my home.  Christopher Judge did not provide the information regarding the plumber, the foundation contractor, or any of the other intended subcontractors and suppliers, for such things as the flooring, sheetrock, tape and texture, painting, insulation, cabinets, trim, doors and hardware, mirrors, windows, light fixtures, plumbing fixtures, garage door, countertops, brick and masonry, driveway and sidewalk installation.  Since May 2022, Christopher Judge and Raquelle Ann Judge have done nothing to find any contractors to repair the defects in my home, or to complete the construction of my house.  Further, Raquelle Ann Judge has done nothing to assist with the interior design of my home.

"Christopher Judge allowed the subcontractors to leave huge piles of trash on my property (since he had no dumpster), and has allowed excess concrete to be dumped on my property, as well.

"After further insistence that he provide proper information, on or about November 28, 2022, Christopher Judge provided the following additional information:

"*I'm unfamiliar with the requirements surrounding your demand to provide all their contact information prior to the home being completed. I will once again provide you with the known information, but will be unable to provide you with the information of future contractors as no one is under contract to work on this home in the categories you've requested. Many contractors come and go, will be unavailable when we are ready, cost doesn't line up according to budget, etc etc.*

Foundation Work: Alexander Concrete Construction
(817) 503-5906, acreteservices@gmail.com
Address unknown

Lumber Supplier: Home Depot

Framer: Evelio Lara
(469) 922-8414, Email unknown
Address unknown

Roofer: Aender Osorio
(469) 661-7114, Email unknown
Address unknown

HVAC: Trejo Air Conditioning & Heating Services
(817) 554-4466, marionlee-trejoac@mail.com
101 Mimosa Way, Venus, Texas 76084

MSJ Appendix 000142

Electrician: Zain Galvan (JBL Services, Inc)
(682) 774-9858, Email unknown
Address unknown

Plumbing: Eduardo Gaytan
(469) 672-7188, Email unknown
Address unknown

Fireplace: Tomas Flores
(214) 557-9256, Email unknown
Address unknown

"I attempted to contact each of these sub-contractors to request that they correct their defective work and complete the scope of work.  They all refused to return to the jobsite, and the HVAC subcontractor stated that I would need to pay him, as Christopher Judge had not paid him and that Christopher Judge had produced false documentation to show he had paid him.

"Pursuant to the Draw Schedule, I paid the Judges the following amounts, which they requested and accepted—which additionally describes the overpayments that I made:

| DESCRIPTION | | DUE | REQUESTED | PAID | OVERPAID |
|---|---|---|---|---|---|
| 8/9/21 | Deposit | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 |
| 1/9/22 | Draw #1-windows/doors | $17,246.25 | $17,246.25 | $17,246.25 | $17,246.25 |
| 2/17/22 | Draw #2-foundation | $34,492.50 | $38,060.61 | $38,060.61 | $ 3,568.11 |
| 3/2/22 | Draw#3-foundation complete | $34,492.50 | $38,060.61 | $38,060.61 | $ 3,568.11 |
| 5/2/22 | Draw #4-Lumber delivered | $34,492.50 | $38,060.61 | $38,060.61 | $ 3,568.11 |
| 5/2/22 | Draw #5-paid ½ | $17,246.25 | $19,030.30 | $19,030.30 | $ 1,784.05 |
| 5/6/22 | Draw #5-paid ½ | $17,246.25 | $19,030.30 | $19,030.30 | $ 1,784.05 |
| 5/6/22 | Draw #5- overpaid ½ | $     0.00 | $     0.00 | $19,030.30 | $19,030.30 |
| | **TOTALS** | **$165,216.25** | **$179,488.68** | **$198,518.98** | **$60,548.98** |

"Following the third party inspection, I provided a copy of the report to Christopher Judge. He said that he would repair all of the defects, however, the Judges have not resolved any of the construction defects revealed by the third-party inspection.  The Judges made numerous promises to construct my house, and correct all of the defective work, however no work has been performed on my home by the Judges since approximately May 2022.

"The total amount of money that the Judges have been over-paid, and unaccounted for, is **$60,548.98**.  This amount of money should still be held in a trust account, as none of the money

MSJ Appendix 000143

has been due or earned by Judge DFW, LLC,  Christopher Judge or Raquelle Ann Judge. I asked Christopher Judge where these over-payments were, and he stated that he spent the money, that he has no money left, that he took my prior payment intended for the doors and windows (Draw #1 in the amount of $17,246.25) and spent it, and that he was not required to have a construction trust account and that he had no knowledge of needing to have such account.  He further admitted that he never ordered the doors and windows, and that he had been lying to me, for months about having ordered them, and the expected delivery of the windows and doors.  He further stated that I could go finish the house myself with the remaining money left under the contract.  To date, I have paid the Judges a total of **$198,518.98** towards the construction of my home (which includes the $60,548.98 over-paid to the Judges).  I have demanded, on numerous occasions, that the Judges provide an accounting of all funds spent on this project, a list of all subcontractors and suppliers and an accounting of funds in the construction trust account.  Christopher Judge admitted, in October 2022, that he never established a separate construction trust account for this project and that he commingled my money with his own monies.  He further stated that he does not have any of my money left.  Christopher Judge finally provided an accounting of all of the amounts that he has spent, to date, on the construction of my home, which only totaled $20,400.00.  Christopher Judge has not provided any explanation as to what happened to the $198,518.98 that was paid to the Judges, other than to say that he has none of my money left, and that I can finish building the house with the remaining amount due, under the contract.

"If the work in place had been performed in a good and workmanlike manner, in accordance with the contract and plans, and according to industry standards and applicable building codes, the overpayment of **$60,548.98** would be the extent of my damages. But, due to the Judge's poor workmanship, inferior and dangerous construction, I was compelled to expend additional sums of money to correct all of the construction defects.

"I have since learned that the $6,000.00 that Christopher Judge claimed to have paid to the HVAC contractor (Trejo Air Conditioning), was never paid.  Although Christopher Judge provided me with a copy of a canceled check, Trejo Air has informed me that that payment was for other jobs, and that Christopher Judge had not paid for my air conditioning installation, and that Trejo Air would not complete the installation, or repair the defective installation and code violations that were discovered by the inspector, unless I paid him an additional $6,000.00 that was due for the installation of the HVAC rough-in that was partially performed at my home.  I have since learned that the HVAC installed by Trejo Air was under-sized and incompatible with size of my home, and I have had to pay another air conditioning contractor (Galan and Sons Air Conditioning) the sum of $10,000.00 to install the proper size HVAC system.

"I repeatedly requested that Christopher Judge provide an accounting for the $198,518.98 that was paid to him.  Christopher Judge merely sent a text, containing the following information:

| Zain Galvan | Electrical rough in | $11,900.00 |
| Eduardo Gaytan | Plumbing top-out | $1,000.00 |
| Tomas Flores | Fireplace rough-in | $1,500.00 |
| Trejo Air | HVAC rough in | $6,000.00 |

MSJ Appendix 000144

"Christopher Judge and Raquelle Ann Judge have failed to provide an accounting for the remaining $178,118.98 which I paid to them.

"After the third-party inspection, it was revealed that there were numerous defects and code violations relating to the foundation, the framing, the plumbing, the electrical and the roof (none of the work in place has passed inspection). Christopher Judge stated that all of the items would be addressed and repaired, as required, to meet code. Christopher Judge stated on numerous occasions that he would have a structural engineer look at the framing to assess what needed to be done to correct the defects and comply with building codes. Christopher Judge made numerous false promises and representations that the engineer was on vacation, that he was getting it scheduled, and that he could not find an engineer to inspect the work. Christopher Judge has never followed through with obtaining an engineer's inspection and report. Christopher Judge has promised, on numerous occasions, to hire a new framer and correct the framing defects, after which, he would address the plumbing, electrical, HVAC and roofing defects, yet he has never done so. Christopher Judge has promised that work would resume, on many occasions, but no work has been performed since approximately May 2022. Christopher Judge has done nothing to address the construction defects or resume the work on the house. On November 26, 2022, a written demand was sent to Christopher Judge and Raquelle Ann Judge, demanding the return of the $60,548.30 and demanding that they resume work at the property. The Judges have not refunded any of the money, but Christopher Judge has continued to say that the $10,000.00 deposit was non-refundable, that he has not abandoned the project, and that he is "going to hire a framer". On December 3, 2022, Christopher Judge that his "plan" was to get the framing corrected "within the next two weeks", yet, Christopher Judge has done nothing since August 2022, other than to say that he texted a framer, and that was his "*best option to get things done*".

"My house was supposed to have been completed by June 2022. I have since hired a new builder, Black Bear Construction Group, Inc. to assist in correcting all of the construction defects, and to assist with the completion of the home construction. It is anticipated that the house will be completed in approximately December 2024.

"I have also learned that the Judges allowed the Builder Risk Insurance to lapse (which I have now paid). They failed to obtain the required Johnson County Building Permit, although Christopher Judge stated that he thought he "*took care of it*." He has allowed the portable toilet to be repossessed. He never installed a temporary power pole which is required for construction purposes (which I had installed). He never obtained a trash dumpster (which I obtained). He has never scheduled the water well company to dig a water well, although he promised on many occasions that he had, and that we were "on the schedule" for installation.

"Christopher and Raquelle Ann Judge have allowed the sub-contractors to pile trash and excess concrete on my property without cleaning or removing any of it. Christopher Judge did not obtain a trash dumpster, which I have now obtained. Through August 2022, Christopher Judge repeatedly promised that he would pick up the trash, that he would obtain the building permit, pay the builder risk insurance premium, install a temporary power pole, and schedule the water well installation, but he has never done any of those things.

MSJ Appendix 000145

**Permit.** Christopher Judge was responsible for obtaining the building permit from the city of Cleburne, who issues permits for construction in the Extra Territorial Jurisdiction limits of the city of Cleburne. When I asked him about it, he repeatedly said that he obtained it, that he paid for it, and that he was pretty sure that he got it, and that he would check. In 2023, I was contacted by the city of Cleburne, advising that there was no permit issued for the construction project, for which I was required to apply for and pay **$900.00** to the city of Cleburne.

**Inspection.** I paid **$700.00** to Texas Inspections, which Christopher Judge said he would reimburse, per the contract, but he never has.

**Builder Risk Insurance.** Christopher Judge had taken out a builder risk insurance, however I learned that he had stopped paying the premium, and that the policy was subject to being canceled for non-payment. I paid **$988.00** for one year coverage to keep the insurance coverage in place.

**Trash.** Christopher Judge allowed the framer, electrician, and plumber to throw all of their trash in the front yard. Christopher Judge promised, on many occasions, that he would remove the trash, but he never did. I incurred a cost of **$2,400.00** to remove the trash left by Christopher Judge and Raquelle Ann Judge.

**Electric Pole**. Christopher Judge promised on many occasions that he would have a temporary electric installed, so that workers would be able perform their work, yet he never did. I had the electric pole installed, and I incurred a cost of **$900.00**.

**Trash Dumpster**. Christopher Judge promised, on many occasions, to obtain a trash dumpster, which he never did. I have obtained a trash dumpster, at a cost of $400.00 per month, and I will need the dumpster for a total of 12 months, during the completion of the construction project, at a cost of **$4,800.00**.

**Storage container**. I obtained a storage container, for the duration of the remainder of the construction project, at a cost of $119.00 per month. I will need the storage container for a total of 12 months, during the completion of the construction project, at a cost of **$1,428.00**.

**Electrical Connection**. I obtained the electrical connection for power from United Electric Co-Op, to supply temporary power, as well as to bring the electric power to the house, which Christopher Judge promised to do, yet he never did. I paid United Electric Co-Op **$1,360.14** to provide the electric power to my property.

**Interim Interest**. Due to the delays caused by Christopher Judge and Raquelle Ann Judge, I have incurred 12 months of additional interim interest on the money that I borrowed to construct the house. I have incurred interest charges of **$21,120.00** due to the delays caused by Christopher Judge and Raquelle Ann Judge.

**Engineer's Report**. I have incurred the cost of **$1,150.00** for the engineer's report to provide details on the construction defects and what is required to correct each of the defects. Christopher Judge promised to pay for the Engineer's report but he never did.

MSJ Appendix 000146

**HVAC**.                  Christopher Judge represented, on multiple occasions, that he had paid $6,00.00 to Trejo Air Conditioning for the installation of the inside air handler and furnace unit, as well as the installation of air conditioning ducts (the AC rough-in).  Christopher Judge had not paid for this labor and materials.  Trejo Air Conditioning refused to complete the installation, perform any more work, or warranty the HVAC work, and I was compelled to hire Galan and Sons Air Conditioning to install a new 5 ton HVAC unit, at a cost of $10,000.00.  I am, therefore, requesting judgment for the return of the $6,000.00 paid to Christopher Judge, and for the additional sum of **$10,000.00** that was paid to Galvan and Sons Air Conditioning.

**Plumbing**.                  Christopher Judge told me that he had hired an unlicensed, unqualified person to install the plumbing lines.  The PEX plumbing lines are incorrectly installed, installed in the wrong locations, and have red PEX lines (hot water) connected to white PEX lines (cold water).  .  I was required to hire a licensed plumber, through Black Bear Construction Group, Inc.), to to remove and reinstall the PEX lines that had been partially and improperly installed. Water and drain lines were installed in incorrect locations, and the concrete foundation had to be broken, and replaced, to move the lines.  Additionally, Christopher Judge had installed aa used bathtub in my house, which has now been removed and replaced.  Additionally, Christopher Judge had installed some of the hardware for the shower plumbing, but has lost, or not provided the remaining pieces and all of it will need to be replaced, as well.  Christopher Judge stated on many occasions that he was going to find a licensed plumber to correct all of the defects, but he never did.  As a result, I have had to pay a plumber to correct all of the defective work, and to complete the plumbing installation.  I am requesting the return of the **$1,000.00** that Christopher Judge has represented that he paid for the Plumbing installation.

**Electrical**.                  Christopher Judge has represented that he paid $11,910.00 to Zain Galvan to install the electric wiring.  There is no record that Zain Galvan is a licensed electrician, and Christopher Judge has admitted that Zain Galvan is not licensed.  Zain Galvan stated that "JBL Services" is the company that he works under, and they have the electric license.  Then, he changed his statement, to say that he is a journeyman electrician, and that the master electrician, that he works under, is Jose Rosa of Standard Electric.  Upon searching the Texas Department of Licensing and Regulation, Zain Galvan is not listed as being a Journeyman Electrician, and there is no electrician license issued to Jose Rosa and he has never worked for JBL Services.  The wiring installed by Zain Galvan is improper and defective and does not meet code, as shown on the inspection report.  Further, some of the circuits are missing, some are wired incorrectly, switch locations are missing, wires are run to the wrong location.  There are no electric wires installed for the smoke detectors, nail plates are missing in several locations, the doorbell circuit is missing, low voltage wires are installed in the wrong location.  The low voltage wires (ethernet cables for intenet) have to be re-installed, because they are running next to the high voltage wires, which is a code violation, and causes electrical interfence.  The high voltage wires are also running alongside the water lines, which is improper.  Furthermore, almost all of the wiring had to be re-installed, for the reason that Christopher Judge allowed the installer to use aluminum wiring in most of the house, and copper wires in other parts of the house.  Aluminum wiring is a code violation, and not acceptable or appropriate for new home construction.  Aluminum wiring was banned after the 1970's for new construction, and should only be used to remodel old-work, pre-existing aluminum wiring, or for non-high voltage application.  I am requesting the return of the

**$11,910.00** paid for the defective, improper and unsafe electrical work.  I have since hired a licensed electrical company to wire my home.  Additionally, the electrical and water lines to the kitchen island were installed in the wrong location, and the concrete foundation had to be broken, and replaced, to move the water lines and to replace the electric wiring, as the Christopher Judge did not use underground wiring to the kitchen island.

   **Survey**.     Christopher Judge was supposed to have obtained a topographical survey, prior to the construction of the house, to determine the proper elevation for the house foundation.  He did not perform one, and merely installed the foundation on the existing ground without any determination or study being conducted as to the elevation of the property. I will have to obtain a topographical survey, to determine what grading will need to be done to protect the house from potential flooding from drainage on the property.  The cost of the survey is **$4,250.00**, for which I am requesting reimbursement.

   **Framing Issues**.   Finally, I have hired Black Bear Construction Group, Inc. to correct all of the framing defects that have been discovered by the inspector and the engineer.  Walls were in incorrect locations, the wall studs were not sixteen inches on center, which is an industry standard.  The door openings were all of different sizes, and were not as specified on the house drawing prepared by Christopher Judge. Likewise, the window openings were of all different sizes from what was specified on the house drawing.  All of the door openings and the window openings had to be changed and replaced.  The front porch roof and the rear porch roof were an improper slope (too low) which did not meet code requirements, and there was an improper roof valley, which resulted in the roof to leak.  The front and rear roofs, over the porches had to be removed and replaced.  The framer did not install proper posts to hold up the front porch, and merely used 4x4 posts, which were improperly installed.  They were too short, and did not properly support the front porch.  The framer had toe-bearing rafters throughout the house which was a code violation, and was unsafe, as the roof could collapse due to the improper, and insufficient support that existed.  Many of the rafters did not have the proper straps to hold them up. The inspector, and the engineer both indicated that the design of the house by Christopher Judge was improper and dangerous.  There were no beams across the peak of the roof in the main living area.  It only had 2x4's and 2x6's which were not sufficient to hold up the roof.  In fact, after one year, the roof had sagged approximately one-inch as a result of the poor construction and design.  Additionally, Christopher Judge built the garage with a cathedral ceiling in the garage, which is not customary in the construction industry.  There was nothing holding up the roof over the garage, except 2x4's and 2x6's leaving the roof of the garage subject to collapse.  There was missing bracing in the roof area, and no fire-blocking had been installed in any of the interior framing.

   Black Bear Construction Group, Inc. has removed and replaced the front and rear roofs, with a proper slope; has installed a beam over the garage and installed rafters in the garage, instead of the cathedral ceiling; removed and replaced all door openings and window openings to the correct specified dimensions; braced the attic area; raised the roof to the proper height;  installed a beam over the main living area; removed and replaced the toe bearing rafters; corrected the framing issues; installed the windows; repaired the damaged construction siding; removed and replaced plumbing drains in incorrect locations; repaired the concrete foundation; and installed missing brick ledges on the exterior of the house.  To date, Black Bear Construction Group, Inc. has substantially completed all of the work that Christopher Judge, Raquelle Ann Judge and Judge

MSJ Appendix 000148

DFW, LLC was required to complete through Draw #5 of the Draw Schedule.  To date, I have paid the sum of **$112,807.32** to Black Bear Construction Group, Inc. to correct and complete the work that should have been performed through Draw #5.  I am requesting a judgment for this amount. I have attached hereto, as **Exhibit H** the invoices from Black Bear Construction Group, Inc., which are incorporated herein.  This amount also includes the additional sum of $500.00 which Black Bear Construction Group, Inc. paid for water for the construction site, which has not been billed yet, which I still owe.  (Note: this amount does not include the $7,703.50 that is included in Invoice #1023 for the installation of bricks, which would have been due after Draw #5.)

"I have requested Chritopher Judge and Raquelle Ann Judge to produce their bank records, statements and cancelled checks.  To date, they have provided half of the bank statements requested. I have found that they have withdrawn over $500,000.00 from their bank accounts, yet they have failed to provide the documents that reflect these expenditures and withdrawals.

"On February  18, 2023 Christopher Judge purchased a 2014 Jeep, VIN Jeep automobile, VIN 1C4BJWDG7EL200606, using some or all of the Plaintiff's money.  I have requested that Christopher Judge and Raquelle Ann Judge produce documents that reflect the source of the funds used to purchase the Jeep automobile, yet they have failed to provide any such information.

"Additionally, Defendants purchased and remodeled the real property described and located at Lot 22, Block 15, CARROL PARK ADDITION, THIRD FILING, an addition to the City of Denton, Denton County, Texas, according to the map or plat thereof recorded in Volume 350, Page 318, Map Records, Denton County, Texas, also known as 908 Crescent St., Denton TX 76201.

"I have requested, through discovery, that the Defendants produce an accounting of Plaintiff's monies and payments, as well as documentation showing the funds used to purchase the 2014 Jeep, and to remodel/improve the Crescent Street property in Denton, Texas.  To date, the Defendants have failed to produce any such documents.  I am requesting the Court to impose a constructive trust as to each of those assets, inasmuch that my money was used to purchase the Jeep and remodel the house.

### RECAP OF DAMAGES

"The following is a recap of the actual damages which I have incurred as a result of the overpayments to Christopher Judge and Raquelle Ann Judge:

| Draw | Due | Requested | Paid | Overpay | |
|------|-----|-----------|------|---------|--|
| deposit | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | |
| 1 | $17,246.25 | $17,246.25 | $17,246.25 | $17,246.25 | |
| 2 | $34,492.50 | $38,060.61 | $38,060.61 | $3,568.11 | |
| 3 | $34,492.50 | $38,060.61 | $38,060.61 | $3,568.11 | |
| 4 | $34,492.50 | $38,060.61 | $38,060.61 | $3,568.11 | |
| 5 | $17,246.25 | $19,030.30 | $19,030.30 | $1,784.05 | 1st half |

MSJ Appendix 000149

| | | | | | |
|---|---|---|---|---|---|
| 5 | $17,246.25 | $19,030.30 | $19,030.30 | $1,784.05 | 2nd half |
| 5 | $0.00 | | $19,030.30 | $19,030.30 | overpay |
| **TOTAL** | **$165,216.25** | **$179,488.68** | **$198,518.98** | **$60,548.98** | |

"I have overpaid Christopher Judge and Raquelle Ann Judge the sum of **$60,548.98** under the terms of the construction contract, through Draw Number 5.  I am requesting Judgment in the amount of **$60,548.98** for the amounts that I have overpaid, and for the amounts that Christopher Judge and Raquelle Ann Judge have wrongfully requested, collected and retained by them and spent by them.

"Christopher Judge and Raquelle Ann Judge have failed to complete the construction project in a good and workmanlike manner, their work would not pass in the construction industry, their work is defective and it does not meet minimum code requirements.  I am additionally requesting judgment in the amount of **$172,133.60** to complete the construction contract through Draw #5 as shown below:

| | | |
|---|---|---|
| Overpayments to Christopher & Raquelle Ann Judge | | **60,548.98** |
| | | |
| Builder Risk Insurance | $983.00 | |
| Inspection Report | $700.00 | |
| Engineering Report | $1,150.00 | |
| Labor to pick up trash left in yard | $1,200.00 | |
| Labor to remove temporary trash bin | $1,200.00 | |
| Permit Fee | $900.00 | |
| Dumpster | $4,800.00 | |
| Conex Storage | $1,428.00 | |
| Pacific Columns material | $1,990.77 | |
| Watkins Electric - install power pole | $900.00 | |
| Sodd Electric repair electrical | $14,707.45 | |
| Galan & Sons HVAC | $11,621.32 | |
| United Coop temp power connection | $1,436.14 | |
| 12 months additional interest on construction loan | $21,120.00 | |
| **Sub-Total Costs to Correct** | | **$64,136.68** |
| | | |
| Black Bear Construction to repair thru Draw 5 | $110,439.32 | |
| Black Bear Construction to repair master shower floor | $2,368.00 | |
| | | |
| **Sub-Total Payments to Black Bear to Correct** | | **$112,807.32** |
| | | |
| **TOTAL DAMAGES** | | **$237,493.00** |

MSJ Appendix 000150

|  |  |  |
|---|---|---|
|  |  |  |

"The total amount that I have paid to Black Bear Construction Group, Inc. to correct the construction defects and to complete the work contemplated through Draw Number 5, is **$112,807.32**.  The total amount that I paid for items that the Defendants failed to pay is **$64,136.68**.  The amount that I overpaid to the Defendants, as set forth above, is **$60,548.88.  The total amount of my out of pocket expenses and damages is $237,493.00**

**"Therefore, I am requesting a judgment for the total amount of my out-of-pocket expenses and damages in the amount of $237,493.00.**

"All of the costs that I have incurred were reasonable and necessary, usual and customary charges for the services and materials that I have been required to pay, as a result of the acts and omissions of Christopher Judge and Raquelle Ann Judge, and were necessary to correct the construction defects and to complete the house construction through Draw #5 in a good and workmanlike manner.

"Christopher Judge and Raquelle Ann Judge have: taken my money; failed to deposit my money into a separate construction account; commingled my money with their personal funds and other money; misapplied my money by misdirecting it to pay other debts, or to pay themselves, without paying for the labor and materials for my house; collected excess amounts and have not retained those amounts in a separate construction trust account; failed to account for my money; breached their fiduciary duty owed to me in the construction of my home; falsely represented that they purchased windows and doors; falsely represented that the windows had been ordered and that they would be installed; took $17,246.25 from me, under the false pretense that they used it to purchase windows and doors; represented, on multiple occasions, that they had purchased the doors and windows; falsely represented that they paid the HVAC contractor $6,000.00; provided me with a copy of a check to falsely represent to me that they had made payment to the HVAC contractor;  induced me into believing that they were paying the expenses for labor and materials—when in fact they had not; represented that they used qualified, knowledgeable and competent licensed plumbers and electricians, when they had not; would build my home in accordance with customary building practices, in accordance with building codes and in a good and workmanlike manner, when they did not; Christopher Judge was a licensed architect, which he was not; that my home would be designed by a licensed architect and that a proper set of building plans would be prepared, which did not occur; Christopher Judge and Raquelle Ann Judge were experienced custom home builders, when they were not; and would correct the numerous construction defects, when they obviously had no intention of doing so.  They have failed to provide the names of all contractors and vendors, they have failed to account for all of the funds paid to them, they failed to hold my money in a trust account and they have failed to return the amounts overpaid to them after repeated verbal and written demand for them to do so.

"On or about February 18, 2023, Christopher Judge used my money, and paid cash to purchase a 2014 Jeep automobile, VIN 1C4BJWDG7EL200606 (which was not listed as an exempt asset in the Judges' bankruptcy).  I am requesting the Court to order and declare that I am the lawful owner of the 2014 Jeep automobile, VIN 1C4BJWDG7EL200606 free and clear of any

MSJ Appendix 000151

and all claims of Christopher Judge and Raquelle Ann Judge as a result of a constructive trust imposed on that vehicle.

"Following my payment of the $10,000.00 deposit and the $17,246.25 intended for doors and windows, Raquelle Ann Judge purchased real property located at 908 Crescent Street, Denton, Denton County, Texas, 76201, legally described as  Lot 22, Block 15, CARROL PARK ADDITION, THIRD FILING, an addition to the City of Denton, Denton County, Texas, according to the map or plat thereof recorded in Volume 350, Page 318, Map Records, Denton County, Texas (the "Crescent Street property"), on February 7, 2022.  Thereafter Christopher Judge and Raquelle Ann Judge have remodeled the house, and made significant improvements to the house. Christopher Judge and Raquelle Ann Judge used my money to purchase that house and to pay for the improvements made to that house.  I am requesting the court to impose a constructive trust on the Crescent Street property for my benefit, and to appoint a receiver to take possession of the property and to sell the Crescent Street property and to pay the net proceeds in satisfaction of the judgment herein.  I am requesting the Court to appoint Kent Davis, Attorney at Law, 9288 Huntington Square, North Richland Hills, Texas 76182, Tel. 817-479-2200 as receiver, and I am requesting the Court to waive the requirement of a bond.

"I am requesting a judgment in the total amount of **$237,493.00** for the actual damages that I have sustained from the conduct and actual fraud of Christopher Judge, Raquelle Ann Judge and Judge DFW, LLC, jointly and severally.

"Alternatively, I am requesting the Court to grant a judgment for all of the money that I paid to Judge DFW, LLC, Christopher Judge and Raquelle Ann Judge, in the amount of **$198,518.98.**

"I am requesting the sum of **$200,000.00** as and for punitive damages against Christopher Judge and Raquelle Ann Judge and Judge DFW, LLC.

"I am requesting the court to award a judgment for reasonable and necessary attorney's fees incurred in connection with the breach of contract claims.

FURTHER AFFIANT SAYETH NAUGHT.

MSJ Appendix 000152



Kristin E. Newman, Affiant

SUBSCRIBED AND SWORN TO BEFORE ME by Kristin E. Newman on December 9th, 2024, to certify which witness my hand and official seal.

Notary Public, State of Texas

ROBIN NEWMAN
My Notary ID # 128001678
Expires October 15, 2026

-19-